06 CV 4880

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

VISHRANTHAMMA SWARNA,

         Index No.

    Plaintiff,

      - against -

         **COMPLAINT**

BADAR AL-AWADI , HALAL MUHAMMAD
AL-SHAITAN, and STATE OF KUWAIT

         JURY TRIAL
    Defendants.        DEMANDED

----------------------------------------------------------------x

    Vishranthamma Swarna, by and for her Complaint in the above-captioned matter, alleges as follows:

## PRELIMINARY STATEMENT

    1. Plaintiff Vishranthamma Swarna (hereinafter "Ms. Swarna" or "Plaintiff") brings this action to obtain damages for having been subjected to slavery and slavery-like practices in violation of United States and international law. These slavery-like practices include trafficking, involuntary servitude, forced labor, enslavement, and torture. Ms. Swarna also seeks unpaid wages under New York Labor Law and seeks damages and compensation under New York State common law for breach of contract, unjust enrichment, fraud, and fraudulent inducement.

    2. Ms. Swarna institutes this action against her former employers, Badar Al-Awadi (hereinafter "Al-Awadi"), a Kuwaiti diplomat previously stationed in the United States, and his wife Halal Muhammad Al-Shaitan (hereinafter, "Al-Shaitan", collectively the "Individual Defendants"). Ms. Swarna seeks damages from the Individual Defendants for trafficking Ms. Swarna into the United States under false pretenses and for subjecting her to slavery-like

1

conditions through physical, sexual, and psychological abuse. She further seeks her agreed-upon pay for her labor and the statutory minimum payment for such labor.

3. Ms. Swarna also institutes this action against the State of Kuwait, the employer of Defendant Al-Awadi, which is responsible for the acts of its agent, Defendant Al-Awadi, and which is further responsible for aiding and abetting in the acts described herein and as a co-conspirator in the confinement of Ms. Swarna.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330, 1331, 1332, 1350, 1351, 1367 and 28 U.S.C. § 1602, *et seq.*

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (f)(1), because the events that give rise to this action occurred within this district.

## PARTIES

6. Plaintiff Vishranthamma Swarna is a 42-year-old citizen of India, who resides in the State of New York. At the time of the events that give rise to this Complaint, Ms. Swarna was legally residing in the United States by virtue of a duly issued G-5 Employment Visa.

7. Upon information and belief, Defendant Badar Al-Awadi is a citizen of Kuwait who currently resides in France. At all times relevant hereto, Defendant Al-Awadi was stationed in New York City, first, as the Third Secretary to the Kuwait Mission, then Second Secretary, and finally First Secretary. He resided, along with his wife, Defendant Al-Shaitan, and his first one and then two small children, at 415 East 54th Street, New York City, New York.

8. Upon information and belief, Defendant Halal Muhammad Al-Shaitan is a citizen of Kuwait who currently resides in France. At all times relevant hereto, Defendant Al-Shaitan lived in New York City and resided, along with her husband, Defendant Al-Awadi, and her first one and then two small children, at 415 East 54th Street, New York City, New York.

2

9.   Defendant State of Kuwait (hereafter, "Kuwait") is a foreign state as that term is defined in 28 U.S.C. § 1602, *et seq.* (the Foreign Sovereign Immunities Act of 1976). Kuwait maintains a diplomatic presence in the United States, through its Embassy ("Kuwait Embassy"), located in Washington, D.C., and its Permanent Mission to the United Nations, located at 321 East 44th Street, New York, NY 10017. The Permanent Mission of the State of Kuwait to the United Nations (hereafter "Kuwait Mission") is a political subdivision of Kuwait or an agency or instrumentality of Kuwait, as those terms are used in 28 U.S.C. § 1603.

## STATEMENT OF FACTS

10. Plaintiff Vishranthamma Swarna was born in Bhadravati, India where she was educated through the seventh grade. Ms. Swarna later married Devarah Swarna, with whom she had five children.

11. Ms. Swarna's husband fell ill with heart problems and Ms. Swarna became the sole source of income for herself, her husband and their five children. As a result, poverty compelled Ms. Swarna to leave her native country of India to pursue employment. In 1995, Ms. Swarna traveled to Kuwait to work as a domestic worker for Defendant Al-Shaitan's parents (hereafter, the "Al-Shaitans").

12. At that time, Defendant Al-Shaitan's father was a retired high-ranking police officer in Kuwait.

13. Ms. Swarna was one of five domestic workers in the Al-Shaitans' employ.

14. Several months into her work at the Al-Shaitans' home, Defendants Al-Awadi, then Third Secretary to the Permanent Mission of the State of Kuwait to the United Nations, and Al-Shaitan, visited Defendant Al-Shaitan's parents in Kuwait.

15. While visiting the Al-Shaitans in Kuwait, Defendants Al-Awadi and Al-Shaitan met Ms. Swarna. After observing Ms. Swarna's work in the Al-Shaitan household, including Ms.

3

Swarna's interaction with their two-year-old child, the Individual Defendants offered Ms Swarna a position as a live-in domestic worker in their New York home.

## Promised Terms of Employment Agreement

16. Ms. Swarna did not at first accept the offered position, as she was satisfied with her employment with the Al-Shaitans.

17. Among the promises made by Defendants Al-Awadi and Al-Shaitan to entice Ms. Swarna to accept their offer, Defendants promised to pay Ms. Swarna wages of $2000 per month, to provide her with an annual paid vacation to India to visit her family, and to give her Sundays off each week so that Ms. Swarna could attend church. She was further assured both by the Al-Shaitans and by the Individual Defendants that she would be treated well in the United States.

18. In reliance upon these representations, Ms. Swarna agreed to these terms and accepted Defendants' offer of employment.

19. At the time that the Individual Defendants made these representations to Ms. Swarna, they did not intend to carry out their promises.

20. Defendants Al-Awadi and Al-Shaitan instructed Ms. Swarna that she would need to accompany them to the United States Embassy in Kuwait to complete the appropriate immigration paperwork. They instructed Ms. Swarna to communicate the agreed terms of her employment to the Embassy officials.

21. At the United States Embassy, Defendant Al-Awadi sought a G-5 work visa for Ms. Swarna. Such a visa is reserved for the household employees of diplomats and of employees of international organizations.

22. For the purpose of inducing the government of the United States to issue a G-5 work visa to allow Ms. Swarna to work for Defendants in New York, Defendants Al-Awadi and Al-Shaitan

4

represented to the American Embassy that they would compensate Ms. Swarna at the rate of $2,000 per month for her services in the United States and provide her with lawful conditions of employment. The United States Embassy issued a G-5 visa authorizing Ms. Swarna to work as a live-in domestic worker for Defendants Al-Awadi and Al-Shaitan.

## Plaintiff's Actual Conditions of Employment

23. On or about September 8, 1996, Ms. Swarna arrived in New York where she remained in Defendant Al-Awadi and Al-Shaitan's employ until June 25, 2000, when Ms. Swarna fled their home.

24. During her employment, Defendants Al-Awadi and Al-Shaitan held Ms. Swarna in slavery-like conditions. They forced her to work for little pay in violation of U.S. law and compelled her work through physical and sexual abuse, threats of serious harm to her person, and a pattern of mental, physical and legal coercion.

25. At the time and during the period of her employment with Defendants Al-Awadi and Al-Shaitan, Ms. Swarna spoke and understood very little English.

26. During the entire time Ms. Swarna was employed by Defendants Al-Awadi and Al-Shaitan, she lived in their apartment at 415 East 54th Street, New York.

27. Upon Ms. Swarna's arrival, Defendants Al-Awadi and Al-Shaitan unlawfully confiscated Ms. Swarna's identity and travel documents, including her passport.

28. Defendants Al-Awadi and Al-Shaitan immediately breached their agreement regarding compensation by paying her only $200 per month for the first year she was in their employ instead of the agreed upon amount of $2,000 per month.

29. When Ms. Swarna asked why they were not paying her the $2000 per month they had promised her, Defendants Al-Awadi and Al-Shaitan replied that they had only promised that amount so as to entice Ms. Swarna to come to the United States and so that the United States

5

would issue her a visa. They told Ms. Swarna that she should be satisfied being paid a fraction of what they had promised because it was still more than she would have made in India.

30. In 1997, one year after Ms. Swarna arrived in the United States, Defendants Al-Awadi and Al-Shaitan had a second child, at which point they increased Ms. Swarna's salary from $200 per month to $250 per month.

31. Two years later, Defendants Al-Awadi and Al-Shaitan increased Ms. Swarna's salary to $300 per month.

32. Ms. Swarna was not paid directly by the Individual Defendants during the four years that they employed her. Instead, the Individual Defendants sent Ms. Swarna's monthly earnings, minus a $15 bank check fee, to Ms. Swarna's husband and children in India.

33. Ms. Swarna had no funds of her own during her time in the United States. Rather, she was dependant upon the Individual Defendants for her personal needs, including food, clothing, shelter, and medical care.

34. Upon information and belief, some of Ms. Swarna's expenses were paid by Defendant Kuwait, through the Kuwait Mission. For example, on at least one occasion, Defendant Kuwait, through the Kuwait Mission, reimbursed Defendant Al-Awadi for the cost of dental work for Ms. Swarna.

35. In addition to failing to pay Ms. Swarna the promised compensation, the Individual Defendants breached other agreed upon terms of her employment. Despite their promise, Defendants Al-Awadi and Al-Shaitan refused Ms. Swarna her annual visits to India. It was not until Ms. Swarna's husband was gravely ill, two-and-a-half years after she arrived in the U.S, that Ms. Swarna was permitted a visit her home.

6

36. Despite their promise that Ms. Swarna would have Sundays free, Defendants Al-Awadi and Al-Shaitan did not allow Ms. Swarna to take the day off. They further prohibited Ms. Swarna from going to church on Sundays, which had previously been a regular practice of hers. In this manner, Defendants Al-Awadi and Al-Shaitan prevented Ms. Swarna from practicing Christianity, a fundamental element of her identity.

37. Ms. Swarna was forced to hide her copy of the Bible and could only read it surreptitiously. When Defendants Al-Awadi and Al-Shaitan on occasion caught Ms. Swarna reading the Bible at night, they would become angry with her, yell at her, and tell her to go to bed. Defendant Al-Shaitan instructed Ms. Swarna to throw her Bible into the trash.

38. The Individual Defendants subjected Ms. Swarna to harsh working conditions, contrary to their promises in inducing Ms. Swarna to come to the United States.

39. Defendants Al-Awadi and Al-Shaitan required Ms. Swarna to work sixteen to seventeen hours per day, seven days per week. In addition to serving as primary caretaker of Defendants' children, Ms. Swarna also served as a domestic worker, cleaning and maintaining the home, serving meals throughout the day to all family members and guests, and performing other household tasks.

40. Ms. Swarna was required to wake up daily at 6:00 or 6:30 a.m. to begin work. Her work day ended between midnight and 2:00 a.m.

41. In the mornings, Ms. Swarna bathed and fed Defendants Al-Awadi and Al-Shaitan's children and prepared breakfast for Defendants Al-Awadi and Al-Shaitan.

42. After Defendant Al-Awadi would go to work, Defendant Al-Shaitan would regularly leave the home and leave the children in Ms. Swarna's care during the day.

7

43. In the afternoons, Ms. Swarna fed the children and began preparing dinner for the entire family. She would also clean and vacuum the Defendants' apartment, including the living room, dining room, kitchen, three bathrooms and three bedrooms.

44. Ms. Swarna was also required to wash and iron the entire family's laundry.

45. Ms. Swarna spent the evenings preparing and serving the Individual Defendants' meals and cleaning up after the family.

46. Ms. Swarna was also required to attend to the children in the evening and overnight, including changing their diapers and, when they were older, changing and washing the sheets when one of them had wet his or her bed.

47. Whenever Defendants Al-Awadi and Al-Shaitan had guests over, they required Ms. Swarna to cook for everyone. Defendants Al-Awadi and Al-Shaitan would entertain at least once a week. During the month of Ramadan, they would have guests over each night.

48. Ms. Swarna's daily tasks did not end until midnight, and often not until 2 a.m.

49. In addition to requiring Ms. Swarna to work extremely long hours, Defendants Al-Awadi and Al-Shaitan deprived Ms. Swarna of her privacy by making her sleep in the same room as their children. For the first year Ms. Swarna was in Defendants Al-Awadi and Al-Shaitan's employ, Ms. Swarna was given only a mattress on the floor to sleep on.

50. Ms. Swarna's work in the Individual Defendants' home included work for Defendant Kuwait as well. Ms. Swarna cooked for official and semi-official functions, both in the Individual Defendants' home, and for events held outside of their home.

51. Ms. Swarna's work in the Individual Defendants' home was a necessary and expected part of Defendant Al-Awadi performing his official duties as a high-ranking diplomat. As a

8

high-ranking diplomat, Defendant Al-Awadi hosted many social functions in his home,
especially for families of other Persian Gulf nation diplomats.

52. Ms. Swarna also taught the domestic servants of other Kuwait Mission employees how to
cook traditional Kuwaiti dishes.

53. On at least one occasion, Defendant Kuwait sent a driver employed by the Kuwait
Mission to pick up food that Ms. Swarna cooked for an official event held at the Kuwait Mission.

### Enforced Isolation

54. Defendants isolated Ms. Swarna from the outside world for the purpose of keeping her in
a situation of forced labor and enslavement.

55. Ms. Swarna was prohibited by Defendants Al-Awadi and Al-Shaitan from leaving the
apartment alone. With few exceptions--for example when she was dragged out of the apartment
and locked out by Defendant Al-Shaitan as a punishment, and when she deposited the trash in
the apartment complex garbage chute--Ms. Swarna did not leave the apartment alone.

56. When Defendants Al-Awadi and Al-Shaitan left Ms. Swarna in their apartment alone,
they locked her in the apartment from the outside.

57. Defendants Al-Awadi and Al-Shaitan warned Ms. Swarna that the police would arrest her
if she ever went outside of the apartment alone.

58. For the first four months that Ms. Swarna was in the employ of Defendants Al-Awadi and
Al-Shaitan (September through December 1996), they did not allow Ms. Swarna to leave the
apartment at any time, either alone or accompanied.

59. Thereafter, during the approximately three-and-a-half years Ms. Swarna remained in
Defendants Al-Awadi and Al-Shaitan's employ, she was permitted to leave their apartment
building on approximately ten occasions, when accompanied by Defendants Al-Awadi and/or
Al-Shaitan.

60. In addition to confining her to the home, Defendants Al-Awadi and Al-Shaitan tightly controlled Ms. Swarna's activities, prohibiting her from communicating with others and limiting her contact with her family.

61. Whenever the handyman, electrician, or others visited the apartment during the day, Defendant Al-Shaitan confined Ms. Swarna in her room so as to prevent Ms. Swarna from having contact with others.

62. On the few occasions that Ms. Swarna left the home under the supervision of Defendants Al-Awadi and Al-Shaitan, she was instructed to look down at the ground and to avoid making eye contact with anyone. They also prohibited Ms. Swarna from speaking to anyone, especially fellow Indians. On one occasion, Defendant Al-Shaitan grabbed Ms. Swarna's hand and pulled her away to prevent her from talking to an Indian woman in United Nations Park.

63. Defendants Al-Shaitan and Al-Awadi also enforced Ms. Swarna's isolation by preventing her from learning English by, for example, forbidding her to watch any English language television.

64. Defendants Al-Awadi and Al-Shaitan prevented Ms. Swarna from using the telephone except to answer when they themselves called, which they indicated by letting the phone ring twice, then hanging up and calling back.

65. Defendants Al-Awadi and Al-Shaitan also controlled Ms. Swarna's contact with her family by intercepting calls from her children. They only permitted her to call her children on rare occasions, and when she did, they listened to the call and deducted the cost of calling cards from Ms. Swarna's wages.

66. Defendants Al-Awadi and Al-Shaitan read all letters sent from her family prior to giving them to Ms. Swarna.

67. They read all letters she wrote to her family prior to sending them.  Upon information and belief, the Individual Defendants failed to deliver to Ms. Swarna many letters sent by her family and failed to mail most of the letters written by Ms. Swarna to her family.

68. Upon information and belief, another official in the Kuwaiti Mission arranged for Ms. Swarna's correspondence with her family to be translated from Telegu, Ms. Swarna's first language, so that the correspondence could be monitored.

69. On two occasions during the four year employment of Ms. Swarna, Defendants Al-Awadi and Al- Shaitan permitted Ms. Swarna to return to India to visit her ailing husband and her children.  However, Defendants Al-Awadi and Al-Shaitan threatened the safety of Ms. Swarna, her husband, and her children if she failed to return to Individual Defendants' home in New York.  The Individual Defendants told Ms. Swarna that if she did not come back after a month, they would come and get her in India.  Defendant Al-Awadi specifically told Ms. Swarna, "No matter where you go in India, we will hunt you."

70. Based on previous threats to her and her family's safety, the serious mistreatment she regularly received in Defendants Al-Awadi and Al-Shaitan's home, Defendant Al-Awadi's senior position in the Kuwait government, and Defendant Al-Shaitan's family's senior position in the Kuwait police, Ms. Swarna believed that she and her family would be in danger if she did not return as they demanded.  For this reason, she returned to work for Defendants.

71. When Ms. Swarna returned from her second trip to India, the Individual Defendants did not pay Ms. Swarna for three months of work, claiming that she was being punished for having taken off one month of work.

### Physical and Psychological Abuse

72. Defendants Al-Awadi and Al-Shaitan repeatedly assaulted, abused, demeaned, and humiliated Ms. Swarna, both physically and psychologically.

11

73. Defendants Al-Awadi and Al-Shaitan repeatedly pushed, dragged, and yelled at Ms. Swarna.

74. On at least two occasions, Defendant Al-Shaitan threatened to cut out Ms. Swarna's tongue. On one of these occasions, Defendant Al-Shaitan took a knife, grabbed Ms. Swarna's tongue, and acted as if she was going cut it.

75. On several occasions, Defendant Al-Shaitan grabbed Ms. Swarna by the collar, dragged her, and locked her out of the apartment for half-hour periods. Fearing that if she left the apartment complex she would be harmed as Defendants had represented, Ms. Swarna sat outside the door, crying, waiting to be let back into the apartment.

76. Ms. Swarna made frequent requests to be sent back home to India, but these requests were refused and were accompanied by threats that if Ms. Swarna attempted to leave she and her family would be injured.

77. On one occasion, Ms. Swarna attempted to leave the Individual Defendants' employ and escape their home, Defendant Al-Awadi injured Ms. Swarna by violently throwing a suitcase at her. Both Defendants Al-Awadi and Al-Shaitan proceeded to hit her in the face. Defendant Al-Awadi then threateningly picked up an iron and approached Ms. Swarna as if he were going to throw it at her, causing Ms. Swarna to believe she was in imminent danger of being seriously hurt or killed.

78. Throughout Ms. Swarna's time in their home, Defendants Al-Awadi and Al-Shaitan refused to address Ms. Swarna by her name but rather referred to her by derogatory names, including the Arabic words for "dog" and "donkey."

79. On several occasions, Defendant Al-Awadi threatened Ms. Swarna stating "Tomorrow, I will take you to Kuwait, where my father and brother are police officers, and we will show you what we can do." These threats caused Ms. Swarna to believe that she would be killed.

### Rape/Sexual Enslavement

80. In September 1998, on an occasion when Defendant Al-Shaitan was in Kuwait visiting family members and Defendant Al-Awadi and Ms. Swarna were in the Individual Defendants' apartment alone, Defendant Al-Awadi demanded Ms. Swarna accompany him to his room to have sex with him. When Ms. Swarna refused, Defendant Al-Awadi forced himself upon her and raped her despite her resistance.

81. Defendant Al-Awadi threatened to kill Ms. Swarna if she told anyone, especially his wife.

82. Thereafter, until Ms. Swarna managed to escape on June 25, 2000, Defendant Al-Awadi raped Ms. Swarna on many occasions when his wife was not in the home.

83. At all times after the first rape in September 1998, Ms. Swarna was forced to live under the constant threat of rape, knowing that Defendant Al-Awadi might rape her at any time when his wife was not present.

### Escape from Defendants

84. On or about June 25, 2000, Defendants Al-Awadi and Al-Shaitan were scheduled to take a trip to visit their family in Kuwait with their children. They told Ms. Swarna that she would be traveling to Kuwait with them to take care of the children and to prepare the family for the trip.

85. The day before Ms. Swarna and Defendants Al-Awadi and Al-Shaitan were scheduled to depart, Defendant Al-Shaitan became angry with Ms. Swarna for requesting a break to eat her breakfast and shouted at her. Later that day Ms. Swarna begged the Individual Defendants to send her back to India rather than take her to Kuwait.

86. Defendant Al-Awadi responded by becoming very angry with Ms. Swarna. He began shouting at Ms. Swarna, grabbed a packed suitcase, and threw it at her. The impact caused bleeding in her finger and bruises on her body.

87. Defendant Al-Awadi then picked up an iron rod, and motioned as if to hit Ms. Swarna with it. Afraid for her life, she began screaming and threatened to call for the police. At this point, Defendant Al-Shaitan slapped Ms. Swarna across the face.

88. Shortly thereafter, Defendant Al-Awadi again threatened Ms. Swarna as he had on a number of previous occasions, stating that his brother and father were "high ranking police officials in Kuwait." He stated that if Ms. Swarna did not continue working for them, he would show her what they would do to her and once in Kuwait they would "punish" her.

89. Ms. Swarna believed that if she traveled to Kuwait with Defendants Al-Awadi and Al-Shaitan at that time as planned, she would be physically punished and jailed, if not killed.

90. Based on the conditions she had lived and worked under for the previous four years with Defendants Al-Awadi and Al-Shaitan, Ms. Swarna did not believe that Defendants Al-Awadi and Al-Shaitan would freely let her leave their employment. After that particular attack, Ms. Swarna believed that she would have to find a way to escape from Defendants Al-Awadi and Al-Shaitan and avoid going to Kuwait, or else face more and more serious attacks.

91. The next morning, Defendant Al-Shaitan left the apartment to go to the beauty parlor. Shortly thereafter, Defendant Al-Awadi left the apartment to buy some milk. While both Defendants Al-Awadi and Al-Shaitan were gone, Ms. Swarna, still frightened from the previous day's attack, finished packing the family's suitcases and noticed that Defendants Al-Awadi and Al-Shaitan had left everyone's passports, including her own, on their bed in preparation for the trip. Ms. Swarna took her passport, her Bible, photographs of her children, and the transmittal

14

receipts Defendants Al-Awadi and Al-Shaitan had given her and fled from Defendants Al-Awadi and Al-Shaitan's apartment.

92. After Ms. Swarna left the apartment building she had no place to go and sought aid from a passing taxicab. Through her tears, Ms. Swarna told the taxicab driver of her ordeal and he drove her to a temple where he told her she could find refuge.

93. In May 2002, Ms. Swarna filed a complaint against Defendants Al-Awadi and Al-Shaitan in the Southern District of New York in the action captioned *Vishranthamma v. Al-Awadi*, 02 Civ. 3710 (PKL)(MHD) for various claims based on their unlawful actions against her. On December 2, 2003, Kuwait submitted a letter to the court asserting Defendant Al-Awadi's diplomatic immunity. After a default judgment hearing at which Ms. Swarna testified to her abuse at the hands of the Individual Defendants, the Court dismissed her action without prejudice based on Defendant Al-Awadi and Al-Shaitan's diplomatic immunity. The Court noted that Defendant Al-Awadi might not be immune after leaving the United States.

94. A few months time after Plaintiff's testimony at the default judgment hearing, Defendant Kuwait transferred Defendant Al-Awadi to a post in Paris so as to assist him in evading the legal consequences of his actions in the United States. Defendant Al-Awadi is currently the First Secretary in the Kuwait Embassy to France.

95. Despite press reports of Ms. Swarna's ordeal, public demonstrations in front of the Kuwait Mission, and Ms. Swarna's testimony during the default judgment hearing, upon information and belief, Defendant Kuwait took no action to investigate Ms. Swarna's claims or to sanction Defendant Al-Awadi for his actions. To the contrary, Defendant Kuwait assisted Defendant Al-Awadi in evading responsibility for his actions by protecting him during the Court

proceedings, by transferring him out of the United States, and by maintaining his position as a senior diplomat for Kuwait, among other acts.

### Additional Facts

96. G-5 and A-3 visas are nonimmigrant diplomatic visas granted to the attendants and servants of representatives of foreign governments. These visas are granted to enable representatives of foreign governments to perform their duties.

97. Defendant Al-Awadi was granted diplomatic immunity as an agent of the Kuwaiti Government. This immunity to civil and criminal jurisdiction led Defendant Al-Awadi to believe he could act with impunity which greatly facilitated his exploitation and abuse of Ms. Swarna.

98. In a circular memorandum dated May 20, 1996, the United States Department of State notified all foreign states with a diplomatic presence in the United States, including Defendant Kuwait, that "the Department [was] concerned to learn of problems which continue to arise in the working relationships between some members of the diplomatic and consular community and their personal household employees," including "instances where wages have been withheld from personal domestics for undue periods, where the wages actually paid are substantially less than those stipulated at the time of employment, where passports have been withheld from the employee; where the actual number of working hours weekly is substantially more than those originally contemplated and with no additional pay, and where the employee has been forbidden from leaving the employer's premises even though off duty."

99. Based upon these problems, the State Department further informed Defendant Kuwait that it should take affirmative steps to monitor its employees, including "review[ing] each employment contract…[and] keep[ing] a copy on file at the mission and ensure that mission members respect their obligations as employers."

16

100.    In the same May 20, 1996 letter concerning the treatment of domestic workers by diplomats, the State Department informed the Kuwaiti government that it would "*hold the Chief of Mission and the sending government responsible for the conduct of persons sent to the United States as diplomatic representatives or of others entitled to immunity*" (emphasis added).

101.    Upon information and belief, the Kuwait Mission failed to take affirmative steps to monitor its diplomats in the United States, as required by the 1996 U.S. State Department letter.

102.    On June 19, 2000, the Secretary of State sent a second letter to government Missions, including the Kuwait government, stating again the legal obligations of diplomats to their employee domestic workers.

103.    Upon information and belief, the Kuwaiti government expected that its senior diplomats in the United States, including Defendant Al-Awadi, would use the services of domestic servants.

104.    Upon information and belief, there exists a pattern of rape, physical assault, involuntary servitude, and mistreatment of South Asian domestic workers in Kuwait that takes place largely with impunity. Human Rights Watch, *Global Report on Women's Human Rights,* http://www.hrw.org/about/projects/womrep/.

105.    Moreover, though such abuses have been widely reported, the Kuwaiti government has displayed a pattern and practice of complacency by denying abused domestic workers justice under applicable criminal and civil laws, as well as explicitly excluding them from the protection of the host country's labor laws.  Human Rights Watch, *Global Report on Women's Human Rights,* http://www.hrw.org/about/projects/womrep/.

106.    As just one example of such complacency, despite a direct linkage between passport deprivation and the illegal restriction of the freedom of its holder, the Kuwaiti Ministry of

17

Interior's then director of police investigations, Brigadier al-Muhaini, stated in 1992 that he was

"not concerned with the passports, as a matter of fact. If an employer keeps the passport, it is

only so the employee won't lose it, not to keep her in custody. It is just as we treat our children at

home—it's the same thing with the maids." Human Rights Watch, *Global Report on Women's*

*Human Rights*, http://www.hrw.org/about/projects/womrep/.

107.    The Human Rights Watch report "Global Report on Women's Human Rights" states

that the Kuwaiti abuse of South Asian domestic workers commonly includes sexual and physical

assaults, debt bondage, passport deprivation, and confinement, all of which create conditions of

near total isolation that promote further abuse. In addition, the domestic workers' exclusion

from the labor laws paves the way for this isolation and denies them even minimal protection

against unfair practices.

108.    The United States Department of State has labeled the "physical or sexual abuse of

foreign women working as domestic servants" in Kuwait as "a pervasive problem," noting

"employers physically abused foreign women working as domestic servants, and, despite

economic and social difficulties for a domestic servant who lodged a complaint, there were

continuing reports of the rape of such women by male employers." Bureau of Democracy,

Human Rights and Labor, U.S. Department of State, *Kuwait: Country Reports on Human Rights*

*Practices* - 2004, http://www.state.gov/g/drl/rlse/hrrpt/2004/41725.htm.

109.    In addition, the State Department has found that South Asian workers in Kuwait,

especially, "live much like indentured servants. They frequently face poor working conditions

and some physical abuse." The government of Kuwait has furthered such practice through

specifically excluding domestic servants from the private sector Labor Law and treating

domestic servants who run away from their employers as criminals under Kuwaiti law. Bureau

of Democracy, Human Rights and Labor, U.S. Department of State, *Kuwait: Country Reports on Human Rights Practices* - 1999, http://www.state.gov/g/drl/rlse/hrrpt/1999/419.htm.

110.    The Kuwaiti government knew or should have known about Defendants Al-Awadi and Al-Shaitan's specific abuse of Ms. Swarna and not only did not take steps to stop the abuse, but once the abuse became public, instead took steps to protect its agent instead choosing to post him in another diplomatic position in a new country where he was again clothed with diplomatic immunity for actions done in his new post in the new country.

111.    Upon information and belief, Kuwait has continued its policy and practice of failing to monitor its diplomats abroad even after it became aware of the facts giving rise to this Complaint, and the abuse of domestic workers by Kuwaiti diplomats remains widespread. Indeed, Kuwaiti diplomats posted to the United States continue to hold their employees in slavery and slave-like conditions, as evidenced by the recent escape of at least three other domestic workers of Kuwaiti Diplomats, as reported by members of Andolan.

## FIRST CLAIM FOR RELIEF
### Alien Tort Claims Act – for Slavery and Slavery-Like Practices
### (All Defendants)

112.    Ms. Swarna realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

113.    Defendants Al-Awadi and Al-Shaitan, by intentionally exercising powers of ownership over Ms. Swarna through the use of threats of serious harm and psychological, sexual, physical, and legal coercion; by maintaining psychological control over her through verbal and physical abuse and harassment; and through measures taken to prevent and deter her escape, subjected Ms. Swarna to conditions of slavery and slavery-like practices including forced labor, involuntary servitude, and sexual slavery in violation of the law of nations.

114.    By inducing Ms. Swarna to accept employment with them in the United States through fraud and deception for the purposes of subjecting her to a condition of involuntary servitude, forced labor and enslavement, Defendants engaged in trafficking of Ms. Swarna in violation of the law of nations.

115.    Numerous international instruments, customary international norms, domestic laws and precedents, and international case law establish modern manifestations of slavery such as trafficking, involuntary servitude, enslavement, forced labor, and sexual slavery as violations of the law of nations. Such authorities include the

116.    Universal Declaration of Human Rights, art. 4, G.A. Res. 217(A), U.N. GAOR, 3d Sess., U.N. Doc. A/810 (1948); the International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 8, 999 U.N.T.S. 171, 61 I.L..M 368 (1967); Convention to Suppress the Slave Trade and Slavery, Sept. 25, 1926, 46 Stat. 2183, 60 U.N.T.S. 253; the Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery, Sept. 7, 1956, 18 U.S.T. 3201, 226 U.N.T.S. 3; the Convention Concerning Forced or Compulsory Labour (ILO No. 29), June 28, 1930, 39 U.N.T.S. 55; the Convention Concerning the Abolition of Forced Labour (ILO No. 105), June 25, 1957, 320 U.N.T.S. 291; the Convention on the Elimination of All Forms of Discrimination Against Women, Dec. 18, 1979, art. 6, 19 I.L.M. 33, 37, 1249 U.N.T.S. 13; and the Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, G.A. Res. 25, annex II, U.N. GAOR, 55th Sess., Supp. No. 49, at 60, U.N. Doc. A/45/49 (2001).  These prohibitions against modern manifestations of slavery are reflected in United States law in the Trafficking Victims Protection Act, codified at 22 U.S.C. § 7101, *et seq.,* and 18 U.S.C. § 1589, as well as other U.S. authorities.

117.    Defendants Al-Awadi and Al-Shaitan's actions constitute torts in violation of the law of nations, and are actionable pursuant to the Alien Tort Statute, 28 U.S.C. § 1350.

118.    Defendant Kuwait is liable for the acts of its agent, Defendant Al-Awadi.

119.    Defendant Kuwait aided and abetted these violations by providing practical assistance and encouragement to Defendants Al-Awadi and Al-Shaitan by, inter alia, failing to monitor their actions, by utilizing the services of Ms. Swarna, and by assisting in monitoring the communications Ms. Swarna had with her family, which defendant Kuwait knew or should have known would have a substantial effect on the perpetration of the violations described.

120.    In agreeing to and assisting with the surveillance of Ms. Swarna's family, Defendant Kuwait conspired with the Individual Defendants to deprive Ms. Swarna of her freedom and keep her in slavery and slave-like conditions.

121.    As a direct and proximate result of the actions described herein, Ms. Swarna has sustained damages, including physical injury, emotional distress, and economic losses.

## SECOND CLAIM FOR RELIEF
### New York State Minimum Wage and Overtime
### (All Defendants)

122.    Ms. Swarna realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

123.    Defendants Al-Awadi and Al-Shaitan employed Ms. Swarna within the meaning of the New York State Labor Law, N.Y. Labor Law §§ 2(5)-(7).

124.    Defendants Al-Awadi and Al-Shaitan's intentional and willful failure to pay Ms. Swarna the minimum wages required by law violates New York State Labor Law §§ 190, *et seq.* and 650, *et seq.* and the New York State Department of Labor regulations, from commencement of employment as a domestic worker from on or about September 8, 1996, until approximately June 25, 2000.

125.    Defendants Al-Awadi and Al-Shaitan's willful failure to pay Ms. Swarna overtime pay for work in excess of 44 hours per week violates New York State Labor law §§ 190, *et seq.* and 650, *et. seq.* and New York State Department of Labor regulations, 12 N.Y.C.R.R. § 142-2.2.

126.    Defendants Al-Awadi and Al-Shaitan's willful violations of the New York Labor Law and New York Codes, Rules & Regulations entitle Ms. Swarna to recover her unpaid minimum wages, unpaid overtime compensation, an additional 25% as liquidated damages, and attorneys' fees and costs, pursuant to N.Y. Labor Law §663, in addition to declaratory relief.

127.    Defendant Kuwait is responsible for the acts of its agent, Defendant Al-Awadi.

### THIRD CLAIM FOR RELIEF
### New York State Spread of Hours
### (All Defendants)

128.    Ms. Swarna realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

129.    Defendants Al-Awadi and Al-Shaitan's willful failure to pay Ms. Swarna an extra hour's pay for every day that Ms. Swarna worked in excess of 10 hours violates New York State Labor Law §§ 190, *et. seq.* and 650, *et seq.* and New York State Department of Labor regulations, 12 N.Y.C.R.R. §§ 137-1.6, 142-2.4.

130.    Ms. Swarna is entitled to an award of an extra hour's pay for each workday, where the interval between the beginning and end of her workday exceeded 10 hours and liquidated damages pursuant to New York State Labor Law §§ 190, *et. seq.*, 198, 650, *et. seq.*, 663 and the New York State Department of Labor regulations, 12 N.Y.C.R.R. §§ 137-1.6, 142-2.4, plus interest.

131.    Defendant Kuwait is responsible for the acts of its agent, Defendant Al-Awadi.

22

## FOURTH CLAIM FOR RELIEF
### Fraud and Fraudulent Inducement
### (All Defendants)

132.    Ms. Swarna realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

133.    Defendants Al-Awadi and Al-Shaitan intentionally and knowingly misrepresented to Ms. Swarna the conditions of Ms. Swarna's employment in the United States in order to induce her to come to the United States.

134.    Defendants Al-Awadi and Al-Shaitan made the above misrepresentations, including the promises that Ms. Swarna would be paid $2000 per month, that she would be able to visit her family in India, and that she would be well treated by the Individual Defendants in order to entice Ms. Swarna to come to the United States and to force her to work as a domestic servant in their household.

135.    Defendants Al-Awadi and Al Shaitan induced Ms. Swarna to come to New York knowing of and intending that that their misrepresentations would lead Ms. Swarna to rely upon their misrepresentations and come with them to New York.

136.    Ms. Swarna did in fact rely on Defendants Al-Awadi and Al-Shaitan's misrepresentations to her detriment and as a result was forced to work as a domestic worker for the Defendants and endure physical, psychological, and sexual abuse at great economic, physical, and financial detriment.

137.    At the time that Defendants Al-Awadi and Al-Shaitan made the foregoing representations and promises to Ms. Swarna, they had no intention of carrying out such representations and promises.

138.    As a direct and proximate result of these actions, Ms. Swarna has sustained damages.

139.    Defendant Kuwait is responsible for the acts of its agent, Defendant Al-Awadi.

### FIFTH CLAIM FOR RELIEF
### Unjust Enrichment
### (All Defendants)

140.    Ms. Swarna realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

141.    Ms. Swarna rendered services as a live-in domestic servant to Defendants Al-Awadi and Al-Shaitan, and Defendant Kuwait in good faith and with the expectation that she would be fairly compensated for such services.

142.    Defendants Kuwait, Al-Awadi, and Al-Shaitan accepted these services and in turn failed to compensate Ms. Swarna for the fair market value of her services.

143.    Defendants Kuwait, Al-Awadi, and Al-Shaitan have been unjustly enriched at Ms. Swarna's expense.

144.    Defendant Kuwait is responsible for the acts of its agent, Defendant Al-Awadi.

145.    Ms. Swarna requests damages.

### SIXTH CLAIM FOR RELIEF
### Breach of Contract
### (All Defendants )

146.    Ms. Swarna realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

147.    Ms. Swarna and Defendants Al-Awadi and Al-Shaitan entered into a valid, legally enforceable employment contract whereby Ms. Swarna agreed to work as a domestic servant in the home of Defendants Al-Awadi and Al-Shaitan and, in return, Defendant Al-Awadi and Al-Shaitan agreed, *inter alia,* to pay Ms. Swarna $2000 per month for her services, to provide Ms. Swarna with annual paid visits to see her family in India, and to treat Ms. Swarna well during the course of the employment.

148.    Defendants Al-Awadi and Al-Shaitan materially breached this contract by, *inter alia,* by failing to pay the agreed amount, by refusing Ms. Swarna her paid vacation to India, and by holding Ms. Swarna in slavery and slave-like conditions.

149.    As a result of Defendants' actions, Ms. Swarna has suffered damages.

150.    Defendant Kuwait is responsible for the acts of its agent, Defendant Al-Awadi.

**WHEREFORE,** Plaintiff respectfully requests that judgment be granted as follows:

(a)    Money damages in the amount sought for each Claim for Relief;

(b)    Punitive and exemplary damages according to proof;

(c)    Attorneys fees and costs for Plaintiff against Defendant; and

(d)    Such other further relief as the Court may deem just and proper.

Plaintiff demands a trial by jury.

Dated: New York, New York
       June 23, 2006

                              CITY UNIVERSITY SCHOOL OF LAW, INC.
                              MAIN STREET LEGAL SERVICES
                              INTERNATIONAL WOMEN'S HUMAN
                              RIGHTS CLINIC
                              65-21 Main Street
                              Flushing, New York 13367
                              (718) 340-3400


                              By _____
                                   Andrew Fields [AF 7795]

25