**UNITED DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| VISHRANTHAMMA SWARNA, | : |
|  | : |
| Plaintiff, | : **Case No.: 06-CV-4880  (PKC)** |
|  | : |
| -against- | : |
|  | : |
| BADAR AL-AWADI, HALAL | : |
| MUHAMMAD AL-SHAITAN, and STATE | : |
| OF KUWAIT, | : |
|  | : |
| Defendants. | : |
|  | : |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR DEFAULT JUDGMENT

David A. Kotler (DK 4210)
DECHERT, LLP
Suite 500
902 Carnegie Center
Princeton, NJ 08540

Andrew J. Fields (AF 7795)
MAIN STREET LEGAL SERVICES, INC.
International Human Rights Clinic
City University of New York
65-21 Main Street
Flushing, NY 11367

Catherine J. Rosato*
Reid K. Weisbord*
Jennifer L. Rellis*
DECHERT LLP
The Cira Centre
2929 Arch Street
Philadelphia, PA 19104

Attorneys for Plaintiff
* Not admitted in this District

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 2

PROCEDURAL HISTORY...................................................................................... 8

JURISDICTION ................................................................................................ 9

I.    Personal Jurisdiction ................................................................................ 9

    A.    The Individual Defendants.................................................................. 9

    B.    Kuwait .......................................................................................... 11

II.   Subject Matter Jurisdiction ...................................................................... 12

    A.    The Individual Defendants.................................................................. 12

    B.    Kuwait .......................................................................................... 13

ARGUMENT ................................................................................................... 13

I.    The Standard For Default Judgment ........................................................... 14

    A.    Default By The Individual Defendants .................................................. 14

    B.    Default By Kuwait .......................................................................... 15

II.   Defendants' Enslavement Of Ms. Swarna Violates Customary International Law
      Norms Under The Alien Tort Statute........................................................... 17

    A.    The Supreme Court's Decision In *Sosa* Confirmed That The Alien Tort
        Statute Provides A Cause Of Action For Violations Of Customary
        International Law Norms .................................................................. 18

    B.    The Customary International Law Norms Prohibiting Slavery And
        Slavery-Like Practices Are Actionable Torts Under *Sosa*................................. 18

    C.    The Individual Defendants Are Liable To Ms. Swarna For Their
        Violations of Customary International Law Pursuant to the Alien Tort
        Statute ........................................................................................ 28

    D.    Kuwait Aided And Abetted The Individual Defendants And Is Also Liable
        Under The Alien Tort Statute ............................................................ 31

III.  The Court Should Grant Default Judgment On Ms. Swarna's State Law Claims........... 32

    A.    Wage and Hour Claims...................................................................... 33

    B.    Breach Of Contract ........................................................................ 36

    C.    Unjust Enrichment .......................................................................... 40

    D.    Fraudulent Inducement .................................................................... 41

## TABLE OF CONTENTS
(continued)

**Page**

IV. Kuwait Is Vicariously Liable To Ms. Swarna For The Actions Of The Individual
Defendants Under Principles Of Respondeat Superior And Ratification ........................ 43

    A.    Respondeat Superior ........................................................................................ 43

    B.    Ratification .................................................................................................... 48

V. None of the Defendants Is Entitled To Immunity In This Action ................................... 50

    A.    The Individual Defendants .............................................................................. 50

    B.    Kuwait Is Not Immune .................................................................................... 54

CONCLUSION ....................................................................................................................... 59

## TABLE OF AUTHORITIES

### FEDERAL CASES

**Page**

*Almog v. Arab Bank PLC*,
    471 F.Supp.2d 257 (E.D.N.Y. 2007) ........................................................20, 32

*Ayres v. 127 Rest. Corp.*,
    12 F.Supp.2d 305, 309 (S.D.N.Y. 1998).........................................................2

*Banque Arabe Et Internationale D'Investissement v. Md. Nat'l Bank*,
    57 F.3d 146 (2d Cir. 1995).........................................................................41

*Bausch & Lomb Inc. v. Bressler*,
    977 F.2d 720 (2d Cir. 1992) ........................................................................7

*Broadbent v. Org. of Am. States*, ,
    628 F.2d 27, 34 (D.C. Cir. 1980) ................................................................56

*Cabello v. Fernandez-Larios*,
    402 F.3d 1148 (11th Cir. 2005) ..................................................................32

*Chuidian v. Philippine Nat'l Bank*,
    912 F.2d 1095 (9th Cir. 1990) ....................................................................53

*Comm. of U.S. Citizens Living in Nicar. v. Reagan*,
    859 F.2d 929 (D.C. Cir. 1988) ...................................................................21

*Commercial Bank of Kuwait v. Rafidain Bank*,
    15 F.3d 238 (2d Cir. 1984).....................................................................15, 16

*Credit Lyonnais Sec. (USA), Inc. v. Alcantara*,
    183 F.3d 151 (2d Cir. 1999).....................................................................13, 14

*El-Hadad v. Embassy of the U.A.E.*,
    69 F. Supp. 2d 69 (D.D.C. 1999) ................................................................56

*Filartiga v. Pena-Irala*,
    630 F.2d 876 (2d Cir. 1980)........................................................................18

*Flores v. S. Peru Copper Corp.*,
    414 F.3d 253 (2d Cir. 2003)) .....................................................................20

*Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*,
    973 F.2d 155 (2d Cir. 1992)....................................................................13, 14

# TABLE OF AUTHORITIES
(continued)

**Page**

*Hill v. Republic of Iraq*,
    175 F.Supp.2d 36 (D.D.C. 2001) .................................................................16

*Holden v. Can. Consulate*,
    92 F.3d 918 (9th Cir. 1996) ......................................................................55

*Holzapfel v. Town of Newburgh*,
    145 F.3d 516 (2d Cir. 1998)......................................................................34

*Int'l Design Concepts, LLC v. Saks, Inc.*,
    486 F.Supp.2d 229 (S.D. N.Y. 2007)......................................................42

*Iwanowa v. Ford Motor Co.*,
    7 F.Supp.2d 424 (D. N.J. 1999) ..............................................................25

*John Roe I v. Bridgestone Corp.*,
    492 F.Supp.2d 988 (S.D. Indiana 2007) ..................................................24

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
    115 F.3d 1020 (D.C. Cir. 1997) ...............................................................53

*Kadic v. Karadic*,
    70 F.3d 232 (2d Cir. 1995)........................................................................23

*Kato v. Ishihara*,
    360 F. 3d 106 (2d Cir. 2004)....................................................................55

*Khulumani v. Barclay*,
    504 F.3d 254 (2d Cir. 2007).................................................................31, 32

*Kiobel v. Royal Dutch Petroleum Co.*,
    456 F.Supp.2d 457 (S.D. N.Y. 2006)......................................................32

*Knab v. Republic of Georgia*,
    1998 U.S. Dist. LEXIS 8820 (D.D.C. May 29, 1998) ...........................53

*Letelier v. Republic of Chile*,
    488 F. Supp. 665 (D.D.C. 1980) ..............................................................57

*Leutwyler v. Office of Her Majesty Queen Rania Al Abdullah*,
    184 F. Supp. 2d 277 (S.D.N.Y. 2001)......................................................55

## TABLE OF AUTHORITIES
(continued)

**Page**

*Liu v. Republic of China*,
892 F.2d 1419, 1431 (9th Cir. 1989) ............................................................57

*NLRB v. Local 3, Int'l Bhd. of Elec. Workers*,
730 F.2d 870 (2d Cir. 1984)..................................................................49, 50

*In re Noboa*,
Nos. M18-302, M19-111, 1995 U.S. Dist. LEXIS 14402 (S.D.N.Y. Oct. 4, 1995)............5

*Orix Credit Alliance v. Phillips-Mahnen, Inc.*,
No. 89 Civ. 8376 (THK), 1993 WL 183766 (S.D.N.Y. May 26, 1993).....................48, 49

*The Paquete Habana*,
175 U.S. 677 (1900)............................................................................19

*Park v. Shin*,
313 F.3d 1138 (9th Cir. 2002) ...........................................................46, 55, 56

*Prisco v. State of N.Y.*,
804 F.Supp 518 (S.D.N.Y. 1992)..................................................................48

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
162 F.3d 748 (2d Cir. 1998)....................................................................11

*Republic of Arg. v. Weltover, Inc.*,
504 U.S. 607 (1992)............................................................................9

*Shalaby v. Saudi Arabian Airlines*,
97 Civ. 9393  1998 U.S. Dist. LEXIS 17571 (S.D.N.Y. Nov. 9, 1998) ..........................53

*Sharp v. Patterson*,
No. 03-CV-8772, 2004 WL 2480426 (S.D. N.Y. Nov. 3, 2004)..................................36

*Slaughter-House Cases*,
83 U.S. 36 (1873)..............................................................................23

*Smith ex rel. Smith v. Islamic Emirate of Afghanistan*,
262 F.Supp.2d 217 (S.D.N.Y. 2003).........................................................15, 16

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004)........................................................................18, 19

*Tenn. Coal, Iron, & R.R. Co. v. Muscoda Local No. 123*,
321 U.S. 590 (1944)............................................................................34

## TABLE OF AUTHORITIES
(continued)

**Page**

*In re Terrorist Attacks on Sept. 11, 2001,*
    392 F.Supp.2d 539 (S.D.N.Y. 2005)...............................................................................57

*Turner Constr. Co. v. Am. Mfrs. Mut. Ins. Co.,*
    485 F.Supp.2d 480 (S.D.N.Y. 2007)........................................................................39, 40

*Ungar v. Islamic Republic of Iran,*
    211 F.Supp.2d 91 (D.D.C. 2002) ...............................................................................16

*United States v. Guinand,*
    688 F. Supp. 774 (D.D.C. 1988) ...........................................................................51, 52

*United States v. Kozminski,*
    487 U.S. 931 (1988).......................................................................................................22

*U.S. East Telecomms., Inc. v. U.S. West Info. Sys., Inc.,*
    No. 87-CV-2924, 1993 WL 385810 (S.D.N.Y. Sept. 30, 1993)...............................38

*Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.,*
    517 F.3d 104 (2d Cir. 2008)...............................................................................17, 18, 19

*In re World War II Era Japanese Forced Labor Litig.,*
    164 F. Supp. 2d 1160 (N.D. Cal. 2001) .......................................................................24

*Zveiter v. Braz. Nat'l Superintendency of Merch. Marine,*
    833 F. Supp. 1089 (S.D.N.Y. 1993).............................................................................56

### STATE CASES

*Farash v. Sykes Datatronics, Inc.,*
    452 N.E.2d 1245 (NY 1983)..........................................................................................38

*Goldman v. Metro. Life Ins. Co.,*
    841 N.E.2d 742 (N.Y. 2005)..........................................................................................41

*Graubard Mollen Dannett & Horowith v. Moskovitz,*
    653 N.E.2d 1179 (N.Y. 1995)...................................................................................41, 42

*Joan Hansen & Co. v. Everlast World's Boxing Headquarters Corp.,*
    744 N.Y.S.2d 384 (N.Y. App. Div. 2002) ..................................................................40

# TABLE OF AUTHORITIES
(continued)

**Page**

*J.R. Loftus, Inc. v. White*,
    649 N.E.3d 1196 (N.Y. 1995) ........................................................................38

*Magness v. Human Res. Servs., Inc.,*
    555 N.Y.S.2d 347 (N.Y. App. Div. 1990) ......................................................36

*Ochs v. Woods,*
    117 N.E. 305 (N.Y. 1917) ..............................................................................41

*P & L Group, Inc. v. Garfinkel,*
    541 N.Y.S.2d 535 (N.Y. App. Div. 1989) ......................................................36

*Riviello v. Waldron,*
    391 N.E.2d 1278 (N.Y. 1979) ........................................................................45

*Rocanova v. Equitable Life Assurance Soc. of the U.S.,*
    634 N.E.2d 940 (N.Y. 1994) ..........................................................................42

*Wiener v. Lazard Freres & Co.,*
    672 N.Y.S.2d 8 (N.Y. App. Div. 1998) ..........................................................40


## DOCKETED CASES

*Vishranthamma v. Al-Awadi,*
    02 Civ. 3710 (PKL) (MHD) (S.D.N.Y.), ..........................................................8


## FEDERAL STATUTES,  RULES, AND LEGISLATIVE MATERIAL

18 U.S.C. §1584 ...........................................................................................23, 24

18 U.S.C. §1589 ................................................................................................26

22 U.S.C. § 7101, *et seq.* ............................................................................26, 30

28 U.S.C. § 1330 ..........................................................................................11, 13

28 U.S.C. § 1331 ................................................................................................12

28 U.S.C. § 1350 ..............................................................................12, 13, 17, 18

28 U.S.C. § 1367 ................................................................................................13

## TABLE OF AUTHORITIES
(continued)

**Page**

28 U.S.C. § 1602, *et seq.*.................................................................................... *passim*

29 U.S.C. § 206 ...........................................................................................................33

H. Rep. 94-1487, 1976 U.S.C.C.A.N. 6604 ...........................................12, 15, 16, 17

H.R. Rep. No. 106-939, Sec. 12, at 101 (2000) ............................................26, 27

Fed. R. Civ. P. 4 ...............................................................................................10, 11

Fed. R. Civ. P. 12 ............................................................................................14, 15

Fed. R. Civ. P. 55 ................................................................................... *passim*

## STATE STATUTES AND RULES

N.Y. C.P.L.R. §§ 5001 ...............................................................................................39

N.Y. C.P.L.R. §§ 5004 ...............................................................................................39

N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4 ......................................................35

N.Y. Lab. Law § 663(1) .............................................................................................33

## INTERNATIONAL MATERIALS

Abolition of Forced Labor Convention,
    June 25, 1957, 320 U.N.T.S. 291 ......................................................................24

*Case Concerning the Barcelona Traction Light & Power Co.*,
    (Bel v. Spain) 1970 I.C.J. ...................................................................................22

Convention Concerning Forced or Compulsory Labour (ILO No. 29),
    June 28, 1930, 39 U.N.T.S. 55 .....................................................................23, 24

*Empson v. Smith*,
    (1965) 1 Q.B.. 426 ..............................................................................................52

Final Rep. submitted by Ms. Gay J. McDougall, Spec. Rapporteur,
    June 22, 1998, Dec. E/CN.4/Sub.2/1998 ...........................................22, 25, 26

# TABLE OF AUTHORITIES
### (continued)

**Page**

Hague Convention on Service Abroad of Judicial and Extrajudicial Documents,
Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638 .......................................................11, 12

Int'l Convention on Civil and Political Rights
Dec. 19, 1996, 999 U.N.T.S. 171.........................................................................21, 22, 25

Int'l Labor Conference, *A Global Alliance Against Forced* Labor
(93rd Sess. 2005).......................................................................................................29

Int'l Criminal Court, Elements of Crime, ......................................................................25, 26, 29

Practical Handbook on the Operation of the Hague Convention of 15 November 1965 on
the Service Abroad of Judicial and Extrajudicial Documents in Civil or
Commercial Matters (3rd ed. 2006).............................................................................12

*Prosecutor v. Kunarac,*
Case No. IT-96-23, Appeals Chamber Judgment (June 12, 2002) ...............21, 22, 28, 29

Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and
Children, Supplementing the U.N. Convention Against Organized Crime,
Nov. 15, 2000, G.A. Res. 25, UN Doc. A/45/49 ....................................................24, 27, 30

Rep. of the Comm'n of Inquiry appointed under article 26 of the Constitution of the Int'l
Labour Org. to examine the observance of Myanmar of the Forced Labour
Convention, 1930 (No.29), Geneva, July 2, 1998 ...........................................................24

Rome Statute of the Int'l Criminal Court,
July 17, 1998, 2187 U.N.T.S. 90 ...................................................................22, 25, 28, 29

Slavery Convention                                          ,
Sept. 15, 1926, 212 U.N.T.S. 17...............................................................................21, 23

Statute of the Int'l Court of Justice,
June 26, 1945, 59 Stat. 1055, 1060, T.S. No. 993 ...........................................................19

Supplementary Convention on the Abolition of Slavery, the Slave Trade & Institutions &
Practices Similar to Slavery,                                    Sept. 7,
1956, 18 U.S.T. 3201, 266 U.N.T.S. 3.............................................................................21

U.N. Comm'n on Human Rights, INTEGRATION OF THE HUMAN RIGHTS OF WOMEN AND
A GENDER PERSPECTIVE, Rep. of the Spec. Rapporteur, Summary of cases
transmitted to Governments and replies received, March 27, 2006,
E/CN.4/2006/62/Add.1 ...............................................................................................49, 50

## TABLE OF AUTHORITIES
### (continued)

**Page**

Universal Decl. of Human Rights, G.A. Res. 217A, U.N. GAOR, ed Sess., 1st Plen. mtg,
  U.N. Doc A/810, Dec. 10, 1948......................................................................................25

Vienna Convention on Consular Relations,
  Apr. 24, 1963, 21 U.S.T. 77........................................................................................10

Vienna Convention on Diplomatic Relations,
  Apr. 18, 1961, 23 U.S.T. 3227...........................................................................43, 51, 52

Vienna Convention on Law of Treaties,
  May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679 ........................................................21

## MISCELLANEOUS

Gov't Accountability Office, Rep. to the Subcomm. on Human  Rights and the Law,
  Comm. on the Judiciary, U.S. Senate: HUMAN RIGHTS - U.S. Government's
  Efforts to Address Alleged Abuse of Household Workers by Foreign Diplomats
  with Immunity Could Be Strengthened, July 2008...........................................................3

*Restatement (Third) Foreign Relations* § 103 ...............................................................20

*Restatement (Third) Foreign Relations* § 702 ...............................................................20

State Dept., Bureau of Democracy, Human Rights, and Labor, *Kuwait: Country Reports
  on Human Rights Practices – 2007* .............................................................................47

State Dept., Employees of Int' Orgs.and NATO .............................................................43

Plaintiff Vishranthamma Swarna ("Ms. Swarna"), by her undersigned counsel, submits this Memorandum of Law in Support of her Motion for Default Judgment pursuant to Federal Rule of Civil Procedure 55(b)(2).

## PRELIMINARY STATEMENT

Ms. Swarna was enslaved in New York City by Defendants Badar Al-Awadi ("Al-Awadi") and Halal Muhammed Al-Shaitan ("Al-Shaitan") (together the "Individual Defendants") from 1996 until her escape in 2000.  During this time, Al-Awadi was promoted several times, ultimately serving as the First Secretary to the Permanent Mission to the United Nations of the State of Kuwait ("Kuwaiti Mission" or "Mission").  Al-Awadi and his wife, Al-Shaitan, trafficked Ms. Swarna from Kuwait (to which she had emigrated from her native India) to New York to work in their Manhattan apartment as a live-in domestic employee, cooking and cleaning for the family and taking care of their children.  This was done with the knowledge and assistance of Defendant State of Kuwait ("Kuwait").  Individual Defendants enticed Ms. Swarna here by false promises regarding pay and working conditions.  They promised her a salary of $2,000 per month, Sundays off to worship, and periodic trips home to India to visit her ailing husband and five children.  Instead, the Individual Defendants paid her $200 per month (*i.e.*, 10% of what she had been promised), required her to work at least eighteen hours per day, seven days per week with no time for worship, and limited and controlled her contact with her family.  Worse yet, Ms. Swarna also was subjected to frequent beatings by the Individual Defendants, escalating to repeated rapes by Al-Awadi.  This abuse was facilitated and sanctioned by Kuwait.  And to protect the Individual Defendants from prosecution and civil liability, Kuwait relocated them to Paris after reports of the treatment of Ms. Swarna became public.  Al-Awadi is currently

the acting First Secretary for the Embassy of Kuwait, but as explained herein, is not immune from civil liability in the United States.  Nor are Al-Shaitan and Kuwait.

## <u>STATEMENT OF FACTS</u>

The relevant facts are set forth in Ms. Swarna's Declaration dated August 5, 2008 and the transcript of Ms. Swarna's sworn testimony in her earlier action (attached as Exhibits A and B) and are as follows:

Ms. Swarna is a 44-year-old woman who was born into a severely impoverished family in Bhadravati, India.  Ms. Swarna was educated through the seventh grade and at the age of fifteen married her husband Devaraj Swarna.  Swarna Decl. ¶ 4 (Exhibit A).  The Swarnas had five children together.  *Id.*  Prior to his death in 2002, Mr. Swarna had been severely ill for approximately 10 years and was unable to work.  Since the time her husband became ill, Ms. Swarna has been the sole breadwinner for her family.  *Id.*

In 1995, as a result of her husband's health problems and his inability to work, Ms. Swarna went to an employment agency to assist her in finding work outside of India.  *Id.* at ¶ 5. The agency eventually found Ms. Swarna a position as a domestic worker in the Kuwaiti home of the parents of Al-Shaitan (the "Al-Shaitans").  *Id.*  In 1995, Ms. Swarna traveled to Kuwait and began working in the Al-Shaitans' home.  *Id.*  Ms. Swarna was one of five domestic workers and her duties included taking care of the Al-Shaitans' small children, cooking, and household cleaning.  *Id.*

While Ms. Swarna was working for the Al-Shaitans, the Individual Defendants, who at the time were living in New York City, came to visit Kuwait.  *Id.* at ¶ 6.  At the time the Individual Defendants had a two-year-old son and Defendant Al-Awadi was the Third Secretary

to the Permanent Mission of Kuwait to the United Nations.  *Id.*  After observing Ms. Swarna's ability to interact well with their son, the Individual Defendants asked her to return with them to the United States and work in their home.  *Id.* at ¶ 7.  Ms. Swarna initially rejected the Individual Defendants' offer, as she was satisfied with working for the Al-Shaitans in Kuwait.  *Id.* However, the Individual Defendants promised Ms. Swarna they would pay her $2,000 per month, would give her Sundays off to go to church, and would give her one-month paid vacation per year during which Ms. Swarna would be able to return to India to visit her family.  *Id.*  Based upon these assurances, Ms. Swarna accepted the Individual Defendants' offer of employment. *Id.*

In order to allow Ms. Swarna to travel to and work in the United States, the Individual Defendants sought a G-5 visa for Ms. Swarna.  *Id.*  at ¶ 8.  A G-5 visa allows foreign officials for international organizations, such as the United Nations, to bring private servants into the United States for employment in their homes during diplomatic assignments.  *See* Gov't Accountability Office, Rep. to the Subcomm. on Human  Rights and the Law, Comm. on the Judiciary, U.S. Senate: HUMAN RIGHTS - U.S. Government's Efforts to Address Alleged Abuse of Household Workers by Foreign Diplomats with Immunity Could Be Strengthened, July 2008, at 7-10, attached as Exhibit C.  Al-Awadi escorted Ms. Swarna to accompany him to a meeting with an official from the United States Embassy in Kuwait.  Swarna Decl. ¶ 8.  Prior to that meeting, the Individual Defendants directed Ms. Swarna to tell the official, if asked, that the Individual Defendants would pay her $2,000 per month in the United States.  *Id.*  At the meeting, Al-Awadi lied to the United States Embassy official and told him that he would provide Ms. Swarna with a contract of employment promising, among other things, a $2,000 monthly salary.  *Id.*  The

-3-

Individual Defendants never provided such a contract to Ms. Swarna.  *Id.*  Based upon Al-Awadi's misrepresentations, the United States Embassy issued Ms. Swarna a G-5 visa authorizing her to work as a live-in domestic servant for the Individual Defendants.  *Id* at ¶ 8.

On or about September 8, 1996, Ms. Swarna arrived in the United States and began her employ as a domestic worker in the Individual Defendants' home, located at 315 East 54th Street, Apartment 22G, New York, New York.[1]  Swarna Decl. ¶ 9.  Al-Awadi met Ms. Swarna at the airport upon her arrival in the United States, and immediately confiscated her passport and visa. *Id*.

From the moment that Ms. Swarna stepped onto United States soil, she was treated as a slave by the Individual Defendants. Ms. Swarna was deprived of her legal documents, forced to work long and strenuous hours against her will, subjected to repeated physical, sexual, and psychological abuse, and wholly deprived of basic liberties including the freedom to stop working for the Individual Defendants or leave the confines of the Individual Defendants' apartment.  Moreover, the Individual Defendants – with the full knowledge and participation of Kuwait – paid Ms. Swarna next to nothing for her labor, in clear violation of United States law.

In the Individual Defendants' Manhattan home, located a mere mile from the United Nations and the Kuwaiti Mission, Ms. Swarna was forced to work day and night with little time to sleep.  Ms. Swarna worked from 6 a.m. until midnight – approximately eighteen hours per day - seven days a week.  *Id.* at ¶ 12.  Ms. Swarna's chores included, *inter alia,* caring for two young

---

[1]     That apartment was, and has been since October 1982, the property of Kuwait.  *See* Condominium Unit Deed, attached as Exhibit D; Tenant Profile, CG00141, attached as Exhibit E.

children,[2] doing the laundry and ironing, cleaning the home, cooking for the family, and cooking for and serving guests. *Id.* at ¶¶ 12, 13. The Individual Defendants entertained frequently and hosted dinner parties at least once a week and every day during the month of Ramadan, and hosted countless parties in honor of employees of the Kuwaiti Mission. *Id.* at ¶ 13. Ms. Swarna cooked for and waited on the Individual Defendants' guests, and on those evenings was not through with her work until between 3:00 a.m. and 4:00 a.m. *Id.*

Moreover, Ms. Swarna slept in the same room as the Individual Defendants' two children, and when the children awoke at night Ms. Swarna tended to their needs, changed their diapers, changed soiled bedclothes, bathed them, and soothed them back to sleep. *Id.* at ¶ 11. In exchange for Ms. Swarna's labor, the Individual Defendants (or more precisely, Kuwait) paid Ms. Swarna a paltry $200 per month. *Id.* at ¶ 17.

In addition, the Individual Defendants completely isolated Ms. Swarna from the outside world, making it impossible for her to seek help or to gain the basic information about United States' norms and laws necessary to understand the illegality and impermissibility of their conduct. During the four years that Ms. Swarna was employed by the Individual Defendants, she was treated as a prisoner. Ms. Swarna was never permitted to leave the apartment without one or the other of the Individual Defendants or an employee from the Kuwaiti Mission. *Id.* at ¶ 24. Even then, Ms. Swarna only left the apartment ten to fifteen times in total in four years. *Id.* The Individual Defendants (or the member of the Mission who was with her) watched Ms. Swarna closely during those outings, forbade Ms. Swarna from speaking with anyone, scolded her if she

---

[2]    Approximately one year after Ms. Swarna arrived in the United States, the Individual Defendants had another child. *Id*. at ¶ 11.

did, and went so far as to demand that she keep her head down so that she could not make eye contact with anyone. *Id.* In fact, when the Individual Defendants left Ms. Swarna alone in the apartment  they would lock her inside (for hours and even days at a time) with no way out. *Id.* at ¶ 25.

The Individual Defendants prevented Ms. Swarna from communicating with those outside of their household. *Id.* at ¶¶ 26, 27. Ms. Swarna was prohibited from using the telephone except to answer when they themselves called, which they indicated by letting the phone ring twice, then hanging up and calling back. *Id.* at ¶ 26. The Individual Defendants intercepted Ms. Swarna's telephone calls from her family in India, and rarely permitted her to call home herself. *Id.* at ¶ 27. Moreover, the Individual Defendants read Ms. Swarna's mail, often failed to give Ms. Swarna her mail, and never mailed the letters which Ms. Swarna hoped to send to her family in India.[3] *Id.*

The Individual Defendants coerced Ms. Swarna's labor through repeated physical abuse and overt and implicit threats of severe physical harm. The Individual Defendants repeatedly assaulted, abused, demeaned, and humiliated Ms. Swarna, both physically and psychologically. They regularly beat, pushed, slapped, dragged, yelled at, and threatened Ms. Swarna. *Id.* at ¶¶ 29, 30. A complete recitation of the physical abuses inflicted upon Ms. Swarna would be impossible; however, at the very least, Ms. Swarna suffered the following during the four years she was imprisoned in their apartment. On at least two occasions, Al-Shaitan threatened to cut out Ms. Swarna's tongue. On one of these occasions, she took a knife, grabbed Ms. Swarna's

---

[3]      The Individual Defendants were able to monitor Ms. Swarna's mail, by having another official in the Kuwaiti Mission arrange for the mail's translation from Telegu, Ms. Swarna's first language. *Id.* at ¶ 28.

tongue, and acted as if she was going cut it.  *Id.*  On several occasions, Al-Shaitan grabbed Ms.

Swarna by the collar, dragged her, and locked her out of the apartment for half-hour periods.

Fearing that if she left the apartment complex she would be harmed or arrested Ms. Swarna sat

outside the door, crying, waiting to be let back into the apartment.  *Id.*

      The above and other almost daily abuses resulted in Ms. Swarna's suffering from

dramatic weight loss (such that others incorrectly thought she was suffering from tuberculosis),

hair loss, nightmares, and fatigue.  *Id.* at ¶¶ 32, 33.  In fact, Ms. Swarna even contemplated

suicide, dreaming of escaping the Individual Defendants' apartment and drowning herself in the

East River.  *Id.* at ¶ 34.

      Most shockingly, Ms. Swarna was forced to endure systematic and demeaning sexual

assaults at the hands of Al-Awadi.  *Id.* at ¶ 36.  Beginning in September 1998, Al-Awadi forced

himself upon Ms. Swarna and raped her despite her resistance.  *Id.*  He then threatened to kill

Ms. Swarna if she told anyone.  *Id.*  Thereafter, until Ms. Swarna managed to escape almost two

years later, Al-Awadi raped her on many occasions when his wife was not in the home.  *Id.*

Further, from the time of that initial sexual assault, Ms. Swarna lived under the constant threat of

rape, knowing that Al-Awadi might rape her at any time when his wife was not present.

      The abuse Ms. Swarna suffered finally came to a head on or about June 25, 2000.  The

family and Ms. Swarna were preparing for a trip to Kuwait the next day.  *Id.* at ¶ 37.  Ms.

Swarna, debilitated by the inhumane and barbaric treatment of her employers, begged the

Individual Defendants to send her back to India rather than take her to Kuwait.  Al-Awadi,

visibly angry with Ms. Swarna, screamed at and threw a fully-packed suitcase at her.  *Id.* at ¶ 38.

The attack caused Ms. Swarna to bleed and left painful bruises on her body.  Al-Awadi then

picked up an iron rod, and motioned as if to hit Ms. Swarna with it.  Afraid for her life, she

began screaming and threatened to call for the police. At this point, Al-Shaitan slapped Ms.

Swarna across the face.   Shortly thereafter, Al-Awadi warned Ms. Swarna that if she did not

continue to work for him, harm would come to her during the family's trip to Kuwait.  *Id.* at ¶

39.  Based on these threats, Ms. Swarna believed that if she traveled to Kuwait, she would be

physically punished and jailed, if not killed, and decided she must escape.  Accordingly, the next

morning, fearful for her life, penniless, and with no place to go, Ms. Swarna took what little

belongings she had and fled the Individual Defendants' apartment.  *Id.* at ¶ 40.

## PROCEDURAL HISTORY

Ms. Swarna filed her first suit against from the Individual Defendants in this Court on

May 15, 2002.  *Vishranthamma v. Al-Awadi*, 02 Civ. 3710 (PKL) (MHD) (S.D.N.Y.).  The

Individual Defendants did not appear in the action.  Kuwait submitted a letter to the Court

asserting Al-Awadi's diplomatic immunity, and attorney Robert Thabit submitted a letter to the

Court on behalf of both Al-Awadi and Al-Shaitan to the same effect.  The Court held a default

judgment hearing on February 25, 2004, at which Ms. Swarna testified to her abuse at the hands

of the Individual Defendants.  *See* Hearing Transcript (Exhibit B).

The Court sought the comment of the State Department regarding the diplomatic status of

the Individual Defendants and pertinent immunity issues, and in response the State Department

certified that the Individual Defendants were accorded immunity during their time in the United

States.  The State Department also stated that their immunity came to an end upon Al-Awadi's

departure from the United States except with respect to actions taken in the exercise of his

functions as a member of the Mission.  *See* Certification of L. Dunham, Ass't Chief of Protocol, U.S. Dept. of State, Oct. 15, 2004, attached as Exhibit F.

In light of the Individual Defendants' immunity at the time they were sued and served, on January 26, 2005, the Court dismissed Ms. Swarna's action without prejudice; the Court gave Ms. Swarna leave to re-file since by that time the Individual Defendants had moved to France and were no longer immune from suit.  *See* Argument, Section V.A.2, *infra*.

On June 23, 2006, Ms. Swarna filed this action against the Individual Defendants and Kuwait, seeking damages against all Defendants pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350 ("Alien Tort Statute"), and under state law for failure to pay the minimum wage, fraud and fraudulent inducement, breach of contract, and unjust enrichment.  The Individual Defendants and Kuwait have been properly served with the Summons and Complaint.  *See* Jurisdiction, Section I, *infra*.   None of the Defendants has answered or otherwise appeared in this action.  In light of Defendants' failure to appear, on February 13, 2008, this Court ordered that Ms. Swarna "may proceed with motion of default and the presentation of evidence."  *See* Memo Endorsed, dated February 13, 2008, Dkt. No. 21.

## JURISDICTION

**I.    Personal Jurisdiction**

**A.     The Individual Defendants**

This Court has personal jurisdiction over the Individual Defendants because the conduct alleged in the Complaint took place in New York, and the Individual Defendants have been served with process.

Here, the Individual Defendants were served with process pursuant to Federal Rule of Civil Procedure 4(f)(3).  *See* Dkt. No. 19.  The Order directed Plaintiff to effect service by delivering the Summons and Complaint as follows:  (1) by sending the Summons and Complaint via international courier to the Individual Defendants' residence in Paris, France followed by U.S. Mail to the same address and (2) by delivery of the Summons and Complaint to Robert W. Thabit, the Individual Defendants' counsel in a prior action brought by Plaintiff.  On September 21, 2007, Plaintiff's counsel served the Summons and Complaint pursuant to the Order.  Plaintiff has separately filed with the Court the Certificate of Service dated September 21, 2007, confirming service.  *See* Dkt No. 20.

Additionally, the exercise of personal jurisdiction over the Individual Defendants comports with the Due Process requirements of the Fourteenth Amendment because a defendant may reasonably foresee being hailed into court for misconduct committed in the forum state, even where that defendant was a diplomat.  The misconduct alleged in the Complaint occurred over the course of four years during which time the Individual Defendants lived and worked in New York, thereby purposefully availing themselves of the protections of the jurisdiction.  Even as diplomats, the Individual Defendants knew that they were required to comply with local laws. *See e.g.* Vienna Convention on Consular Relations, art. 41, Apr. 14, 1963, 21 U.S.T. 77 ("Without prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving State.").  The question of whether the Individual Defendants may be immune from jurisdiction on the separate grounds of diplomatic immunity or sovereign immunity is discussed below at Argument Section VI, *infra.*

**B.      Kuwait**

This Court also has personal jurisdiction over Kuwait.  A court may exercise "personal jurisdiction over foreign sovereigns with respect to all claims (a) over which there is subject matter jurisdiction, and (b) as to which process has been properly served.  28 U.S.C. § 1330(b)." *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 759 (2d Cir. 1998).  For the reasons explained below, this Court has subject matter jurisdiction over Ms. Swarna's claims against Kuwait.  Additionally, service has been made on Kuwait through diplomatic channels pursuant to the Foreign Sovereign Immunities Act ("FSIA").

Federal Rule of Civil Procedure 4(j) governs service of process upon foreign governments.  The Rule directs that service upon a foreign state shall be effected pursuant to the provisions of FSIA.  FSIA sets forth a hierarchical list of methods for service on a foreign state.  The first such method permits service by delivery of the summons and complaint in accordance with special arrangements made between the plaintiff and the foreign state.  *See* 28 U.S.C § 1608(a)(1).  Because no such special arrangement was made here, § 1608(a)(1) is not applicable.

The second enumerated method permits service in accordance with an applicable international convention on the service of judicial documents.  *See* 28 U.S.C § 1608(a)(2).  Here, because both the United States and Kuwait are signatories to the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters ("Hague Service Convention"), that convention applies.

Article 9 of the Hague Service Convention permits the use of "diplomatic channels" to forward judicial documents for the purpose of service "if exceptional circumstances so require." Hague Service Convention, art. 9, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638.  Service on

a foreign sovereign is an exceptional circumstance under Article 9.  *See* Permanent Bureau of the Hague Conf. on Private Int'l Law, Practical Handbook on the Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ¶ 193 (3rd ed. 2006) ("One example of such exceptional circumstances [under Article 9] is service of a claim on a foreign sovereign State.").[4] Thus, FSIA allows Plaintiff to effect service on Defendant Kuwait through diplomatic channels.

On December 20, 2006, the United States Embassy in Kuwait delivered to the Ministry of Foreign Affairs of Kuwait a Diplomatic Note accompanied by the Summons and Complaint, along with a Notice of Suit and appropriate translations into Arabic.  *See* Dkt. No. 21.  Pursuant to the service provisions of FSIA, service was thereby effected.  Accordingly, service upon Kuwait through diplomatic channels pursuant to Article 9 of the Hague Service Convention fulfills the requirements set forth in Section 1608(a)(2) of FSIA for service of process on a foreign sovereign and therefore service of Kuwait is complete.

## II.     Subject Matter Jurisdiction

### A.     The Individual Defendants

This Court has subject matter jurisdiction over Ms. Swarna's claims of involuntary servitude and forced labor against the Individual Defendants under the Alien Tort Statute.  28 U.S.C. §§ 1331, 1350.  *See* Argument, Section III, *infra*.  This Court has supplemental

---

[4]     *See also* H. Rep. 94-1487, 1976 U.S.C.C.A.N. 6604, 6625 ("Service through diplomatic channels is widely used in international practice. It is provided for in the European Convention on State Immunity, *supra*, which was negotiated by 18 European nations.  It is accepted and indeed preferred by the United States in suits brought against the United States Government in foreign courts." (citations omitted)).

jurisdiction over the remainder of Ms. Swarna's claims because they form part of the same case or controversy as her Alien Tort Statute claims.  28 U.S.C. § 1367(a).

### B.      Kuwait

This Court has subject matter jurisdiction over Plaintiff's claims against Kuwait pursuant to 28 U.S.C. §§ 1330, 1350, and FSIA.  Section 1330 confers original jurisdiction on the district courts in "any nonjury civil action against a foreign state…as to any claim for relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title, or under any applicable international agreement." 28 U.S.C. § 1330(a).  Here, Ms. Swarna has asserted a civil action against Kuwait, and Kuwait is not entitled to immunity because the alleged conduct falls within the statutory exceptions to FSIA.  28 U.S.C. § 1605.  *See* Argument, Section V.B, *infra*.

## ARGUMENT

Entry of judgment against the Individual Defendants and against Kuwait is appropriate on this Motion for Default Judgment with respect to each of Ms. Swarna's claims.  With respect to the claims against the Individual Defendants, liability is conceded, *see Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir. 1992), and this Court need only conduct a hearing to establish damages due to Plaintiff, *see Credit Lyonnais Sec. (USA), Inc. v. Alcantara,* 183 F.3d 151, 155 (2d Cir. 1999).

Kuwait is liable for each of Ms. Swarna's claims under several alternate theories of liability.  First, Kuwait is liable as a principal for all of Ms. Swarna's claims by virtue of the actions of its agents – including its agent Al-Awadi –where the agents either were acting within the scope of their employment or where their actions were subsequently ratified by Kuwait.

With respect to Ms. Swarna's claims under the Alien Tort Statute, Kuwait is additionally liable because it was aiding and abetting the violations of the Individual Defendants.  With respect to Ms. Swarna's claim for unjust enrichment, Kuwait is liable for the benefits it received from Ms. Swarna's labors.

## I.     The Standard for Default Judgment

### A.     Default By The Individual Defendants

Pursuant to Rule 55(b)(2), a default by the Individual Defendants "is deemed to constitute a concession of all well pleaded allegations of liability."  *Greyhound Exhibitgroup*, 973 F.2d at 158 (citations omitted).  The default, however, "is not considered an admission of damages."  *Id.*  Rather, damages "usually must be established by the plaintiff in an evidentiary proceeding in which the defendant has the opportunity to contest the amount."  *Id.*  Thus, the Individual Defendants are presumed to be liable, and the Court should "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty."  *Credit Lyonnais Sec. (USA), Inc.*, 183 F.3d at 155 (citations omitted).

Here, although service was effected pursuant to the September 21, 2007 Order, the Individual Defendants have failed to answer or otherwise move with respect to the Complaint within twenty days from the service of the Summons and Complaint as required by Fed. R. Civ. P. 12(a).  Plaintiff's Motion for Default Judgment under Rule 55(b)(2) is therefore proper.  In support of her claims against the Individual Defendants, Ms. Swarna submits her Declaration and other evidence of damages.  Ms. Swarna respectfully requests a hearing, as the Court deems necessary, to demonstrate the amounts owed to her.

**B.      Default By Kuwait**

Unlike the Motion for Default Judgment against the Individual Defendants, where the default constitutes an admission of liability, the Motion for Default Judgment against Kuwait is governed by FSIA.  *See* 28 U.S.C. § 1608(e).  The default judgment standard under FSIA requires "evidence satisfactory to the court" establishing the liability of the foreign sovereign. FSIA provides:

> No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, *unless the claimant establishes his claim or right to relief by evidence satisfactory to the court*.  A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

*Id.* (emphasis added).  In addition to the evidence submitted in support of her claims for damages, Ms. Swarna submits evidence, including her Declaration and other supporting documentation, demonstrating the liability of Kuwait.  Further, this Memorandum of Law directly addresses the nature of Ms. Swarna's substantive claims against Kuwait and marshals the evidence submitted in support of those claims.

The standard of proof under FSIA § 1608 (e) mirrors the standard applied under Federal Rule of Civil Procedure 55(e) for a default judgment against the United States.  *See* Fed. R. Civ. P. 55(e); *see also* H. Rep. 94-1487, 1976 U.S.C.C.A.N. 6604, 6625 (the evidence satisfactory to the court standard of FSIA § 1608(e), "is the same requirement applicable to default judgments against the U.S. Government under rule 55(e), F.R. Civ. P."); *Smith ex rel. Smith v. Islamic Emirate of Afghanistan,* 262 F.Supp.2d 217, 222 (S.D.N.Y. 2003) (*citing Commercial Bank of Kuwait v. Rafidain Bank* (hereinafter, *"Rafidain"*), 15 F.3d 238, 242 (2d Cir. 1994)).

In *Smith*, Judge Baer considered two standards of proof under FSIA § 1608 (e) which had been applied by courts in the District of Columbia, "where many § 1608(e) cases are litigated." 262 F.Supp.2d at 222. Some courts applied the clear and convincing evidence standard while others required only "a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." *Id.* (*citing Ungar v. Islamic Republic of Iran*, 211 F.Supp.2d 91, 98 (D.D.C. 2002)); *Hill v. Republic of Iraq*, 175 F.Supp.2d 36, 38 n. 4 (D.D.C. 2001) (requiring "evidence of a nature and quality to support summary judgment")). Rejecting the clear and convincing evidence standard as too stringent and not consistent with Congress' intention in passing FSIA, Judge Baer concluded "the more appropriate burden to be met by the plaintiff is that stated in *Ungar*, namely 'a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff.'" 262 F.Supp.2d at 224. As the court in *Ungar* explained, this standard, "freely translated in the context of default, means a legally sufficient *prima facie* case." 211 F.Supp.2d at 98.

But even this standard may be too high in certain contexts, where, as here, a plaintiff is unable to take discovery from the defendant by virtue of the defendant's default. As the Second Circuit explained in *Rafidain,* "neither Rule 55(e) nor § 1608(e) relieves the sovereign from the duty to defend cases and to obey court orders." 15 F.3d at 242. Where a plaintiff has been denied the opportunity to engage in pretrial discovery, application of a standard of proof that presumes that full discovery has been taken would be unfairly prejudicial. Accordingly, the rule adopted in *Smith*, if rigidly applied, would have the effect of "reliev[ing] the sovereign from the duty to defend cases" and affirmatively encourage sovereigns to default. The authors of FSIA did not intend this result: "In determining whether the claimant has established his claim or right to relief, it is expected that courts will take into account the extent to which the plaintiff's case

depends on appropriate discovery against the foreign state."  H. Rep. 94-1487, 1976

U.S.C.C.A.N. 6604, 6625.  Thus, where discovery against the foreign state has been frustrated by

the state's own default, it is appropriate for the court to apply a lesser standard of proof.

Here, although service was effected, Kuwait failed to answer or otherwise move with

respect to the Complaint within 60 days from service of the Summons and Complaint.  28 U.S.C.

§ 1608(c)(2)(D).  Ms. Swarna's Motion for Default Judgment against Kuwait is therefore proper.

In support of her motion, Ms. Swarna presents evidence to establish her *prima facie* case against

Kuwait.  However, where such evidence would typically come from the defaulting Defendant,

the Court should take into account the Kuwait's frustration of pre-trial discovery.

## II.    Defendants' Enslavement Of Ms. Swarna Violates Customary International Law Norms Under the Alien Tort Statute

The Alien Tort Statute confers this Court with subject matter jurisdiction over Ms.

Swarna's claims and provides the district courts with "original jurisdiction of any civil action by

an alien for a tort only, committed in violation of the law of nations or a treaty of the United

States." 28 U.S.C. §1350.  Thus, federal subject matter jurisdiction exists when (1) an alien sues,

(2) for a tort, (3) committed in violation of the law of nations or a treaty ratified by the United

States.[5]  *See Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 116

(2d Cir. 2008) (hereinafter, "*Dow Chemical*").  Here, Ms. Swarna is a citizen of India, seeking

damages in tort, for violations of customary international norms prohibiting slavery and slave-

like practices including sexual slavery, forced labor, involuntary servitude, and trafficking.

---

[5]      "[T]he law of nations has become synonymous with the term 'customary international law,' which describes the body of rules that nations in the international community 'universally abide by, or accede to, out of a sense of legal obligation and mutual concern."  *Dow Chemical,* 517 F.3d at 116.

**A.     The Supreme Court's Decision In *Sosa* Confirmed That The Alien Tort Statute Provides A Cause Of Action For Violations Of Customary International Law Norms**

In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the United States Supreme Court held that the Alien Tort Statute provides a private cause of action for certain claims based on violations of customary international law.  *Id*. at 748 (affirming the line of cases beginning with *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980)).  While accepting that the Alien Tort Statute provides federal court jurisdiction for claims arising from violations of customary international law, the Supreme Court held that, "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when §1350 was enacted." *Id.* at 732.  In so holding, the Court cited approvingly to earlier cases decided under the Alien Tort Statute that had permitted claims for violations of well-recognized norms under customary international law.  Subsequent decisions have interpreted *Sosa* to require that the norm upon which an Alien Tort Statute claim is based must be defined with the degree of specificity comparable to the three common law international torts of 1789 and be of an international character accepted by the civilized world.  *See, e.g., Dow Chemical*, 517 F.3d at 117 (citations omitted).

**B.     The Customary International Law Norms Prohibiting Slavery And Slavery-Like Practices Are Actionable Torts Under *Sosa***

The customary international norms upon which Ms. Swarna bases her claims, including the norms prohibiting slavery and slave-like practices like sexual slavery, forced labor, involuntary servitude, and trafficking, all fall squarely within the "narrow class of international norms" that have such definitive content and widespread acceptance that they are actionable in

federal court in an action brought under the Alien Tort Statute.  The term customary international law, "describes the body of rules that nations in the international community 'universally abide by or accede to, out of a sense of legal obligation and mutual concern."  *Dow Chemical,* 517 F.3d at 116.

### 1.      Principles For Deriving Customary International Law Norms

As the Supreme Court held in *The Paquete Habana* case, where necessary, courts should look to the to the customs and usages of international law to ascertain the content of that law:

> [W]here there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat.

*The Paquete Habana,* 175 U.S. 677, 700 (1900).  Article 38 of the Statute of the International Court of Justice, which is itself recognized as a statement of customary international law regarding the sources of international law, provides:

> The Court, whose function is to decide in accordance with international law such disputes as are submitted to it, shall apply: (a) international conventions, whether general or particular, establishing rules expressly recognized by the contesting states; (b) international custom, as evidence of a general practice accepted as law; (c) the general principles of law recognized by civilized nations; and (d) subject to the provisions of Article 59, judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of the rules of law.

Statute of the International Court of Justice, art. 38(1), June 26, 1945, 59 Stat. 1055, 1060, T.S. No. 993.

Treaties and conventions are also evidence of international custom in that they reflect the actual practice of nations accepted as law.  *See Almog v. Arab Bank PLC,* 471 F.Supp.2d 257, 273 (E.D.N.Y. 2007) (citing *Flores v. S. Peru Copper Corp.,* 414 F.3d 253, 256 (2d Cir. 2003)) ("A State's ratification of a treaty is evidence of its intent to be legally obligated by the principles embodied in the treaty and therefore evidences the "customs and practices" of that State."). Widespread adoption of a treaty embodying a legal norm may therefore be evidence that the norm is customary international law.  *Id.* at 273 ("[I]f enough States ratify a treaty, a norm of international law may be established.  The more States that have ratified a treaty, especially those States with greater relative influence in international affairs, the greater the treaty's evidentiary value.").  In addition to treaties, other evidence of state practice, legal obligation, and the recognition of customary international norms, include declaratory resolutions by international organizations, decisions by international courts and tribunals, and the writings of international legal scholars.  *See, e.g., Restatement (Third) Foreign Relations* § 103 and comments.

> **2.    The Prohibitions Against Slavery And Slavery-like Practices Including Forced Labor, Involuntary Servitude, Sexual Slavery, And Trafficking Are Well-Established Norms Of Customary International Law**

The international prohibitions against slavery and the slave trade are among the most well-established principles of customary international law.  *See e.g. Restatement (Third) Foreign Relations* § 702 and comment a (listing slavery and the slave trade as among those human rights "whose status as customary law is generally accepted (as of 1987) and whose scope and content are generally agreed").  The prohibitions against slavery, and the slave trade are acknowledged

as having reached the status of *jus cogens* norms, permitting no derogation.[6]   *See e.g.*

International Covenant on Civil and Political Rights ("ICCPR"), art. 8 and 4, Dec. 19, 1996, 999

U.N.T.S. 171, (prohibiting "slavery and the slave trade in all their forms" as well as servitude

and forced labor and providing that no derogation is permitted from the prohibitions against

slavery, slave trade, and servitude in times of emergency).   The prohibitions against slavery-like

practices, including forced labor, involuntary servitude, sexual slavery and trafficking, derive

from the historical norms against slavery and the slave trade and are also prohibited under

customary international law as practices commonly referred to as "contemporary forms of

slavery."   *See, e.g., Prosecutor v. Kunarac,* Case No. IT-96-23, Appeals Chamber Judgment

ICTY, ¶ 117 (June 12, 2002) (noting that the contemporary forms of slavery were included

within the customary international norm prohibiting enslavement as a crime against humanity).

### a)        Slavery

There can be no dispute that slavery and the slave trade are violations of customary

international law.   Countless international treaties and conventions have as their purpose the

abolition of slavery and the slave trade.   *See, e.g.*, Slavery Convention, Sept. 25, 1926, 212

U.N.T.S. 17 (prohibited slavery and the slave trade, and committed states to bring about the

complete abolition of slavery in all its forms, including  forced labor); Supplementary

Convention on the Abolition of Slavery, the Slave Trade and Institutions and Practices Similar to

Slavery, arts. 6, 7, Sept. 7, 1956, 18 U.S.T. 3201, 266 U.N.T.S. 3 (prohibiting debt bondage,

---

[6]        The Vienna Convention on the Law of Treaties defines a *jus cogens* norm as a peremptory
international law norm that is "accepted and recognized by the international community of states
as a whole as a norm from which no derogation is permitted and which can be modified only by a
subsequent norm of general international law having the same character."   Vienna Convention on
the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679; *see also Comm. of
U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 939-40 (D.C. Cir. 1988) (citing art. 53).

serfdom, child slavery, and certain practices relating to the subjugation of married women as property of their husband); ICCPR arts. 4, 8 (prohibiting "slavery and the slave-trade in all their forms," which, as noted above, is considered non-derogable even in times of emergency); Rome Statute of the Int'l Criminal Court, art. 7(c & g), July 17, 1998, 2187 U.N.T.S. 90, (including "Enslavement and Sexual Slavery" as violations within the Court's jurisdiction when committed in the context of a crime against humanity).[7]  Moreover, slavery and the slave trade have been repeatedly recognized in numerous other contexts to violate customary international law.  *See, e.g.*, *Case Concerning the Barcelona Traction Light and Power Co.,* (Bel. v. Spain) 1970  I.C.J. ¶¶ 33-34 (the prohibition of slavery is an *erga omnes* obligation, which all States have a legal interest in preventing); *Kunarac,* ¶ 124 (holding that the crime of enslavement is a violation of customary international law).  The United Nations Special Rapporteur on the issue of systematic rape, sexual slavery, and slavery-like practices in armed conflict found that the prohibitions against slavery and the slave-trade had risen to the level of a customary international norm by the beginning of the twentieth century.  *See* Final Rep. submitted by Ms. Gay J. McDougall, Spec. Rapporteur, June 22, 1998, Doc. E/CN.4/Sub.2/1998/13 (hereinafter, "McDougall Final Report"), § 46[8] ("[P]rohibitions against slavery and slave-like practices were among the first prohibitions to achieve the status of peremptory norms of customary international law or *jus cogens*. . . and by the beginning of the twentieth century it had already become evident that

---

[7]     The Rome Statute defines "enslavement" as "the exercise of any or all of the powers attaching to the right of ownership over a person and includes the exercise of such power in the course of trafficking in persons, in particular women and children." *Id.*, art. 7(2)(c).

[8]     *available at* http://www.unhchr.ch/huridocda/huridoca.nsf/7fba5363523b20cdc12565a800312a4b/3d25270b5f a3ea998025665f0032f220?OpenDocument#IIIB (last visited July 31, 2008)

international prohibitions concerning slavery and the slave trade had attained the status of customary international law.") (citations omitted).  Courts in the United States have recognized slavery and the slave-trade as violations of *jus cogens* norms.  *See Kadic v. Karadic,* 70 F.3d 232, 239-40 (2d Cir. 1995) (noting that slave-traders, like pirates, are enemies of all mankind and that non-state actors may be held liable for violation of the norm).

The domestic laws of the United States likewise unambiguously condemn slavery and forced labor, including modern forms of slavery.  Interpretations of the Thirteenth Amendment in the Supreme Court confirmed that its purpose was to outlaw all forms of slavery within the United States. *See Slaughter-House Cases*, 83 U.S. 36, 69 (1873).  Acting on the power granted to Congress through the Thirteenth Amendment to enact laws operating upon the acts of individuals, Congress criminalized the sending of persons into involuntary servitude, including by kidnapping and enticement. 18 U.S.C. § 1584.  This statute was meant as a broad prohibition against "involuntary servitude," that arises not only out of physical or legal force, but also fraud and deceit.  *United States v. Kozminski*, 487 U.S. 931, 952 (1988).

**b)      Forced Labor, Involuntary Servitude, Sexual Slavery, And Trafficking**

In order to accomplish the task of abolishing slavery, "in all its forms," (Slavery Convention art. 2(b)), the customary international norm prohibiting slavery and the slave trade has expanded to include forced labor, involuntary servitude, sexual slavery, and trafficking, among other violations.  *See, e.g.*, Convention Concerning Forced or Compulsory Labour (ILO No. 29), art. (2)(1), June 28, 1930, 39 U.N.T.S. 55, (calling on states to suppress forced labor and defining "forced or compulsory labour [to] mean all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself

-23-

voluntarily."); Abolition of Forced Labor Convention, June 25, 1957, 320 U.N.T.S. 291

(reaffirming and extended the 1930 Convention Int'l Covenant on Civil and Political Rights, art.

8(3) (stating "no one shall be required to perform forced or compulsory labour")); *see* Rep. of the

Comm'n of Inquiry appointed under article 26 of the Constitution of the Int'l Labour Org. to

examine the observance by Myanmar of the Forced Labour Convention, 1930 (No. 29), Geneva,

2 July 1998, ¶ 203 (describing the prohibition against forced labor as a peremptory (*jus cogens*)

norm).

      This development in international law is most recently reflected in the negotiation and, in

2000, in the signing of the Protocol to Prevent, Suppress, and Punish Trafficking in Persons,

Especially Women and Children, Supplementing the United Nations Convention Against

Organized Crime (hereinafter, "Trafficking Protocol"), Nov. 15, 2000, G.A. Res. 25, annex II,

UN Doc. A/45/49, *entered into force for the United States* Dec. 3, 2005.  The Trafficking

Protocol reflected trends in customary international law responding to the changed

circumstances, as the archetypal forms of enslavement shifted from chattel slavery to victims of

labor and sex trafficking.  The Trafficking Protocol includes references to forms of exploitation,

including, "at a minimum",  "slavery or practices similar to slavery," forced labor, and servitude,

practices which already violate norms embodied in customary international law.

      Courts in the United States have also held that forced labor violates customary

international law.  *See, e.g., John Roe I v. Bridgestone Corp*., 492 F.Supp.2d 988, 990-991 (S.D.

Ind. 2007) (finding that "[s]ome forms of truly forced labor violate specific, universal and

obligatory norms of international law" but that plaintiffs' allegations of "low wages and difficult

working conditions" on a rubber plantation in Liberia did not meet this standard); *In re World*

*War II Era Japanese Forced Labor Litig.*, 164 F. Supp. 2d 1160, 1179 (N.D. Cal. 2001); *Iwanowa v. Ford Motor Co.*, 7 F.Supp.2d 424, 441 (D. N.J. 1999) ("The use of unpaid, forced labor during World War II violated clearly established norms of customary international law.").

Similarly, prohibitions against servitude (typically called involuntary servitude in the United States), are found in the basic human rights instruments as well as among the conventions prohibiting slavery. Thus, Article 4 of the Universal Declaration of Human Rights provides, "No one shall be held in slavery or servitude; slavery and the slave trade shall be prohibited in all their forms." Universal Declaration of Human Rights, G.A. Res. 217A, U.N. GAOR, ed Sess., 1st plen. mtg., U.N. Doc A/810 (Dec. 10, 1948). The ICCPR provides, "No one shall be held in servitude," and this provision is among those designated by the Covenant as non-derogable even in times of emergency. ICCPR, arts. 8(2) and 4.

Sexual slavery is also a well-established norm under customary international law. Sexual slavery is prohibited under customary international law to the same extent as slavery is. *See, e.g.,* McDougall Final Report ¶ 30 ("In all respects and in all circumstances, sexual slavery is slavery and its prohibition is a *jus cogens* norm."). Article 7(1)(g)-2 of the Elements of Crimes derived under the Rome Statute provide a specific definition of sexual slavery, that adds the element of an act of a sexual nature to the elements of slavery. Specifically, it provides that the elements of the crime of sexual slavery as a crime against humanity are:

> (1) The perpetrator exercised any or all of the powers attaching to the right of ownership over one or more persons, such as by purchasing, selling, lending or bartering such a person or persons, or by imposing on them a similar deprivation of liberty. (2) The perpetrator caused such person or persons to engage in one or more acts of a sexual nature.

Int'l Criminal Court, Elements of Crime, art. 7(1)(g) 2.[9]  As McDougall explained, "Sexual

slavery also encompasses situations where women and girls are forced into "marriage", domestic

servitude ,or other forced labour that ultimately involves forced sexual activity, including rape by

their captors."  McDougall Final Report ¶ 30.

　　　　International norms prohibiting involuntary servitude, forced labor, sexual slavery, and

trafficking are also reflected in the laws of the United States.  Acting on the power granted to

Congress through the Thirteenth Amendment to enact laws operating upon the acts of

individuals, Congress criminalized the sending of persons into involuntary servitude, including

by kidnapping and enticement. *See, e.g.,* 18 U.S.C. § 1584 (criminalizing involuntary servitude);

18 U.S.C. §1589 (prohibiting the provision of labor by any means of threats or coercion).

　　　　Congress's relatively recent enactment of the Trafficking Victims Protection Act

("TVPA"), which recognizes the prohibition of forced labor, involuntary servitude, enslavement,

and human trafficking as part of customary international law, demonstrates that Congress

recognizes the United States' obligations under international law in regard to the serious problem

of modern day forms of slavery. 22 U.S.C. § 7101(23) (2000) ("The United States and the

international community agree that trafficking in persons involves grave violations of human

rights and is a matter of pressing international concern. The international community has

repeatedly condemned slavery and involuntary servitude, violence against women, and other

elements of trafficking, through declarations, treaties, and United Nations resolutions and

reports. . . .").  The legislative history clarifies that involuntary servitude does not require a

---

[9]　　　*available at* http://www.icc-
cpi.int/library/about/officialjournal/basicdocuments/elements(e).html?page=library/officialjournal
/basicdocuments/elements(e)#page25 (last visited on July 31, 2008)

showing of physical coercion and notes that the TVPA is to cover "cases in which individuals have been trafficked into domestic service . . . not only where such victims are kept in service through overt beatings, but also where the traffickers use more subtle means designed to cause their victims to believe that serious harm will result to themselves or others if they leave."   H.R. Rep. No. 106-939, Sec. 12, at 101 (2000).  Finally, "'serious harm' . . . [is] intended to be construed with respect to the individual circumstances of victims that are relevant to determining whether a particular type or certain degree of harm or coercion is sufficient to maintain or obtain a victim's labor or services, including the age and background of the victims." *Id.*

### 3.   Customary International Norms Prohibiting Slavery, Forced Labor, Involuntary Servitude, Trafficking, And Sexual Slavery Are Definite And Widely Accepted

Ms. Swarna's claims under the Alien Tort Statute are sufficiently definite and widely accepted.  Each of the norms – prohibiting slavery, forced labor, involuntary servitude, trafficking, and sexual slavery – have clear specific content with specific elements to be applied by this Court.  With respect to international acceptance of the norms, the norm prohibiting slavery is among the most widely accepted and well-entrenched obligations found in international law.  The norms against the enumerated contemporary forms of slavery share in this widespread acceptance, as evidenced by their presence in the foundational human rights conventions, by their viability more recently in international tribunals, and most recently, by the Trafficking Protocol which 118 countries ratified in incredibly short order.

**C.      The Individual Defendants Are Liable To Ms. Swarna For Their Violations of Customary International Law Pursuant to the Alien Tort Statute**

The Individual Defendants are personally liable for exploiting Ms. Swarna's labor and subjecting her to slavery-like conditions.[10]   In addition, as described more fully in Section D below, Kuwait is liable for the violations of customary international law suffered by Ms. Swarna because it is responsible for the acts of its agents, including Al-Awadi.

### 1.   Slavery And Sexual Slavery

Enslavement is the exercise of power over a person.  *See* Rome Statute, art. 7(2)(c) (defining enslavement as "the exercise of any or all of the powers attaching to the right of ownership over a person and includes the exercise of such power in the course of trafficking in persons, in particular women and children.").  Courts look at "indicia of enslavement" to determine whether an individual has been enslaved including the following factors: "[c]ontrol over someone's movement, control of physical environment, psychological control, measures taken to prevent or deter escape, force, threat of force or coercion, duration, assertion of exclusivity, subjection to cruel treatment and abuse, control of sexuality and forced labour." *Kunarac*, at ¶ 119.

The facts here show that the Individual Defendants exercised complete power and control over Ms. Swarna—essentially, they "owned" her once she was in their home in the United States.  Ms. Swarna was not free to quit, negotiate the terms of her work, or otherwise to vary the conditions of her work in the Individual Defendants' home.  The Individual Defendants beat Ms. Swarna when she objected and they did not permit her to leave the home unescorted or

---

[10]      The Court must presume liability on the part of the Individual Defendants as they failed to answer or otherwise move with respect to Ms. Swarna's Complaint.  *See* Argument, Section I.A. *supra*.

communicate freely with others, including her family.  They deprived Ms. Swarna of nutrition, prohibited her from practicing her religion, and controlled her body and sexuality when Al-Awadi repeatedly raped her.  Further, they subjected her to demeaning statements and to beatings all in an effort to assure that Ms. Swarna did as she was directed.  All of these acts were attempts by the Individual Defendants to exercise the right of ownership over Ms. Swarna and her labor – and therefore are sufficient indicia of slavery.  *See Kunarac,* at ¶ 119 [11]

### 2.  Forced Labor

The Individual Defendant's enslavement of Ms. Swarna also demonstrates she was a victim of forced labor because the work she performed for them was "extracted…under the menace of…penalty."  *See* ILO Convention No. 29, art. 2.[12]  The  Individual Defendants dictated the terms of Ms. Swarna's employment and how much (or rather how little) she would be paid for it.  They denied her freedom of movement  and constantly monitored her.  While Ms. Swarna agreed to work for $2,000 a month with yearly vacations and Sundays off to practice her

---

[11]    Because these conditions of slavery also included Al-Awadi forcibly raping Ms. Swarna, the conditions for Sexual slavery have also been proved.  *See e.g.* Elements of Crimes of the Rome Statute, art. 7(1)(g)-2.

[12]    The ILO has identified a list of nine factors that reflect the lack of consent element or involuntary nature of forced labor and thirteen factors that reflect the threat or menace of penalty element of forced labor.  Int'l Labor Conference, *A Global Alliance Against Forced Labor* (93rd Sess. 2005), *available at* http://www.ilo.org/dyn/declaris/DECLARATIONWEB.DOWNLOAD_BLOB?Var_DocumentID =5059 (last visited July 31, 2008).  With respect to the lack of consent element, the factors of physical confinement; psychological compulsion; induced indebtedness; deception and false promises about types and terms of work; withholding and non-payment of wages, and retention of identity documents are all present here.  With respect to the menace of penalty element, the factors of the actual presence or credible threats of physical violence against the worker or family; sexual violence; imprisonment or other physical confinement; financial penalties; ofdenunciation to authorities and deportation; exclusion from future employment; exclusion from community and social life; removal of rights or privileges; deprivation of food, shelter or other necesseitiers; and loss of social status are all present here.  *See id.* at 6, box 1.1.

religion, she did not agree to work nearly 24 hours a day for $200 a month.  Through the

continuous and unrelenting verbal abuse, the use of force against her, including beatings and

rape, and the threat of force against her and her family in India, the Individual Defendants

compelled Ms. Swarna to work against her will.

### 3.  Involuntary Servitude

The TVPA states that "involuntary servitude" includes a condition of servitude induced

by means of—

> (A) any scheme, plan, or pattern intended to cause a person to
> believe that, if the person did not enter into or continue in such
> condition, that person or another person would suffer serious harm
> or physical restraint; or

> (B) the abuse or threatened abuse of the legal process.

22 U.S.C. § 7102(5).

Again, the evidence submitted demonstrates that Ms. Swarna was subjected to

involuntary servitude.  She was repeatedly subjected to threats and beatings for the purpose

compelling her to work.

### 4.  Trafficking

Trafficking encompasses, *inter alia*, the recruitment or transfer by means of

"threat or use of force or other forms of coercion," "fraud", "deception", "abuse of power",  "a

position of vulnerability" or "exploitation.  *See* Trafficking Protocol, art. 3(a).  Ms. Swarna was a

victim of trafficking.

Ms. Swarna was clearly kept in a state of involuntary servitude and sexual slavery.  She

was paid the equivalent of 45 cents per hour (*see* Argument Section III, *infra.*) and was expected

to be on call 24 hours a day, seven days a week.  Swarna Decl. ¶ 12.  Ms. Swarna was denied any

freedom of movement and was constantly monitored by the the Individual Defendants or members of the Kuwaiti Mission

In addition to forcing her to work or be on-call for 24 hours a day, the Individual Defendants subjected Ms. Swarna to cruel and degrading treatment.  They assaulted her with "constant and unrelenting verbal and physical abuse" including insults, threats to her and her family should she leave their employ, and physical violence that included beatings and hitting. *Id.* at ¶ 29.   To further demoralize and subjugate her, Al-Awadi raped her on multiple occasions. *Id.* at ¶ 36.  Ms. Swarna endured this abuse for many years because she believed that if she tried to escape, Individual Defendants would track her down or she would be arrested, physically harmed, or even killed.  *Id.*

### D.    Kuwait Aided And Abetted The Individual Defendants And Is Also Liable Under The Alien Tort Statute

In *Khulumani v. Barclay*, the Second Circuit affirmed aiding and abetting liability under the Alien Tort Statute, finding this was clearly contemplated as an available theory of liability at the time of the statute's enactment.  504 F.3d 254, 255 (2d Cir. 2007) (per curiam) (holding "that in this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the [Alien Tort Statute].").[13]  The *Khulumani* court's opinion finding that aiding and abetting liability is

---

[13]    The *Khulumani* Court disagreed on the source of aiding and abetting liability.  Judge Katzmann's concurring opinion found that using international law as the source for the applicable standard of aiding and abetting was consistent with the Supreme Court's reasoning in *Sosa*. *Id.* at 268 (quoting *Sosa*, 542 U.S. at 732 n. 20 ).  However, Judge Hall, in his concurrence, found that *Sosa* did not make clear whether federal common law or international law should define the scope of liability under Alien Tort Statute and thus concluded that "[l]acking the benefit of clear guidance, I presume a federal court should resort to its traditional source, the federal common law, when deriving the [aiding and abetting] standard." *Id.* at 286.  The unsettled nature of the standard for aiding and abetting liability in the Second Circuit does not affect Ms. Swarna's claim for relief because she can demonstrate sufficient facts under either standard.

available under the Alien Tort Statute parallels the rulings of other circuit courts and lower

courts.  *See Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157-58 (11th Cir. 2005); *Almog*, 471

F.Supp.2d at 286-87 (finding that aiding and abetting liability has been repeatedly found in Alien

Tort Statute cases and is an accepted principle in international law); *Kiobel v. Royal Dutch

Petroleum Co.*, 456 F.Supp.2d 457, 463-64 (S.D.N.Y. 2006) (stating that "where a cause of

action for a violation of international norm is viable under the [Alien Tort Statute], claims for

aiding and abetting that violation are viable as well.").

As will be explained in Section IV of the Argument, *infra*, Kuwait assisted in obtaining a

visa for Ms. Swarna, paid her salary, and monitored her correspondence and travel while aware

of the systemic problem of Kuwait officials abusing their domestic servants.  Given the widely

reported abuse of domestic workers, Kuwait should have monitored its employees when it

approved diplomats and their domestic workers.  Thus, Kuwait's failure to take seriously this

responsibility toward Ms. Swarna was not merely a lack of monitoring, but amounted to creating

a protected space in which the Individual Defendants could commit these abhorrent human rights

violations.  Therefore, this Court should hold Kuwait liable for aiding and abetting the Individual

Defendants in their violations of the Alien Tort Statute.

## III.   THE COURT SHOULD GRANT DEFAULT JUDGMENT ON MS. SWARNA'S STATE LAW CLAIMS

In addition to her claims under the Alien Tort Statute, Ms. Swarna brings five state law

claims: violations of New York's wage and hours law (Counts II and III); fraud and fraudulent

inducement (Count IV); unjust enrichment (Count V); and breach of contract (Count VI).  The

Court should enter judgment for Ms. Swarna on each of those claims.  First, the evidence is clear

that the Individual Defendants breached their employment contract with Ms. Swarna,

fraudulently induced her to work for them in New York, paid her illegally low wages, and were

unjustly enriched by Ms. Swarna's labor.[14]   Moreover, Kuwait itself was unjustly enriched by

Ms. Swarna's labors and is also liable for the actions of its agent, Al-Awadi, pursuant to the

doctrines of *respondeat superior* and ratification.

### A.      Wage and Hour Claims

The Individual Defendants employed Ms. Swarna in New York, and therefore Ms.

Swarna is protected by New York and federal labor laws and is entitled to recover unpaid wages,

spread of hours damages, and liquidated damages.

Ms. Swarna received far less than the statutory minimum wage required by law.  As a

result, New York law states she is allowed to recover the wages she ought to have received:

> "If any employee is paid by his employer less than the wage to
> which he is entitled under the provisions of this article, he may
> recover in a civil action the amount of any such underpayments,
> together with costs and such reasonable attorney's fees as may be
> allowed by the court, and if such underpayment was willful, an
> additional amount as liquidated damages equal to twenty-five
> percent of the total of such underpayments found to be due him
> and any agreement between him and his employer to work for less
> than such wage shall be no defense to such action."

N.Y. Lab. Law § 663(1) (2008).  Ms. Swarna was entitled to at least the federal minimum wage

for the entirety of her employment with Defendants under the Federal Labor Standards Act

(FLSA).  29 U.S.C. § 206(f) (2008).  The federal minimum wage was raised twice during Ms.

Swarna's employment.  *See* http://www.dol.gov/ESA/minwage/chart.htm.  From September 8,

1996 to September 31, 1996 the minimum wage was $4.25 per hour.  *Id.*  From October 1, 1996

---

[14]      The Individual Defendants' failure to answer or otherwise appear, is deemed a concession of
liability as to all claims.  *See* Argument Section I.A, *supra.*  Ms. Swarna only sets forth evidence
of the liability of the Individual Defendants in order to meet the higher requirements for a default
judgment against Kuwait.  *See* Argument Section I.B, *supra.*

to August 31, 1997 the minimum wage was $4.75 per hour.  *Id.*  From September 1, 1997 to June 25, 2000 the minimum wage was $5.15 per hour.  *Id.*  Ms. Swarna is entitled to compensation for 24 hours each day of her employment because she was never at liberty to leave her place of employment and was on duty every hour of every day.  *See Holzapfel v. Town of Newburgh*, 145 F.3d 516, 522 (2d Cir. 1998) ("Work is defined as 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer….'") (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No., 123*, 321 U.S. 590, 598 (1944)).  Ms. Swarna was actively engaged in cooking, cleaning, caring for the Individual Defendants' children and many other tasks for at least eighteen hours each day.  *See* Swarna Decl. ¶¶ 12-14.  Even when she was not actively working on these tasks, Ms. Swarna was not allowed to leave the apartment and pursue any personal activities.  *Id.* at ¶¶ 20, 24-26.  She was imprisoned in the Individual Defendants' home and forced to be ready to cater to Individual Defendants' whims 24 hours a day, 7 days a week. There was never a time she was free from her duties, thus it is appropriate to compensate Ms. Swarna for 24 hours at the minimum wage for each day she worked.

Ms. Swarna was in the employ of Defendants for 1,386 days.  With the exception of a pair of 30 day periods when Ms. Swarna was allowed to visit her family in India, Ms. Swarna was on call and at work 24 hours a day every day.  From the time when she began working for Defendants through September 30, 1996, Ms. Swarna worked a total of 23 days.  From October 1, 1996 through August 31, 1997 Ms. Swarna worked 335 days.  From September 1, 1997 through June 25, 2000, Ms. Swarna worked 968 days (1028 days total less the 60 days she was in India visiting her family).  The following chart summarizes the wages owed Ms. Swarna:

| Date | Days | Hours Per Day | Minimum Wage | Wages Due |
|------|------|---------------|--------------|-----------|
| 09/08/96 – 09/30/96 | 23 | 24 | $4.25 | $2,346.00 |
| 10/01/96 – 08/31/97 | 335 | 24 | $4.75 | $38,190.00 |
| 09/01/97 – 06/25/00 | 968 | 24 | $5.15 | $119,180.80 |
| **Total** | | | | **$160,180.80** |

The Individual Defendants should have paid Ms. Swarna $160,180.80.

Ms. Swarna is entitled to further compensation due to New York's spread of hours provision. *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4 (2008). "An employee shall receive one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage required in this part for any day in which: (a) the spread of hours exceeds 10 hours…." *Id.* Since Ms. Swarna worked 24 hours each day she was in Defendant's employ, Ms. Swarna should be entitled to an extra hours pay for each day at the respective minimum wage for that time period:

| Date | Days | Minimum Wage | Spread of Hour Wages |
|------|------|--------------|----------------------|
| 09/08/96 – 09/30/96 | 23 | $4.25 | $97.75 |
| 10/01/96 – 08/31/97 | 335 | $4.75 | $1,591.25 |
| 09/01/97 – 06/25/00 | 968 | $5.15 | $4,985.20 |
| **Total** | | | **$6.674.20** |

The Individual Defendants should have paid Ms. Swarna an additional $6,674.20, for a total of **$166,855**.

New York also allows for liquidated damages of up to 25% of the underpayment in cases where the underpayment is deemed to be willful. N.Y. Lab. Law § 663(1) (2008). Here the

defendants "knowingly, deliberately, and voluntarily" underpaid Ms. Swarna despite their duty under New York law.  *See P & L Group, Inc. v. Garfinkel*, 541 N.Y.S.2d 535, 537 (N.Y. App. Div. 1989); *see also Magness v. Human Res. Servs., Inc.* 555 N.Y.S.2d 347, 348 (N.Y. App. Div. 1990).  "No finding of malice or bad faith, however, is necessary."  *Ayres v. 127 Rest. Corp.*, 12 F.Supp.2d 305, 309 (S.D.N.Y. 1998).  Due to the fact that the Individual Defendants knew that they were grossly underpaying Ms. Swarna, Ms. Swarna is entitled to an additional $41,713.75 in liquidated damages.  Accordingly, the Individual Defendants are liable for at least $198,218.75  for their violations of applicable wage and hour laws.[15]

## B.     Breach Of Contract

"The elements of a breach of contract under New York law are (1) the existence of a contract; (2) plaintiff's performance on the contract; (3) defendant's breach of contract; and (4) resulting damages."  *Sharp v. Patterson*, No. 03-CV-8772, 2004 WL 2480426, *5 (S.D.N.Y. Nov. 3, 2004) (quotation ommited).  There is ample evidence that the Individual Defendants breached their employment contract with Ms. Swarna.

### 1.     The Evidence Is Overwhelming And Unrebutted That Defendants Materially Breached Their Employment Agreement With Ms. Swarna

Ms. Swarna entered into an employment contract with the Individual Defendants to be their domestic worker in the United States.  *See* Swarna Decl. ¶ 7.  The terms of the contract were clear.  In exchange for moving with the Individual Defendants to New York City and keeping the Individual Defendants' home and caring for their children, the Individual Defendants agreed to: (1) treat Ms. Swarna humanely; (2) pay Ms. Swarna $2,000 per month; (3) allow and

---

[15]      $166,855 (wages owed) + $41,713.75 (25%) - $10,350 (wages paid) = $198,218.75

pay for Ms. Swarna's traveling to India for one month per year to visit her family; and (4) allow Ms. Swarna to not work on Sundays so she could attend Christian services.  *Id.*  Despite the fact that Ms. Swarna dutifully fulfilled her part of the agreement, the Individual Defendants never had any intention of keeping their part of the bargain and breached the employment contract upon arrival in the United States.

Ms. Swarna worked far more hours a day than were reasonable and was treated barbarically by the Individual Defendants.  During her employment, Ms. Swarna routinely worked from 6:00 a.m. until midnight, seven days per week.  *Id.* at ¶ 12.  She was the primary caretaker of the Individual Defendants' children, and performed all of the cooking and cleaning for the household.  *Id.*  Individual Defendants treated Ms. Swarna as a slave—not as an employee—and only permitted her to leave the apartment on approximately fifteen occasions during her nearly four years of employment.  *Id.* at ¶ 24.

In addition to being subject to an abusive and degrading work environment, Ms. Swarna was not paid at the agreed-upon rate.  Upon arriving in the United States, Ms. Swarna was paid $200 a month, not $2,000.  *Id.* at ¶ 15.  During the second year of Ms. Swarna's employment, following the birth of the Individual Defendants' daughter, Ms. Swarna's monthly pay increased to $250 and was ultimately raised in her fourth year to $300.  *Id.*

The Individual Defendants also failed to allow and pay for Ms. Swarna's yearly travel to India.  In the nearly four years she toiled for the Individual Defendants, Ms. Swarna was allowed to visit India only twice.  *Id.* at ¶ 21.  Moreover, although promised that the trips would be paid

for as a term of her employment, on one occasion Ms. Swarna was denied three months of her

salary as punishment for taking a trip to visit her family. *Id*. at ¶ 19.[16]

Finally, the Individual Defendants did not allow Ms. Swarna a single Sunday off so she

could freely practice her Christian faith and attend church. *Id.* at ¶ 20.   In fact, the Individual

Defendants prohibited Ms. Swarna from reading the Bible and on the occasions they caught her

doing so, they beat her and ordered her to throw her Bible away.  *Id.*

In sum, the record is clear and unrebutted that the Individual Defendants wantonly

breached all the promises they made to Ms. Swarna.

### 2.   Ms. Swarna Is Entitled To Significant Damages As A Result Of Defendants' Material Breach

Ms. Swarna is entitled to at least $80,650 in compensatory damages as a result of the

Individual Defendants' beach.  In New York, the proper measure of damages for breach of

contract are expectancy damages.[17]  *See J.R. Loftus, Inc. v. White*, 649 N.E.3d 1196 (N.Y. 1995).

Expectation damages are designed to put the "aggrieved party in the same economic position it

would have been in had both parties fully performed."  *Bausch & Lomb Inc. v. Bressler*, 977

---

[16]     The Individual Defendants' promise that they pay for Ms. Swarna's annual trip home is a result of the Kuwaiti Mission's policy of paying for a yearly trip to and from New York.  *See* Swarna Decl. ¶ 17.

[17]     Ms. Swarna is also entitled to restitution damages for her years of service to the Individual Defendants.  Such damages would be equal to the difference between what she was paid during the course of her employment and the amount a domestic worker similarly situated would have received based on the fair market value, or the reasonable value of services, of such labor at the time.  *See Farash v. Sykes Datatronics, Inc.*, 452 N.E.2d 1245, 1248 (NY 1983) (upon a demonstration that a defendant is liable for material breach, plaintiff may recover "the reasonable value of the services rendered, goods delivered, or property conveyed less the reasonable value of any counter-performance received by him"; *see also U.S. East Telecomms., Inc. v. U.S. West Info. Sys., Inc.*, No. 87-CV-2924, 1993 WL 385810, at *24 (S.D.N.Y. Sept. 30, 1993) (plaintiff in a breach of contract action is entitled to the fair value of services performed, even if that amount is greater than the contract price).

F.2d 720, 729 (2d Cir. 1992).  The loss Ms. Swarna incurred was directly traceable to the Individual Defendants' failure to pay her the contractually agreed upon amount and her enforced bondage.  Although it cannot begin to compensate Ms. Swarna for all of the harm she suffered at the hands of the Individual Defendants, expectation damages would at least compensate Ms. Swarna for the Individual Defendants' failure to pay her the amount promised – $2,000 per month.[18]

Ms. Swarna worked in the Individual Defendants' New York home from September 8, 1996 until June 25, 2000, a period of approximately 45.5 months.  *See* Swarna Decl. ¶¶ 9, 37-40. Under her employment agreement, Ms. Swarna should have been paid approximately $91,000 over the course of that time period ($2,000 multiplied by 45.5).[19]  The Individual Defendants only paid Ms. Swarna $10,350.[20]  In addition to that amount, Ms. Swarna is also entitled to 9% statutory prejudgment interest.   N.Y. C.P.L.R. §§ 5001(a), 5004; *see also Turner Constr. Co. v.*

---

[18]   The damages Ms. Swarna suffered as a result of her enslavement and physical, emotional, and sexual abuse are vastly different in degree and kind than those she suffered for being paid a paltry wage – and are by definition not easily quantifiable.  Accordingly, Ms. Swarna respectfully requests a hearing, as the Court deems necessary, to demonstrate the amounts owed to her.

[19]   As set forth above, the wage the Individual Defendants agreed to pay Ms. Swarna was illegal under New York and United States labor laws.  *See* Argument Section III.A, *supra*.

[20]   As set forth above, Ms. Swarna received $200 dollars during her first twelve months of employment, $250 during the next twenty-four months, and $300 a month over her final nine months.  Ms. Swarna was also denied three months pay during her third year as punishment for visiting India to visit her family.  *Id.* at ¶ 18.  As a result Ms. Swarna was paid $2,400 (12 months multiplied by $200) in her first year, $3,000 (12 months multiplied by $250) in her second year, $2,250 (nine months multiplied by $250) in her third year, and $2,700 (nine months multiplied by $300) in her final year.  Accordingly, the total amount paid to Ms. Swarna over her entire employment was $10,350 ($2,400 + $3,000 + $2,250 + $2,700), $80,650 less than the Individual Defendants contracted to pay Ms. Swarna ($91,000 minus $10,350).

*Am. Mfrs. Mut. Ins. Co.*, 485 F.Supp.2d 480, 490 (S.D.N.Y. 2007) (applying 9% yearly prejudgment interest for New York breach of contract claim).

     **C.**       **Unjust Enrichment**

         **1.**       **Kuwait**

     Unlike the Individual Defendants, Kuwait did not enter into an employment contract with Ms. Swarna.  However, given the work that Ms. Swarna performed directly for Kuwait while she was enslaved by the Individual Defendants, she is entitled to compensation for those services under principles of unjust enrichment.  In order to recover, Ms. Swarna must establish: "(1) the performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."  *Joan Hansen & Co. v. Everlast World's Boxing Headquarters Corp.*, 744 N.Y.S.2d 384, 389 (N.Y. App. Div. 2002).  Furthermore, Ms. Swarna must demonstrate that Kuwait reaped a benefit bestowed by Ms. Swarna, at her expense. *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 12 (N.Y. App. Div. 1998).  Ms. Swarna performed many tasks directly for the Kuwaiti Mission throughout the time of her employment by the Individual Defendants.  Ms. Swarna cooked, served, and cleaned up for dinner parties which took place at the Individual Defendants' home for the benefit of the Mission.  *See* Swarna Decl. ¶¶ 13, 14.  Moreover, Ms. Swarna prepared food for events which took place at the Mission itself.  *Id.* at ¶ 14.  Finally, on at least one occasion, Ms. Swarna was brought to the Ambassador's residence to teach his cooking staff how to make traditional Kuwaiti treats.  *Id.* at ¶ 16.   Kuwait never paid Ms. Swarna a single cent for this work.  Accordingly, Ms. Swarna is entitled to the fair market value of those services.

###### 2.    The Individual Defendants

Should the Court consider that Ms. Swarna and the Individual Defendants did not enter into a valid and enforceable employment contract, Ms. Swarna is entitled to damages under a theory of unjust enrichment.[21]  There can be no question that Ms. Swarna performed services for the benefit of the defendants.  She cared for their children, performed a myriad of household duties, and cooked for and worked at parties taking place at Al-Awadi and Al-Shaitan's home and at the Kuwaiti Mission.  *See* Swarna Decl. ¶¶ 12-14.  Ms. Swarna is entitled to the fair market value of the services she rendered to defendants, which are clearly well above the $200 to $300 she was paid per month and even well above the $2,000 per month she was promised.

###### D.    Fraudulent Inducement

The evidence is also clear that defendants fraudulently induced Ms. Swarna to travel with them to the United States by making promises that they never intended to fulfill.  Accordingly, defendants' conduct rises to the level of fraud and promissory fraud under New York law.

To establish a cause of action for fraud or fraudulent inducement, a plaintiff must show that the defendant knowingly and with intent to defraud, made material representations on which the plaintiff relied, and as a result of such reliance the plaintiff suffered damages.  *See, e.g.*, *Ochs v. Woods*, 117 N.E. 305, 306 (N.Y. 1917); *Banque Arabe Et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146 (2d Cir. 1995).  "A false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement between the parties." *Graubard Mollen Dannett & Horowith v. Moskovitz*, 653 N.E.2d 1179, 1184 (N.Y.

---

[21]    Under New York law, a plaintiff may only bring an unjust enrichment claim in the absence of a valid and enforceable contract.  *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 747 (N.Y. 2005).

1995).  Given that the Individual Defendants breached the terms of their agreement with Ms.

Swarna from the moment they set foot on U.S. soil, it is clear that they never intended to pay her

$2,000 or to treat her humanely.  Moreover, it is equally clear that Ms. Swarna only accepted a

position as the Individual Defendants' domestic worker because of the promise of increased pay

and respectful treatment.  Swarna Decl. ¶ 7  At the time that Al-Awadi and Al-Shaitan offered

Ms. Swarna employment, Ms. Swarna was comfortably working in the home of Al-Shaitan's

parents in Kuwait and was content with her position.  *Id.*  Al-Awadi and Al-Shaitan, in order to

convince Ms. Swarna to accompany them to New York, misrepresented that they would pay her

$2,000 per month, would treat her humanely, would allow her to attend church, and would allow

her to periodically visit her family in India.  As a result, defendants coerced Ms. Swarna into

leaving a stable work environment in Kuwait for a home in the United States which she could

not escape, and where she was isolated, beaten, degraded, physically and emotionally abused,

repeatedly sexually assaulted, and prevented from practicing her faith.

        The Individual Defendants' conduct was so egregious that punitive damages are also

justified.  "While 'punitive damages are not recoverable for an ordinary breach of contract,' it is

elemental that a claim for fraud or fraudulent inducement may serve as a foundation for an award

of punitive damages."  *Int'l Design Concepts, LLC v. Saks, Inc.,* 486 F.Supp.2d  229, 238

(S.D.N.Y. 2007) (quoting *Rocanova v. Equitable Life Assurance Soc. of the U.S.*, 634 N.E.2d

940, 943  (N.Y. 1994).  "[W]here the breach of contract also involves a fraud evincing a high

degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal

indifference to civil obligations, punitive damages are recoverable if the conduct was 'aimed at

the public generally.'"  *Rocanova*, 634 N.E.2d at 944 (quotations omitted).  The Individual

-42-

Defendants' deceiving Ms. Swarna into a state of slavery rises to the level of egregiousness to meet the standard for punitive damages.

Accordingly, this court should enter judgment against the defendants for fraud and grant Ms. Swarna both compensatory and punitive damages.

IV.    **KUWAIT IS VICARIOUSLY LIABLE TO MS. SWARNA FOR THE ACTIONS OF THE INDIVIDUAL DEFENDANTS UNDER PRINCIPLES OF RESPONDEAT SUPERIOR AND RATIFICATION.**

      **A.    Respondeat Superior**

Kuwait is liable for all or nearly all of the acts of Al-Awadi, a senior member of Kuwait's mission, in his dealings with Ms. Swarna, including for those acts that form the basis of Ms. Swarna's claims under Alien Tort Statute as well as for breach of contract, fraud, unpaid wages, and unjust enrichment claims.

First, as a benefit to Al-Awadi's employment, Kuwait provided material assistance to Al-Awadi in trafficking Ms. Swarna to the United States.  Ms. Swarna entered the United States with a G-5 immigration visa, which allows diplomats to bring domestic workers to the United States.[22]  In order to obtain a G-5 visa, the sending government must provide a "diplomatic note," which is a "written confirmation by the sending government of the applicant's status."[23]

---

[22]    The G-5 visa program reflects the special role of domestic workers in the homes of diplomats. The Vienna Convention on Diplomatic Relations addresses in numerous sections the special role of domestic workers employed by diplomats and their relationship to the sending state.  *See, e.g.,* Vienna Convention on Diplomatic Relations art. 10 (requiring notification of receiving state of the arrivals , departures, and discharge of private servants of diplomats); art. 37 (private servants of members of the mission who are not nationals of receiving state, "may enjoy privileges and immunities only to the extent admitted by the receiving State. However, the receiving State must exercise its jurisdiction over those persons in such a manner as not to interfere unduly with the performance of the functions of the mission.").

[23]    *See* State Dept., Employees of Int'l Orgs. and NATO, *available at* http://travel.state.gov/visa/temp/types/types_2638.html (last visited Aug, 4, 2008).

To accommodate Al-Awadi's employment in the United States, Kuwait provided Ms. Swarna with the required diplomatic note, and in so doing, assisted Al-Awadi in bringing Ms. Swarna to the United States.  Kuwait provided Al-Awadi with this assistance for the sole purpose of facilitating Al-Awadi's employment in the United States.  When Al-Awadi accepted this assistance, he did so in the scope of employment and in the course of his responsibilities as Kuwait's employee.

Second, the State Department has repeatedly taken the position that the sending nation is to be help responsible for the mistreatment of domestic workers by diplomats.  On May 20, 1996, the State Department distributed a Circular Diplomatic Note concerning the treatment of domestic workers by diplomats to all Chiefs of Mission, including to Kuwait, stating that the United States government would "*hold the Chief of Mission and the sending government responsible* for the conduct of persons sent to the United States as diplomatic representatives or of others entitled to immunity." United States Department of State, Circular Diplomatic Note of May 20, 1996 (emphasis added).[24]  The State Department further informed Kuwait that it should take affirmative steps to monitor its employees, including "review[ing] each employment contract…[and] keep[ing] a copy on file at the mission and ensure that mission members respect their obligations as employers."  In 2000 – shortly before Ms. Swarna escaped –  the State Department sent a second Circular Diplomatic Note to foreign missions, including Defendant Kuwait, reiterating the legal obligations of diplomats to their domestic workers.  *See* United States Department of State, Circular Diplomatic Note of June 19, 2000.[25]

---

[24]     *available at*: http://www.state.gov/documents/organization/32298.pdf (last visited Aug. 4, 2008).

[25]     *available at*: http://www.state.gov/documents/organization/32298.pdf (last visited Aug. 4, 2008).

Third, the law of agency confirms Kuwait's liability as the principal for the actions of Al-Awadi, its agent.  New York law weighs the following factors in determining whether conduct occurred within the scope of employment, and therefore whether liability is appropriate:

> [T]he connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979).  Foreseeability is held to be particularly critical and, "where the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment."  *Id*. at 1282.

Application of these principles to the facts surrounding the employment and mistreatment of Ms. Swarna demonstrate that Al-Awadi was acting within the scope of his employment throughout and that Kuwait is thereby liable for the actions of its agent.  As explained above, it is anticipated by international law and the immigration laws of the United States that diplomats will have domestic workers in their homes.  This practice was particularly common among the diplomatic staff of the Kuwaiti Mission, where many of the diplomats had multiple domestic workers whose employment, transportation, and care were paid for by Kuwait.  *See* Swarna Decl. ¶¶ 17-19.  Ms. Swarna also regularly performed work for the benefit of the Mission.  She cooked and prepared for countless Mission-related parties taking place at the Individual Defendants' home and at the Mission itself.  *Id.* at ¶¶ 13, 14.  These parties were also regularly attended by members of the missions to the United Nations from other Gulf nations, along with their families, as well as other diplomatic and official guests.  *Id.* at ¶ 13.  In fact, on at least one occasion, Ms. Swarna traveled to the Ambassador's residence to teach his cook how to prepare

traditional Kuwaiti sweets.  *Id.* at ¶ 16.  As such, the employment of Ms. Swarna was plainly within the scope of Al-Awadi's employment.[26]

Moreover, even Al-Awadi's improper actions were within the scope of his agency for Kuwait.  Ms. Swarna was working and living in the Al-Awadi home – which was owned by Kuwait – and serving and cleaning at official parties hosted by the Mission.  These facts demonstrate the "connection between the time, place, and occasion" for Al-Awadi's acts in the home with respect to Ms. Swarna, even the rapes.  Similarly, Kuwait was fully familiar with much of the mistreatment that Ms. Swarna suffered, or at a minimum, should have anticipated such mistreatment.  All of the diplomats at the Kuwaiti Mission, including the Ambassador, over-worked and under-paid the domestic workers in their homes.  *See* Swarna Decl. ¶ 16.  Moreover, a senior member of the Kuwaiti Mission arranged for Ms. Swarna's correspondence with her family in India to be translated so that it could be read by the Al-Awadis.  *Id.* at ¶ 28.

Significantly, the mistreatment of Ms. Swarna in the home of the Al-Awadis was typical of treatment of domestic workers generally in Kuwait itself.  Thus, even after years of efforts by the United States government to encourage Kuwait eradicate the mistreatment of domestic

---

[26]    On this point, one aspect of *Park v. Shin,* 313 F.3d 1138 (9th Cir. 2002), is distinguishable.  In *Park,* the court found that the employment of a domestic servant was outside the scope of the official duties of the defendants, consular officials posted in the United States.  *Id*. at 1144.  In making its finding, however, the court held, "[the defendant] was not acting exclusively or even primarily as an agent of the Republic of Korea when he hired Plaintiff.  Instead, he hired her as a personal family employee, paid her with family funds, and required her to perform work benefiting the Consulate only on a few days each month."  *Id.*  In contrast, here the facts demonstrate that Defendant Al-Awadi was acting on behalf of Kuwait, that Kuwait was reimbursing the Al-Awadi's for the expenses relating to Ms. Swarna's employment, that Ms. Swarna was regularly performing work benefiting the Kuwait Mission, and that the Kuwait Mission was actively involved in the mistreatment of Ms. Swarna.  Moreover, even to the extent to which Ms. Swarna was providing child care to the Individual Defendants' children, this was not inconsistent with her providing services to Kuwait, which also reimbursed the Individual Defendants for the schooling of their children.

workers, the U.S. Department of State reported in its 2008 Country Reports on Human Rights that the "physical or sexual abuse of foreign women working as domestic servants was a serious problem."  Bureau of Democracy, Human Rights, and Labor, U.S. Dept. of State, *Kuwait: Country Reports on Human Rights Practices – 2007*.[27]  The same report found that "[t]he most prevalent trafficking cases [in Kuwait] involved female domestic laborers," and that "[m]any domestic workers reported that they were compelled to work more than their agreement provided for, or that they were not allowed to leave their houses.  One of the most common complaints was lack of payment."  *Id.*

Kuwait was specifically on notice by the State Department to be aware of the potential abuse of domestic workers by its diplomatic staff.  *See* Circular Diplomatic Note dated May 20, 1996.  The letter specifically stated that:

> the Department has been informed of instances where wages have been withheld from personal domestics for undue periods; where the wages actually paid are substantially less than those stipulated at the time of employment; where passports have been withheld from the employee; where the actual number of working hours weekly is substantially more than those originally contemplated and with no additional pay; and where the employee has been forbidden from leaving the employer's premises even though off duty.

*Id*

Each and every one of the illegal activities highlighted by the State Department was committed upon Ms. Swarna by Kuwait's agent, Al-Awadi, through the normal course of his employment for Kuwait.  As a result, Kuwait was on notice and should have reasonably foreseen that its agent would place Ms. Swarna in a condition of involuntary servitude.  Despite this,

---

[27]    *available at* http://www.state.gov/g/drl/rls/hrrpt/2007/100599.htm (last visited July 31, 2008).

Kuwait took no action to prevent these abuses and instead chose to insulate its agent, Al-Awadi, by transferring him to a post in France, demonstrating the state's approval of the Individual Defendant's conduct.  Kuwait should have foreseen such conduct and as a result should be found vicariously liable under New York's standard for *respondeat superior*.

### B.     Ratification

The Court should also find Kuwait liable for the Individual Defendants' treatment of Ms. Swarna, including Al-Awadi's acts of sexual slavery because these acts were ratified both by Kuwait's failure to repudiate the individual defendant's actions and by its subsequent transfer of the defendant to France.  Ms. Swarna's initiation of her lawsuit and the later complaint brought before the UN Special Rapporteur on Trafficking both demonstrate that Kuwait had full and complete knowledge of the underlying facts, such that its continued employment and lack of investigation or repudiation sufficiently ratified Al-Awadi's acts.

Kuwait may be found liable for Al-Awadi's (its agent's) acts if it ratifies or affirms the act, even if the act was initially unauthorized.  *Prisco v. State of N.Y.*, 804 F.Supp 518, 523 (S.D.N.Y. 1992). Expressions of intent to ratify can be inferred when the principal fails to repudiate the acts within a reasonable amount of time after being made aware of the agent's misdeeds, or when there is an opportunity to speak and, under the circumstance, a desire to repudiate would normally be expressed but the principal remains silent. *See id.* at 524 (ratification would have occurred if after being informed of environmental violations at the site, the principal left the site open in order to maintain an informant site); *Orix Credit Alliance v. Phillips-Mahnen, Inc.*, No. 89 Civ. 8376 (THK), 1993 WL 183766, at *10 (S.D.N.Y. May 26,

1993) (principal's "silence and failure to repudiate the guaranty was an unambiguous expression of his intent to ratify it").

A principal's intent to ratify can also be inferred when, in connection with other circumstances, the principal keeps the agent in his employ. *NLRB v. Local 3, Int'l Bhd. of Elec. Workers*, 730 F.2d 870 (2d Cir. 1984).  In *NLRB*, the Second Circuit held that when Local 3 did not discipline workers for unfair labor practices it "signal[ed] to its members that such actions taken by them will never result in any penalties," thus ratifying the unfair labor practices. 730 F.2d at 877.

Here, Kuwait should be held liable for Al-Awadi's mistreatment of Ms. Swarna because it ratified that treatment when it (1) failed to repudiate Al-Awadi's conduct and (2) transferred him to another diplomatic post in France.  Al-Awadi's departure from the United States on July 15, 2004 (Dunham Decl.), came less than five months after Ms. Swarna's testimony on February 25, 2004 at the default hearing in her initial action.  Kuwait had full and complete knowledge of the material facts the moment Ms. Swarna filed her original complaint.  Kuwait's failure to repudiate Al-Awadi, its silence, and its failure to investigate Ms. Swarna's claims evidences ratification of the Individual Defendants' conduct.  Further evidence of ratification is shown by Kuwait's cursory defense of the Individual Defendants before the United Nations Special Rapporteur on the human rights aspects of the victims of trafficking in persons, especially women and children ("UN Special Rapporteur").   By letter dated May 10, 2005, the UN Special Rapporteur brought Ms. Swarna's treatment to Kuwait's attention.  *See* UN Comm'n on Human Rights, INTEGRATION OF THE HUMAN RIGHTS OF WOMEN AND A GENDER PERSPECTIVE, Rep. of the Spec. Rapporteur, Summary of cases transmitted to Governments and replies received,

March 27, 2006, E/CN.4/2006/62/Add.1[28], at 18-19.  By letter dated July 15, 2005, Kuwait

unequivocally defended the Individual Defendants behavior, noting only that Al-Awadi is a

person of "good reputation" and high moral standing"; that Ms. Swarna was "granted all her

rights with respect to leave and health care"; that Ms. Swarna's monthly salary was remitted to

India; and that Ms. Swarna was not prevent from practicing her religion.  *Id* at 19.  Kuwait

simply ignored Ms. Swarna's claims of physical, emotional and sexual assault, and low wages.

In fact, Kuwait has never even attempted to contact Ms. Swarna.  *See* Swarna Decl.  ¶ 44.

Simply put, Kuwait failed to take Ms. Swarna's claims seriously and failed to investigate or ever

discipline Al-Awadi.  Kuwait's failure to discipline Al-Awadi was clear encouragement and

complicity in the acts of the Individual Defendants.  *See NLRB v. Local 3*, 730 F.2d at 877.

Because Kuwait failed to repudiate Al-Awadi or investigate the matter within a reasonable

amount of time, Kuwait affirmed Al-Awadi's actions and this court should find it liable for those

actions.

**V.     NONE OF THE DEFENDANTS IS ENTITLED TO IMMUNITY IN THIS
        ACTION.**

   **A.     The Individual Defendants**

        Diplomatic immunity ceased when the Individual Defendants left the country, and

residual immunity does not apply to the conduct alleged in the Complaint.  Residual immunity

only applies to conduct performed in the exercise of diplomatic functions.  Here, none of the

alleged conduct was performed in the exercise of Al-Awadi's diplomatic functions.  Al-Awadi's

misconduct, while done at the behest of his employer, does not fall within the diplomatic

---

[28]        *available at*
            http://daccessdds.un.org/doc/UNDOC/GEN/G06/121/85/PDF/G0612185.pdf?OpenElement.

functions enumerated by the Vienna Convention on Diplomatic Relations.  Al-Shaitan was not a member of the Kuwaiti mission and therefore did not exercise diplomatic functions.

If, however, the Court were to find that the alleged misconduct was performed in the exercise of Al-Awadi's functions as a diplomat and that residual immunity applies, then such conduct necessarily also falls within Al-Awadi's scope of employment.  This finding would render Kuwait liable for Al-Awadi's conduct.

**1.    Except for Al-Awadi's Acts Performed In The Exercise of His Functions As a Member of the Mission, Diplomatic Immunity Ceased When The Individual Defendants Left The United States**

Individuals with diplomatic immunity are not subject to the civil jurisdiction of the courts in the receiving state, except with respect to court actions in a limited set of circumstances. Vienna Convention on Diplomatic Relations, arts. 29-37, Apr. 24, 1963, 21 U.S.T. 77.  However, Article 39 provides that "[w]hen the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country," except "with respect to acts performed by such a person in the exercise of his functions as a member of the mission."

Where diplomatic immunities have ceased, U.S. courts have subjected former diplomats to jurisdiction for conduct that transpired during a diplomatic mission:

> The United States Government has consistently interpreted Article 39 of the VCDR to permit the exercise of U.S. jurisdiction over persons whose status as members of the diplomatic mission has been terminated for acts they committed during the period in which they enjoyed privileges and immunities, except for acts performed in the Exercise of the functions as a member of the mission. (Article 3 of the VCDR lists the permissible functions of a diplomatic mission.)  The Department of State has publicly stated this interpretation to U.S. law enforcement authorities, to Congress, and to members of foreign diplomatic missions in the United States.

-51-

*United States v. Guinand*, 688 F. Supp. 774, 775 (D.D.C. 1988) (prior grant of diplomatic immunity does not preclude criminal indictment for drug offenses committed while serving as a diplomat upon termination of the diplomat's mission). *See also In re Noboa*, Nos. M18-302, M19-111, 1995 U.S. Dist. LEXIS 14402, at *9-10 (S.D.N.Y. Oct. 4, 1995) (permitting service of a subpoena compelling testimony in court where the diplomatic immunity of the witness had expired). Other parties to the Vienna Convention on Diplomatic Relations construe the scope of diplomatic immunity similarly. *See, e.g., Empson v. Smith*, (1965) 1 Q.B.. 426 (British court held that Canadian attaché not immune from civil suit after diplomatic status had expired).

While the Individual Defendants may have been entitled to immunity while residing in this country, now that they have left, they are no longer entitled to such immunity. When Ms. Swarna brought her prior lawsuit against the Individual Defendants in 2002, the Individual Defendants were entitled to diplomatic immunity at the time of service. While that action was dismissed without prejudice, it progressed as far as a default hearing at which Ms. Swarna's testimony was taken and the court made the following observation: "While it is true that the defendants are no longer protected by diplomatic immunity, that fact allows plaintiff to pursue the defendants – if she can locate them – with a new lawsuit." *Vishranthamma v. Badar Al-Awadi*, Rep. and Recommendation (Exhibit G).

Now, Al-Awadi is only entitled to continuing immunity for those acts he performed in the exercise of his functions as a member of the mission. *See* Vienna Convention on Diplomatic Relations, art. 31(2). To the extent that the Court finds that any of the alleged misconduct does implicate the exercise of Al-Awadi's functions as a member of the Mission and he is entitled to residual immunity, then Kuwait must be held liable because such continuing immunity "applies

only to acts performed on behalf of or imputable to the sending state"  Eileen Denza,

COMMENTARY ON THE VIENNA CONVENTION ON DIPLOMATIC RELATIONS at 363 (Oxford

University 2004.

In *Knab v. Republic of Georgia*, 1998 U.S. Dist. LEXIS 8820 (D.D.C. May 29, 1998), a

diplomat who killed and injured several individuals while driving under the influence of alcohol

asserted the defense of diplomatic immunity in a private cause of action for damages.  The court

found that residual immunity applied because he was acting within the scope of his duties as a

diplomat at the time of the accident, noting that "some courts have suggested that a diplomat is

always acting within the scope of his employment."  *Id*. at *11.

### 2.    The Doctrine Of Foreign Sovereign Immunity Does Not Bar This Action Against The Individual Defendants

FSIA, 28 U.S.C. § 1604, immunizes foreign states from certain lawsuits in the United

States and extends this immunity to individuals when they are sued for acts done in their official

capacity as employees of a foreign sovereign.  *Shalaby v. Saudi Arabian Airlines*, 97 Civ. 9393

(DC), 1998 U.S. Dist. LEXIS 17571, at *6  (S.D.N.Y. Nov. 9, 1998).  Immunity does not apply,

however, where the act falls within an exception to FSIA, 28 U.S.C. § 1605, or where an agent of

a foreign sovereign acts outside the scope of his official duties.  *Id.* ("a lawsuit against a foreign

official acting outside the scope of his authority does not implicate any of the foreign diplomatic

concerns involved in bringing suit against another government in the United States courts"); *see

also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027 (D.C. Cir. 1997)

("individuals . . . are not entitled to immunity under the FSIA for acts that are not committed in

an official capacity"); *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1106 (9th Cir. 1990)

("if the officer purports to act as an individual and not as an official, a suit directed against that

action is not a suit against the sovereign").  Thus, to the extent that Al-Awadi was not acting within his official capacity, the doctrine of foreign sovereign immunity does not apply to Ms. Swarna's claims.  FSIA does not apply to Al-Shaitan because she was not acting in any official capacity on behalf of Kuwait.

As set forth more fully below in the section regarding the application of FSIA to the Kuwait, to the extent that Al-Awadi was acting within the scope of his authority, either the commercial activity or the tort in the United States exceptions to the FSIA apply.  *See* 28 U.S.C. § 1605(c).  Therefore, even though Al-Awadi was acting on behalf of Kuwait, the doctrine of foreign sovereign immunity does not bar Ms. Swarna's claims against him because her claims come within one of the exceptions in FSIA.

**B.      Kuwait Is Not Immune**

Kuwait is also not entitled to immunity.  Because Ms. Swarna's claims against Kuwait fall within FSIA's commercial activity and tort exceptions, sovereign immunity does not bar Ms. Swarna's action against Kuwait.

**1.      FSIA's Commercial Activity Exception Precludes Immunity**

The commercial activity exception to FSIA provides that a foreign state is not immune from suit where the action arises from the commercial activities of the state.  The statute provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--
>
> * * *
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state . . . .

28 U.S.C. § 1605(a)(2).  This exception is construed broadly, with courts looking to the nature of the activity rather than its purpose.  *See* 28 U.S.C. § 1603(d)(3) (as part of the definition of commercial activity, the statute provides "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.").  Where an activity is one that is typically done by a private party regardless of whether the activity was done for a sovereign purpose, that activity is considered "commercial" and the doctrine of sovereign immunity does not apply.  *See Leutwyler v. Office of Her Majesty Queen Rania Al Abdullah*, 184 F. Supp. 2d 277, 290 (S.D.N.Y. 2001) (citation omitted).  The Supreme Court's established test for determining whether an act by a sovereign is commercial in nature provides:

> [T]he question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.  Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in "trade and traffic or commerce". . . .

*Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 614 (1992); *see also Kato v. Ishihara*, 360 F. 3d 106 (2d Cir. 2004) (quoting *Weltover*).

Application of the *Weltover* test to the commercial activity at issue here – the employment of personnel – is straightforward: the "employment of diplomatic, civil service, or military personnel is governmental and the employment of other personnel is commercial. Because private parties cannot hire diplomatic, civil service or military personnel, such hiring is necessarily governmental."  *Holden v. Can. Consulate*, 92 F.3d 918, 921 (9th Cir. 1996).  Thus, the hiring of a domestic worker is a commercial activity because domestic workers are not "diplomatic, civil service or military personnel":

> The act of hiring a domestic servant is not an inherently public act that only a government could perform. To the contrary, private actors commonly employ domestic servants. Further, because the nature rather than the purpose of the act in question determines whether it is a commercial activity under the FSIA, it is irrelevant that [the defendant] hired Plaintiff in part for the purpose of providing services associated with entertaining guests of the Consulate.

*Park v. Shin*, 313 F3d 1138, 1145 (9th Cir. 2002).

Furthermore, the employment of personnel who are not citizens of the sending state is deemed to be commercial in nature. *El-Hadad v. Embassy of the U.A.E.*, 69 F. Supp. 2d 69, 74 (D.D.C. 1999) (the "employment of American citizens or third country nationals by the foreign state in the United States" is commercial for purposes of the FSIA) (quoting *Broadbent v. Org. of Am. States*, 628 F.2d 27, 34 (D.C. Cir. 1980)), *Zveiter v. Braz. Nat'l Superintendency of Merch. Marine*, 833 F. Supp. 1089, 1093-1094 (S.D.N.Y. 1993) ("according to the Report of the House Judiciary Committee, the employment of American citizens or third country nationals [as civil service personnel] by the foreign state in the United States, in contrast to employment of citizens of the foreign sovereign, would be commercial").

Here, the hiring of Ms. Swarna as a domestic worker was a commercial activity for two independent reasons. First, the hiring of Ms. Swarna to work as a domestic employee is conduct that private actors commonly perform and since there is nothing inherently governmental about the hiring of a domestic servant, this conduct constitutes a commercial activity. Second, Ms. Swarna is not a citizen of Kuwait, so the nature of her employment by a Kuwaiti diplomat is necessarily commercial. Therefore, Kuwait it is not immune from suit.

## 2.      FSIA's Tort Exception Precludes Immunity

The tort exception to FSIA provides that a foreign sovereign is not immune for personal

injury claims for tortious injury caused by an agent acting within the scope of his employment,

except where the claim is based on the performance of a discretionary function of the sovereign.

FSIA § 1605 specifically provides that a foreign state shall not be immune from jurisdiction in

any case:

> in which money damages are sought against a foreign state for
> personal injury or death, or damage to or loss of property,
> occurring in the United States and caused by the tortious act or
> omission of that foreign state or of any official or employee of that
> foreign state while acting within the scope of his office or
> employment . . . .

28 U.S.C. §1605 (a)(5); *see also In re Terrorist Attacks on Sept. 11, 2001,* 392 F.Supp.2d 539,

544 (S.D.N.Y. 2005).  However, the tort exception does not apply to:

> (a) any claim based upon the exercise or performance or the failure
> to exercise or perform a *discretionary function* regardless of
> whether the discretion be abused, or
> (b) any claim arising out of malicious prosecution, abuse of
> process, libel, slander, misrepresentation, deceit, or interference
> with contract rights . . . .

28 U.S.C. §1605 (a)(5) (emphasis added); *see also In re Terrorist Attacks,* at 544.  Moreover,

discretion, does not include violations of the foreign state's own laws and serious criminal acts.

*Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989); *Letelier v. Republic of Chile*, 488

F. Supp. 665, 671-74 (D.D.C. 1980).  Ms. Swarna satisfies the first prong because Al-Awadi

performed the alleged misconduct in the scope of his employment by Kuwait.  *See* Section

IV.A., *supra.*  Her claims also satisfy the second prong because Defendants' actions were " not

grounded in the social, economic, or political policies of the [Defendant State]", and were not "performed at the planning level of government." *Id.* (citations omitted).

Here, the acts of Kuwait and its agents were not discretionary acts. The tortious acts here relate to employment mistreatment, human trafficking, and enslavement. Such actions cannot be characterized as grounded in the social, economic, and political policies of Kuwait and therefore do not invoke the discretionary act exception. In contrast to acts performed at the planning level of Kuwait's government, the alleged employment mistreatment, human trafficking, and enslavement of Ms. Swarna relate purely to services incidental to the operation of the Kuwaiti Mission. In addition, the mistreatment of Ms. Swarna rises to the level of a violation of customary international law, as well as serious criminal acts, which necessarily are not discretionary functions relevant to governmental planning.

Accordingly, all of Ms. Swarna's claims arise under the enumerated exceptions to sovereign immunity. The commercial activities exception applies to all of her claims, including claims for breach of contract, unjust enrichment, unpaid wages, spread of hours, assault, rape, fraud, involuntary servitude, slavery, imprisonment and trafficking, because these claims arise from a commercial activity not subject to sovereign immunity – the hiring of a domestic servant. Independently, the tort exception applies to Ms. Swarna's claims for fraud, involuntary servitude, slavery, imprisonment, and trafficking, which are based upon the commission of non-discretionary tortious acts by Defendant Al-Awadi performed in the scope of his employment. Kuwait is therefore not immune from suit and this Court has jurisdiction to hear all of Ms. Swarna's claims.

## **CONCLUSION**

For the foregoing reasons, this Court should grant Ms. Swarna's Motion for

Default Judgment as to all counts in the Complaint against Al-Awadi, Al-Shaitan, and Kuwait.

Dated:  August 5, 2008

Respectfully submitted,

*/s/ David A. Kotler*
David A. Kotler (DK 4210)
Suite 500
902 Carnegie Center
Princeton, NJ 08540
(609) 955-3200

Andrew J. Fields (AF 7795)
MAIN STREET LEGAL SERVICES, INC.
International Human Rights Clinic
City University of New York
65-21 Main Street
Flushing, NY 11367
(718) 340-3400

Catherine J. Rosato*
Reid K. Weisbord*
Jennifer Rellis*
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(609) 620-3200

Attorneys for Plaintiff
* Not admitted in this District