UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
VISHRANTHAMMA SWARNA,

                    Plaintiff,                    06 Civ. 4880 (PKC)

        -against-                   MEMORANDUM
                                          AND
BADAR AL-AWADI, HALAL            ORDER
MUHAMMAD AL-SHAITAN, and
STATE OF KUWAIT

                    Defendants.
----------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        Plaintiff Swarna Vishranthamma brings this action against her former employers, Badar Al-Awadi and his wife, Halal Muhammad Al-Shaitan ("Individual Defendants") and the State of Kuwait (collectively, "defendants").  At the time of the events in question, Mr. Al-Awadi was a diplomat serving in New York City with the Permanent Mission of the State of Kuwait to the United Nations ("Kuwait Mission"), and plaintiff was employed as the Individual Defendants' live-in domestic servant.  Mr. Al-Awadi now lives in Paris, France.  Plaintiff, asserting jurisdiction under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, seeks damages against the Individual Defendants for subjecting her to slavery and slavery-like practices, including trafficking, involuntary servitude, forced labor, assault and sexual abuse ("ATCA claims").  Plaintiff also brings claims under New York law for failure to pay legally required wages, N.Y. Labor Law §§ 190, et seq. and 650, et seq., fraud, unjust enrichment and breach of contract ("labor law claims).  Plaintiff seeks damages against Kuwait on the grounds that Kuwait is vicariously liable on the ATCA and labor law claims, and that Kuwait ratified Mr. Al-Awadi's acts and aided and abetted the Individual Defendants' allegedly unlawful conduct.

Defendants have not answered or otherwise moved with respect to the complaint. Plaintiff now moves for a default judgment pursuant to Rule 55(b)(2), Fed. R. Civ. P. Defendants have filed a Notice of Appearance and argue that this Court lacks subject matter jurisdiction because the Individual Defendants have diplomatic immunity under the Vienna Convention on Diplomatic Relations ("VCDR"), Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, and because Kuwait has sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1607.  For the reasons explained below, plaintiff's motion for a default judgment is granted with respect to her claims against the Individual Defendants, but is denied with respect to her claims against Kuwait.  Plaintiff's motion for authorization to seek discovery from Kuwait is denied as moot.

BACKGROUND

A. Facts

The following facts, alleged in the complaint and set forth in plaintiff's declaration dated August 5, 2008,[1] are taken as true for the purpose of this analysis because defendants have submitted no evidence in support of their claims of immunity.  See Robinson v. Gov't of Malaysia, 269 F.3d 133, 140 (2d Cir. 2001) ("If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations . . . the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff . . . . But where evidence relevant to the jurisdictional question is before the court, the district court . . . may refer to [that] evidence.") (quotations and citation omitted).

Plaintiff, born in Bhadravati, India, is a citizen of India.  (Decl. ¶ 1; Compl. ¶¶ 6, 10.)  In 1995, she obtained a position as a domestic worker in the Kuwaiti home of the parents of

---

[1] This declaration, denoted here "Decl.," is attached as Exhibit A to plaintiff's memorandum.

Ms. Al-Shaitan.  (Decl. ¶ 5; Compl. ¶ 11.)  At this time, Mr. Al-Awadi was serving in New York

City as a Third Secretary at the Kuwait Mission.[2]  (Decl. ¶ 6; Compl. ¶ 14.)  He and Ms. Al-

Shaitan met plaintiff during a visit to Kuwait.  (Decl. ¶ 6; Compl. ¶ 14.)

       The Individual Defendants asked plaintiff to return to the United States with them

to work in their home.  (Decl. ¶ 7; Compl. ¶ 15.)  They promised to pay her $2,000 per month, to

give her Sundays off to attend church, and to give her one month of paid vacation per year to

allow plaintiff to visit her family in India.  (Decl. ¶ 7; Compl. ¶¶ 16-17.)  In order to secure a G-5

visa for plaintiff,[3] Mr. Al-Awadi informed an official at the United States Embassy in Kuwait

that plaintiff would be given a contract of employment promising payment of $2,000 per month.

(Decl. ¶ 8; Compl. ¶¶ 20-22.)  Plaintiff was never given such a contract.  (Decl. ¶ 8; Compl. ¶¶

28-29.)  Upon her arrival in the United States on or about September 8, 1996, Mr. Al-Awadi

immediately confiscated her passport and visa.  (Decl. ¶ 9; Compl. ¶ 27.)

       Plaintiff lived and worked in the Individual Defendants' home, located about a

mile from the United Nations and the Kuwait Mission.  (Decl. ¶ 9; Compl. ¶ 26.)  She was forced

to work approximately seventeen hours per day, seven days a week.  (Decl. ¶ 12; Compl. ¶¶ 38-

39.)  Her duties included caring for two young children, doing the laundry, ironing, cleaning the

home and cooking for the family.  (Decl. ¶¶ 12-13; Compl. ¶¶ 39-46.)  The Individual

Defendants also entertained frequently, often in honor of employees of the Kuwait Mission, and

on these occasions plaintiff cooked for and served these guests until late into the night.  (Decl. ¶¶

---

[2] Mr. Al-Awadi was accepted by the Department of State as a Third Secretary at the Kuwait Mission on Sept. 11, 1995.  He was promoted to Second Secretary on May 26, 1998, and to First Secretary on June 10, 2002.  He ceased working at the Kuwait Mission on July 15, 2004.  (See Pl. Mem. ex. F (Certification of L. Dunham, Ass't Chief of Protocol, U.S. Dep't of State, Oct. 15, 2004).)

[3] Such a visa is reserved for the household employees of diplomats and of employees of international organizations. (Compl. ¶ 21.)

13-14; Compl. ¶¶ 47-48, 50.)  Plaintiff was paid only $200 to $300 per month.[4]  Plaintiff alleges

"[u]pon information and belief" that "some of [plaintiff's] expenses were paid by Defendant

Kuwait, through the Kuwait Mission."  (Compl. ¶ 34; <u>see</u> Decl. ¶¶ 17-19.)  For example, on one

occasion, the Kuwait Mission allegedly reimbursed Mr. Al-Awadi for the cost of plaintiff's

dental work.  (Compl. ¶ 34.)  Plaintiff was prohibited from making the annual trips to India she

had been promised.  Her first trip to India was two-and-a-half years after she arrived in the

United States, at which point her husband was gravely ill.  (Decl. ¶ 21; Compl. ¶ 35.)  She was

also prohibited from attending church on Sundays, despite a promise that she would be permitted

to do so.  (Decl. ¶ 20; Compl. ¶ 36.)

 Plaintiff was forbidden from leaving the apartment unless supervised by one of

the Individual Defendants or an employee from the Kuwait Mission.  (Decl. ¶ 24; Compl. ¶¶ 54-

59.)  Even with supervision, plaintiff only left the apartment ten to fifteen times total in four

years.  (Decl. ¶ 24; Compl. ¶ 59.)  When she was left alone inside the apartment, the Individual

Defendants locked her inside.  (Decl. ¶ 25; Compl. ¶ 56.)  The Individual Defendants forbade

plaintiff from using the telephone except to answer when they were calling, they intercepted calls

from her family in India, and they read her mail and prevented her from sending mail home to

India.  (Decl. ¶ 27; Compl. ¶¶ 60, 64-68.)

 The Individual Defendants repeatedly assaulted and abused plaintiff, both

physically and psychologically.  (Decl. ¶¶ 29-30; Compl. ¶¶ 72-73.)  On at least two occasions,

Ms. Al-Shaitan threatened to cut out plaintiff's tongue.  (Compl. ¶ 74.)  On several occasions,

Ms. Al-Shaitan dragged plaintiff outside by her collar and locked her out of the apartment for

half-hour periods, with plaintiff believing that if she left the apartment complex she would be

---

[4] Plaintiff initially was paid $200 per month.  (Decl. ¶ 15; Compl. ¶ 28.)  This was increased to $250 per month one year later, and $300 per month two years later.  (Decl. ¶ 15; Compl. ¶¶ 30-31.)

harmed or arrested.  (Id. ¶¶ 57, 75.)  When plaintiff attempted to leave the Individual

Defendants' employ and escape their home, Mr. Al-Awadi injured her by throwing his suitcase

at her and hitting her.  (Id. ¶ 77.)  The Individual Defendants referred to plaintiff with derogatory

names like "dog" or "donkey."  (Id. ¶ 78.)  This near-daily abuse led plaintiff to suffer dramatic

weight loss, hair loss, nightmares and fatigue, and caused plaintiff to contemplate suicide.  (Decl.

¶¶ 31-34.)  In September 1998, Mr. Al-Awadi forced himself upon plaintiff and raped her.  (Id. ¶

36; Compl. ¶ 80.)  He threatened to kill her if she told anyone.  (Decl. ¶ 36; Compl. ¶ 81.)

Thereafter, Mr. Al-Awadi raped plaintiff on many occasions when his wife was not home.

(Decl. ¶ 36; Compl. ¶¶ 82-83.)

On or about June 25, 2000, the Individual Defendants and plaintiff were preparing

for a trip to Kuwait the next day.  (Decl. ¶ 37; Compl. ¶ 84.)  Plaintiff begged to be sent back to

India.  (Compl. ¶ 85.)  Mr. Al-Awadi became angry, screamed at plaintiff, and threw a fully-

packed suitcase at her.  (Decl. ¶ 38; Compl. ¶ 86.)  This attack caused plaintiff to bleed and left

painful bruises on her body.  (Compl. ¶ 86.)  Mr. Al-Awadi then threatened to hit plaintiff with

an iron rod.  (Id. ¶ 87.)  Plaintiff began screaming and threatened to call the police.  (Decl. ¶ 38;

Compl. ¶ 87.)  Ms. Al-Shaitan slapped plaintiff across the face and Mr. Al-Awadi warned

plaintiff that if she did not continue to work for him, she would be harmed during the family's

trip to Kuwait.  (Decl. ¶ 39; Compl. ¶¶ 87-89.)  The next morning, plaintiff seized on an

opportunity to escape and fled the Individual Defendants' apartment.  (Decl. ¶ 40; Compl. ¶¶ 91-

92.)

B. Procedural History

Plaintiff originally filed suit against the Individual Defendants on May 15, 2002. Vishranthamma v. Al-Awadi, 02 Civ. 3710(PKL)(MHD) (S.D.N.Y.). The district court determined that it lacked subject matter jurisdiction because, at the time Mr. Al-Awadi was served, he was employed as a diplomat by the Kuwait Mission and therefore was entitled to diplomatic immunity. See Summary Order, Vishranthamma v. Al-Awadi, 02 Civ. 3710(PKL)(MHD) (S.D.N.Y. Jan. 26, 2005) (adopting Report and Recommendation of Magistrate Judge Dolinger). The court dismissed the case "without prejudice because plaintiff could plausibly institute a new action against defendants now that they are no longer associated with the Kuwaiti Mission." Id.

Plaintiff filed this action against the Individual Defendants and the State of Kuwait on June 23, 2006. On September 20, 2007, the Court granted plaintiff's motion for an order permitting an alternative means of service upon the Individual Defendants, pursuant to Rule 4(f)(3), Fed. R. Civ. P. Swarna v. Al-Awadi, 06 Civ. 4880(PKC), 2007 WL 2815605 (S.D.N.Y. Sept. 20, 2007). Plaintiff has filed a certificate confirming that both Individual Defendants were served in Paris, France in accordance with this order. (Doc. #20.) Plaintiff has effected service on Kuwait by causing the United States Embassy in Kuwait to deliver to the Ministry of Foreign Affairs of Kuwait a Diplomatic Note accompanied by the Summons and Complaint, along with a Notice of Suit and translations into Arabic. (Doc. #21); see Rule 4(j)(1), Fed. R. Civ. P. (directing that a foreign state be served in accordance with the FSIA); 28 U.S.C. § 1608(a)(2) (permitting service by "delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents");

Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or

Commercial Matters, art. 9, Nov. 15, 1965, 20 U.S.T. 36, T.I.A.S. 6638.

On August 5, 2008, plaintiff moved for a default judgment against defendants.

Counsel for defendants appeared on August 12 and subsequently filed a memorandum opposing

the entry of a default judgment.  On December 17, the Court invited the United States to address

the Court concerning the defendants' potential immunity from suit.  (Doc. #52); see 28 U.S.C. §

517.  In a letter dated January 27, 2009, the government responded that "[u]pon thorough

evaluation, the United States respectfully declines the Court's invitation."[5]  (Doc. #55.)


DISCUSSION

The first issue is whether the Individual Defendants, by virtue of their diplomatic

immunity, or Kuwait, by virtue of its sovereign immunity, are immune from any or all of

plaintiff's claims.  Immunity must be determined at the outset because it implicates the Court's

subject matter jurisdiction.  See 22 U.S.C. § 254d; 28 U.S.C. § 1604; see also Filetech S.A. v.

France Telecom S.A., 157 F.3d 922, 929 (2d Cir. 1998) (federal district courts are "duty-bound .

. . to address the issue of subject matter jurisdiction at the outset"); Verlinden B.V. v. Central

Bank of Nigeria, 461 U.S. 480, 493-94 (1983) (determination of applicability of sovereign

immunity is the "threshold" consideration in any action against a foreign state).  The next issue is

whether a default judgment should be granted with respect to those claims, if any, for which no

immunity is available.

---

[5] Defendants have provided the Court with a copy of the Statement of Interest of the United States of America,
submitted in connection with Sabbithi v. Al Saleh, 07-CIV-115(EGS) (D.D.C. July 22, 2008).  However, that
document has no relevance to this case because in Sabbithi, the defendant diplomat was served at a time when his
diplomatic duties had not yet ended.  Thus, the United States did "not . . . address . . . whether Defendants enjoy
'residual immunity' under Article 39(2) of the Vienna Convention."  Id. at 3 n.3.  Nor, in that case, had the plaintiff
properly brought any claims against the State of Kuwait.  Id. at 2 n.2.  Thus, the two main issues presented here --
whether a former diplomat is entitled to residual diplomatic immunity and whether a foreign state is entitled to
sovereign immunity -- were not presented in Sabbithi.

## I. IMMUNITY

A. <u>INDIVIDUAL DEFENDANTS</u>

The Individual Defendants argue that they are immune from this action by virtue of their diplomatic immunity.  The privileges and immunities accorded to diplomatic agents are specified by the Vienna Convention on Diplomatic Relations.  Under the VCDR, current diplomatic agents have near-absolute immunity from civil liability in the Receiving State,[6] pursuant to Art. 31:

> A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State.  He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of:
>
> (a) a real action relating to private immovable property . . .;
>
> (b) an action relating to succession . . .;
>
> (c) an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions.

VCDR art. 31(1).

By contrast, former diplomatic officials enjoy only functional immunity from civil liability in the Receiving State, pursuant to Art. 39:

> When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict.  However, <u>with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist</u>.

---

[6] The "Receiving State" is the country in which the diplomat is stationed and the "Sending State" is the country he or she represents.

Id. art. 39(2) (emphasis added).  The functional immunity provided by Art. 39 is sometimes referred to as "continuing" or "residual" diplomatic immunity.[7]  See, e.g., Brzak v. United Nations, 551 F.Supp.2d 313, 317 (S.D.N.Y. 2008).

The immunity provided to family members of diplomatic agents is specified by Art. 37: "The members of the family of a diplomatic agent forming part of his household shall, if they are not nationals of the receiving State, enjoy the privileges and immunities specified in Articles 29 to 36."  VCDR art. 37(1).

Under the Diplomatic Relations Act, "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . . shall be dismissed."  22 U.S.C. § 254d.  Courts have construed this statute's command to be a jurisdictional limitation.  See, e.g., Ahmed v. Hoque, 01 Civ. 7224(DLC), 2002 WL 1964806, at *8 (S.D.N.Y. Aug. 23, 2002) ("This Court is without subject matter jurisdiction to consider the plaintiff's claims, for the defendants [foreign minister to the U.N. and his wife] are immune from suit."); Weixum v. Xilai, 568 F.Supp.2d 35, 39 (D.D.C. 2008) (dismissing for "lack of jurisdiction" action against foreign official entitled to immunity).

1. Residual Diplomatic Immunity Under Art. 39

At the time Mr. Al-Awadi was served with process, his diplomatic duties in the United States had terminated and he had departed the country.  (See Pl. Mem. ex. F (certifying that Mr. Al-Awadi ceased working at the Kuwait Mission on July 15, 2004); Doc. #20 (certifying that the Individual Defendants were served in France on Sept. 21, 2007).)  Thus, his immunity, if any, from the civil jurisdiction of the United States is determined by Art. 39 of the VCDR.

---

[7] Because the parties use the term "residual diplomatic immunity" in their memoranda, the Court will use that term here.

Under this provision, Mr. Al-Awadi's "privileges and immunities . . . cease[d] at the moment when he le[ft] the country" except "with respect to acts performed . . . in the exercise of his functions as a member of the mission" for which "immunity shall continue to subsist." VCDR art. 39(2). The determinative question, then, is whether the acts allegedly committed by Mr. Al-Awadi against plaintiff were performed in the exercise of his diplomatic functions.

To determine what kinds of acts are immunized by Art. 39, it is instructive to examine the purpose behind Art. 39's provision of residual diplomatic immunity.[8] The preamble to the VCDR makes clear that the purpose of diplomatic immunity "is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States." Id., preamble, cl. 4. Thus, once a person ceases to be a diplomatic agent in a Receiving State, there ceases to be a reason to immunize that person from the criminal or civil jurisdiction of the Receiving State. The one exception is for "acts performed . . . in the exercise of his functions" as a diplomatic agent. Id. art. 39(2). A leading scholar explains the rationale for this exception: "The acts of a diplomatic agent in the exercise of his official functions are in law the acts of the sending State. It has therefore always been the case that the diplomat cannot at any time be sued in respect of such acts since this would be indirectly to implead the sending State." Eileen Denza, Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations 439 (3d ed. 2008) ("Denza").[9] In other words, "[c]ontinuing immunity . . . applies only to acts performed on behalf of or imputable to the sending State." Id. at 441. Thus, residual diplomatic immunity applies to official acts -- because such acts are attributable to the Sending State -- but

---

[8] "A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose." Am. Civil Liberties Union v. Dep't of Def., 543 F.3d 59, 90 (2d Cir. 2008) (quoting Senator Linie Gmbh & Co. Kg v. Sunway Line, Inc., 291 F.3d 145, 153 n.7 (2d Cir. 2002) (quoting Vienna Convention on the Law of Treaties art. 31.1, May 23, 1969, 1155 U.N.T. S. 331)).

[9] Other courts have likewise found Denza to be a persuasive resource in interpreting the diplomatic immunity provisions of the VCDR. See, e.g., Tabion v. Mufti, 73 F.3d 535, 538 (4th Cir. 1996); Logan v. Dupuis, 990 F.Supp. 26, 29 (D.D.C. 1997).

does not apply to private acts -- because the purpose of immunizing a diplomatic agent's private acts is to ensure the efficient functioning of a diplomatic mission, not to benefit the private individual, and this purpose terminates when the individual ceases to be a diplomatic agent.

One set of acts that are indisputably official acts are those directly related to the "functions of a diplomatic mission" listed in Art. 3.[10]  Thus, to take an obvious example, the actions of a diplomatic agent in connection with negotiating a treaty with a representative of the Receiving State would be official acts, and any lawsuit based upon them would be barred by Art. 39's residual diplomatic immunity.  Courts have also held that a diplomatic agent performs acts "in the exercise of his functions" when the acts are taken in the regular course of implementing an official program or policy of the mission.  For example, in De Luca v. United Nations Org., 841 F.Supp. 531, 534-35 (S.D.N.Y. 1994), the court dismissed claims against former U.N. officials alleging that they initiated a unlawful tax audit, forged the plaintiff's pay statement, and failed to supervise and investigate this alleged wrongdoing.  The court found that the plaintiff's claims were "based solely on [the defendants'] official activities at the U.N." because the claims attacked "actions which defendants ha[d] taken in implementing U.N. employment and financial policy."  Id.  Thus, the former officials were entitled to residual diplomatic immunity.  Id. at 536.[11]

---

[10] "The functions of a diplomatic mission consist inter alia in:
    (a) representing the sending State in the receiving State;
    (b) protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;
    (c) negotiating with the Government of the receiving State;
    (d) ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;
    (e) promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations."  VCDR art. 3(1).

[11] Although De Luca and other cases discussed concern the United Nations and its officers, rather than diplomatic missions and their diplomatic agents, these cases focus on the same provision of the VCDR at issue in the instant case.  This is because the Convention on Privileges and Immunities of the United Nations ("U.N. Convention"), Feb. 13, 1946, 21 U.S.T. 1418, T.I.A.S. 6900, specifies that "the Secretary-General and all Assistant Secretaries-General shall be accorded . . . the privileges and immunities, exemptions and facilities accorded to diplomatic envoys, in

Courts have also held that a diplomatic agent's act of hiring and employing an individual to work at the diplomatic mission is an official act, and that disputes arising out of such employment are barred by Art. 39's residual diplomatic immunity.  For example, in <u>Brzak v. United Nations</u>, 551 F.Supp.2d at 315, the court dismissed a suit brought by U.N. employees against the U.N. and several former U.N. officials claiming employment discrimination, sexual harassment, and indecent battery.  The court explained that "[t]he question of whether the suit 'relates to' acts performed by the [former U.N. officials] in their official capacity is determined on the basis of whether the acts alleged occurred in the course of an official's exercise of functions, and not on the nature of the underlying conduct."  <u>Id.</u> at 319.  The court went on to find the officials immune, noting that "the courts have consistently found that functional immunity applies to employment-related suits against officials of international organizations." <u>Id.</u>; <u>see</u> <u>Osman v. Annan</u>, 07-837-CV-W(NKL), 2008 WL 2477535, at *1-*2 (W.D. Mo. June 16, 2008) (dismissing action brought against former Secretary-General of the U.N. for wrongful discharge, explaining that "[c]ourts have consistently found that functional immunity applies to employment-related suits against officials of international organizations"); <u>see also</u> <u>D'Cruz v. Annan</u>, 05 Civ. 8918(DC), 2005 WL 3527153, at *1 (S.D.N.Y. Dec. 22, 2005) (holding current and former U.N. officials entitled to functional immunity under the U.N. Convention from employment discrimination, harassment and retaliation claims).  The rationale underlying these decisions appears to be that diplomatic missions cannot function without having a certain set of employees to carry out various roles.  But, of course, a sovereign "state cannot act except through individuals." <u>In re Terrorist Attacks on September 11, 2001</u>, 538 F.3d 71, 84 (2d Cir. 2008).  Thus, it may be part of a diplomatic agent's official duties to enter into employment

---

accordance with international law." <u>Id.</u> art. V, § 19.  Thus, for the purposes discussed here, the U.N. is analogous to a diplomatic mission and its officers are analogous to diplomatic agents.

relationships with others who will work at the mission.  It follows that disputes arising out of

such an employment relationship are based on acts "performed . . . in the exercise of [the

diplomat's] functions as a member of the mission," and are barred by Art. 39.  VCDR art. 39(2).

Finally, courts have held that residual diplomatic immunity does not extend to

lawsuits based on actions that were entirely peripheral to the diplomatic agent's official duties.

For example, in United States v. Guinand, 688 F.Supp. 774, 774 (D.D.C. 1988), the defendant

was criminally charged with distributing cocaine.  At the time of the alleged misconduct, he was

an employee of the Embassy of Peru, but at the time he was charged, he had been terminated

from his diplomatic post.  Id. at 774-75.  The court held that he was not entitled to the residual

diplomatic immunity of Art. 39 and permitted the prosecution to proceed.  Id. at 776-77.

Similarly, in In re Application of Noboa, M18-302, M19-111(JSM), 1995 WL 581713, at *1, *3

(S.D.N.Y. Oct. 4, 1995), the court had to determine whether the residual diplomatic immunity of

a former diplomatic agent barred a subpoena compelling her to give a deposition and produce

documents.  The court noted that the trip during which she was served with process was not

made for "diplomatic reasons" and therefore held that she lacked immunity.  Id. at *4.

One case that arguably holds to the contrary is Knab v. Republic of Georgia, 97

Civ. 3118(TFH), 1998 WL 34067108 (D.D.C. May 29, 1998).  There, the plaintiff sued a former

diplomat for wrongful death and personal injuries, resulting from a traffic accident that occurred

when the defendant was a diplomatic official.  Id. at *1.  The court recognized that the only

immunity that might apply was the residual immunity provided by Art. 39.  Id. at *4.  However,

because the plaintiff conceded to the court that the defendant had been acting in his official

capacity at the time of the accident, the court held that "there is no reason to suppose that this

accident lies outside the protection of defendant's residual immunity."  Id.  Thus, the Knab court

did not independently analyze whether Art. 39's residual diplomatic immunity applied to the defendant's acts in causing the accident.

In sum, the case law and critical commentary point to the conclusions that the residual diplomatic immunity provided by Art. 39 is a functional immunity that applies to a former diplomatic agent's official acts but not private acts; that official acts include acts directly related to the "functions of a diplomatic mission" listed in Art. 3, as well as acts related to the employment of subordinates at the diplomatic mission; and that official acts do not include acts that were completely peripheral to the official's diplomatic duties.

2. <u>Labor Law Claims</u>

If Mr. Al-Awadi's alleged acts that have given rise to plaintiff's labor law claims were performed in the exercise of his diplomatic functions -- <u>i.e.</u>, if they were official acts, not private acts -- then Mr. Al-Awadi is entitled to residual diplomatic immunity with respect to these claims; on the other hand, if these alleged acts were private in nature, he is not entitled to any residual immunity with respect to claims arising from them.

Plaintiff asserts claims under New York law for failure to pay legally required wages, fraud, unjust enrichment and breach of contract. (Compl. ¶¶ 122-150.) She alleges that the Individual Defendants: "fail[ed] to pay Ms. Swarna the minimum wages required by law" (Compl. ¶ 124); "fail[ed] to pay Ms. Swarna overtime pay for work in excess of 44 hours per week" (<u>Id.</u> ¶ 125); "fail[ed] to pay Ms. Swarna an extra hour's pay for every day that Ms. Swarna worked in excess of 10 hours" (<u>Id.</u> ¶ 129); "intentionally and knowingly misrepresented to Ms. Swarna the conditions of Ms. Swarna's employment in the United States in order to induce her to come to the United States" (<u>Id.</u> ¶ 133); "accepted [plaintiff's domestic services] and in turn failed

to compensate Ms. Swarna for the fair market value of her services" (Id. ¶ 142); and "materially breached [their employment] contract" (Id. ¶ 148).

Defendants argue that this case is analogous to those cases, discussed above, which have held that "courts have consistently found that functional immunity applies to employment-related suits against [diplomatic] officials." Brzak, 551 F.Supp.2d at 319; see also Osman, 2008 WL 2477535, at *1-*2; D'Cruz, 2005 WL 3527153, at *1. The Court agrees that plaintiff's labor law claims are properly described as "employment-related" because they are based on the employment relationship between plaintiff and the Individual Defendants, and premised on the obligations and expectations that arose from that relationship. However, the cases holding that residual diplomatic immunity applies to employment-related disputes concerned lawsuits brought by individuals who were or had been employed at the actual diplomatic mission (or the U.N.) where the former diplomat had been employed. It does not follow that all employment-related acts by a diplomat are official acts to which residual diplomatic immunity attaches once the diplomat's duties end. It is one thing to conclude that the act of a diplomat employing a subordinate at the diplomatic mission was an "act[] performed on behalf of or imputable to the sending State," Denza, supra at 441, but quite another to draw the same conclusion with respect to his employment of an individual who performed no function whatsoever at the diplomatic mission.[12] The guiding question is whether the act of employment was official or private.

---

[12] One case containing language to the contrary is easily distinguished. In Tabion v. Mufti, 73 F.3d at 538-39, the court noted that "[d]ay-to-day living services such as dry cleaning or domestic help were not meant to be treated as outside a diplomat's official functions. Because these services are incidental to daily life, diplomats are to be immune [under VCDR art. 31] from disputes arising out of them." There, the defendant was a current diplomat, not a former diplomat. Id. at 536. Thus, he enjoyed the near-absolute immunity from civil jurisdiction provided by Art. 31. Id. at 537. The court merely held that no exception to this immunity applied to make the defendant amenable to suit by his domestic servant. Id. at 538-39; see VCDR art. 31(1)(c). Here, by contrast, Mr. Al-Awadi is a former diplomat whose entitlement to immunity is governed by Art. 39, not Art. 31.

Mr. Al-Awadi's employment of plaintiff was a private act, not an official one. First, the employment of plaintiff bore no relationship to the "functions of a diplomatic mission" listed in Art. 3. VCDR art. 3(1). Mr. Al-Awadi did not need to employ plaintiff as his domestic servant in order to represent Kuwait, id. art. 3(1)(a); to protect the interests of Kuwait and its nationals, id. art. 3(1)(b); to negotiate with the United States government, id. art. 3(1)(c); to ascertain and report on conditions and developments in the United States, id. art. 3(1)(d); or to promote friendly relations between the United States and Kuwait, id. art. 3(1)(e). Second, Mr. Al-Awadi did not employ plaintiff in the course of implementing an official policy or program of the Kuwait Mission. See De Luca, 841 F.Supp. at 534-35. And, third, plaintiff was not a subordinate of Mr. Al-Awadi, whom he hired to work at the Kuwait Mission. See Brzak, 551 F.Supp.2d at 319; Osman, 2008 WL 2477535, at *1-*2; D'Cruz, 2005 WL 3527153, at *1. Rather, she was his domestic servant, hired to work in his private home, tending to his family's personal affairs. (See Decl. ¶¶ 12-13; Compl. ¶¶ 26, 39-46.) This conclusion is not altered by the fact that plaintiff served members of the Kuwait Mission on the occasions when the Individual Defendants entertained members of the mission at their home. (Decl. ¶ 13; Compl. ¶¶ 47, 50.) This tangential benefit to the Kuwait Mission did not make her an employee of the mission, and did not make Mr. Al-Awadi's act of employing her "in law the act[] of the sending State." Denza, supra at 439. That Kuwait may have reimbursed Mr. Al-Awadi for certain of plaintiff's medical and travel expenses indicates nothing more than that such reimbursements were part of Mr. Al-Awadi's official compensation by Kuwait. (See Compl. ¶ 34.) Thus, Mr. Al-Awadi's alleged acts of fraudulently inducing plaintiff to work for him, failing to pay her minimum wage and breaching their employment contract were not "performed . . . in the

exercise of his functions as a member of the mission," and, thus, no residual diplomatic

immunity bars plaintiff's labor law claims.  VCDR art. 39(2).


3. ATCA Claims

      Plaintiff brings claims under international law for "trafficking, involuntary

servitude, enslavement, forced labor, and sexual slavery."[13]  (Compl. ¶ 115.)  She alleges that the

Individual Defendants "intentionally exercis[ed] powers of ownership over Ms. Swarna through

the use of threats of serious harm and psychological, sexual, physical, and legal coercion; . . .

maintain[ed] psychological control over her through verbal and physical abuse and harassment;

and . . . subjected Ms. Swarna to conditions of slavery and slavery-like practices including forced

labor, involuntary servitude, and sexual slavery."  (Id. ¶ 113.)

      These alleged acts were entirely peripheral to Mr. Al-Awadi's official duties as a

diplomatic agent.  The case most on point is Guinand, 688 F.Supp. at 776-77.  As discussed

above, in Guinand, a former diplomatic agent was charged with cocaine distribution.  Id. at 774.

Because he had been a diplomatic agent at the time of the alleged misconduct but had since been

terminated from his position, the court considered whether the residual diplomatic immunity

provided by Art. 39 barred his prosecution.  Id. at 776.  It held that it did not and permitted the

prosecution to proceed.  Id. at 776-77.  It makes no difference that Guinand was a criminal

prosecution whereas this is a civil action, because Art. 39 does not distinguish between the two.

Acts of physical and psychological assault and abuse, like acts of cocaine distribution, are not

---

[13] The ATCA provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  It provides jurisdiction for claims that "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [the Supreme Court has] recognized."  Sosa v. Alvarez-Machain, 542 U.S. 692, 725 (2004).  Defendants have not argued that plaintiff's allegations are insufficient to state claims for relief under "the law of nations or a treaty of the United States," and therefore, the Court does not address this issue.

related to one's duties as a diplomatic agent.  Nor is there any basis for concluding that the malicious acts alleged here were "performed on behalf of or imputable to the sending State." Denza, supra at 441.

The Individual Defendants' reliance on Knab, 1998 WL 34067108, at *4, is misplaced.  There, the court invoked the residual diplomatic immunity of Art. 39 to bar a civil action from proceeding against a former diplomat accused of killing and injuring several people by causing a traffic accident.  Id.  However, as discussed above, the court did not independently analyze whether Art. 39 applied to the defendant's alleged actions, but rather relied on the fact that the plaintiff conceded the point.  Id.  No such concession has been made here.[14] Furthermore, to conclude that the residual diplomatic immunity provided by Art. 39 extends to rape, forced labor, and the other malicious acts alleged here would be tantamount to holding that Art. 39 extends to all acts taken by a diplomatic agent during his period of service -- in other words, that all acts of a diplomatic agent are "official acts."  There is no support for such a proposition.  For one, this would eliminate any difference between the scope of immunity provided by Art. 31 and that provided by Art. 39, despite the use of more restrictive language in Art. 39.  This interpretation is also confirmed by a reading of Art. 39 taken alone.  Art. 39 first provides that a diplomatic agent's immunity "shall normally cease" when his duties "come to an end" and he departs the country or after a reasonable time to depart has expired.  VCDR art. 39(2).  The next sentence qualifies the prior one: "However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall

_____

[14] Defendants argue that plaintiff has made such a concession because she has argued in the alternative that Kuwait is vicariously liable because Mr. Al-Awadi was acting in his official capacity.  To hold that plaintiff conceded one claim by alleging another would violate Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively . . . . If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.") and 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

continue to subsist." Id.  This qualifier makes clear that diplomatic agents were only intended to receive residual immunity with respect to official acts, and that not all acts of a diplomatic agent were understood to be official.  Thus, because Mr. Al-Awadi's alleged acts of trafficking, involuntary servitude, enslavement, forced labor, rape and sexual slavery were private acts, not official acts, Mr. Al-Awadi has no residual diplomatic immunity from plaintiff's ATCA claims.

4. Ms. Al-Shaitan's Immunity

Art. 37 of the VCDR does not expressly provide residual diplomatic immunity to family members of former diplomatic agents.  It states that "members of the family of a diplomatic agent forming part of his household shall, if they are not nationals of the receiving State, enjoy the privileges and immunities specified in Articles 29 to 36."  VCDR art. 37(1).  The residual diplomatic immunity to which Mr. Al-Awadi is entitled is provided by Art. 39, which is outside the range listed in Art. 37.  Thus, arguably, Art. 39 has no application to Mr. Al-Awadi's wife, Ms. Al-Shaitan.  On the other hand, because Art. 39 applies when "the functions of a person enjoying privileges and immunities have come to an end," it may apply to Ms. Al-Shaitan since she was enjoying the privileges and immunities of Articles 29 to 36 until Mr. Al-Awadi's duties ended.  Id. art. 39(2).  However, it is unclear whether she performed any "functions" within the meaning of Art. 39.

In any event, the Court need not decide whether, if Mr. Al-Awadi were entitled to residual diplomatic immunity under Art. 39, such immunity would also extend to Ms. Al-Shaitan.  Ms. Al-Shaitan has no greater entitlement to immunity than does Mr. Al-Awadi.  Since I have held that plaintiff's labor law and ATCA claims are not barred with respect to Mr. Al-Awadi, it follows that they are also not barred with respect to Ms. Al-Shaitan.

5. <u>FSIA Immunity</u>

   One final issue regarding the Individual Defendants' potential immunity warrants brief attention. The Second Circuit has held that "an individual official of a foreign state acting in his official capacity is the 'agency or instrumentality' of the state, and is thereby protected by the FSIA."[15] <u>Terrorist Attacks</u>, 538 F.3d at 81. The conclusion reached above -- that Mr. Al-Awadi's alleged acts were private acts, not official acts, under the VCDR -- disposes of any argument that Mr. Al-Awadi was acting in his "official capacity" and is entitled to immunity under the FSIA. See <u>Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah</u>, 184 F.Supp.2d 277, 287 (S.D.N.Y. 2001) ("An individual employed by a foreign state enjoys no FSIA immunity for acts that are 'beyond the scope' of her official responsibilities," because "[a]cts that are of a 'personal and private' nature are not undertaken within an employee's official capacity for FSIA purposes.") (quoting <u>Cabiri v. Assasie-Gyimah</u>, 921 F.Supp. 1189, 1197 (S.D.N.Y. 1996)).

B. <u>THE STATE OF KUWAIT</u>

   Kuwait argues that it is immune from this action by virtue of its sovereign immunity. "The doctrine of foreign sovereign immunity has been recognized since early in the history of our Nation. It is premised upon the 'perfect equality and absolute independence of sovereigns, and th[e] common interest impelling them to mutual intercourse.'" <u>Republic of Philippines v. Pimentel</u>, ___ U.S. ___, 128 S.Ct. 2180, 2189-90 (2008) (quoting <u>Schooner Exchange v. McFaddon</u>, 7 Cranch 116, 137 (1812)). Foreign sovereign immunity derives from "standards of public morality, fair dealing, reciprocal self-interest, and respect for the 'power and

---

[15] This opinion did not address whether the FSIA protects a former diplomatic agent. <u>Cf.</u> <u>Yousuf v. Samantar</u>, 552 F.3d 371, 381-82 (4th Cir. 2009) ("Congress did not intend to shield <u>former government agents</u> from suit under the FSIA.") (emphasis in original) (citing <u>Dole Food Co. v. Patrickson</u>, 538 U.S. 468, 478 (2003)).

dignity' of the foreign sovereign."  Nat'l City Bank of N.Y. v. Republic of China, 348 U.S. 356,

362 (1955) (quoting Schooner Exchange, 7 Cranch at 136-37, 143-44).

       Unlike the doctrine of diplomatic immunity, which is governed by the VCDR, the

doctrine of foreign sovereign immunity has been governed by statute since the enactment of the

Foreign Sovereign Immunities Act in 1976.  28 U.S.C. §§ 1602-1607; see Verlinden B.V., 461

U.S. at 488.  And whereas the traditional view of sovereign immunity "granted foreign

sovereigns complete immunity from suit in the courts of this country," the FSIA "codifie[d], as a

matter of federal law, the restrictive theory of sovereign immunity," in which "immunity is

confined to suits involving the foreign sovereign's public acts, and does not extend to cases

arising out of a foreign state's strictly commercial acts."  Id. at 487-88.


1. The FSIA

       "The Foreign Sovereign Immunities Act . . . is the sole source for subject matter

jurisdiction over any action against a foreign state."  Capital Ventures Int'l v. Republic of

Argentina, 552 F.3d 289, 293 (2d Cir. 2009) (quotation omitted).  "The FSIA provides that

foreign sovereigns are immune from suit unless a specific exception to sovereign immunity

applies."  Id. (citing 28 U.S.C. § 1604).  Unless an exception to the FSIA applies, a federal court

lacks subject matter jurisdiction over a claim against a foreign state.  Saudi Arabia v. Nelson,

507 U.S. 349, 355 (1993).  When a defendant asserts sovereign immunity, the defendant has the

initial burden of presenting a prima facie case that it is a foreign sovereign; the plaintiff then has

the burden of bringing forward evidence showing that an exception to the FSIA applies to

deprive the defendant of immunity; but the ultimate burden of persuasion remains with the

alleged sovereign.  See Cabiri v. Gov't of the Republic of Ghana, 165 F.3d 193, 196 (2d Cir. 1999).

Plaintiff does not dispute that Kuwait is a foreign state within the meaning of the FSIA.  See 28 U.S.C. § 1603(a).  Thus, Kuwait is "'presumptively immune from the jurisdiction of United States courts unless a specified exception applies.'"  Kensington Int'l Ltd. v. Itoua, 505 F.3d 147, 154 (2d Cir. 2007) (quoting Saudi Arabia, 507 U.S. at 355).  Plaintiff contends that the "commercial activity exception," 28 U.S.C. § 1605(a)(2), deprives Kuwait of sovereign immunity with respect to plaintiff's labor law claims and that the "tort exception," id. § 1605(a)(5), deprives Kuwait of sovereign immunity with respect to plaintiff's ATCA, ratification, and aiding and abetting claims.

### 2. Labor Law Claims

The commercial activity exception is the "most significant of the FSIA's exceptions."  Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992).  As relevant here, it provides that a foreign state shall not be immune from the jurisdiction of United States courts in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state."  28 U.S.C. § 1605(a)(2).  The FSIA provides that a "'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States."  Id. § 1603(e).  Thus, "[f]or there to be jurisdiction . . . the [plaintiff's] action must be [1] 'based upon' some [2] 'commercial activity' by [the foreign state] that [3] had 'substantial contact' with the United States within the meaning of the Act."  Saudi Arabia, 507 U.S. at 356.

Because I conclude that plaintiff has not shown any "commercial activity" by Kuwait, I need not reach the issues of whether plaintiff's cause of action is "based upon" such activity or whether the activity had "substantial contact" with the United States. The term "commercial activity" is defined in the FSIA to mean "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The Supreme Court has explained that "a state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns. Put differently, a foreign state engages in commercial activity . . . only where it acts in the manner of a private player within the market." Saudi Arabia, 507 U.S. at 360 (quotations omitted). Thus, "the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce." Weltover, 504 U.S. at 614 (emphasis in original) (holding that Argentina's issuance of public debt instruments was commercial activity).

Plaintiff relies heavily on cases holding that the employment of non-diplomatic, non-civil service personnel is "commercial activity." Indeed, as the Second Circuit has noted, the legislative history of the FSIA "identifies the employment of civil service personnel as an example of a 'governmental' rather than 'commercial' activity . . . [and] lists as examples of 'commercial activity' a sovereign's 'employment or engagement of laborers, clerical staff or public relations or marketing agents.'" Kato v. Ishihara, 360 F.3d 106, 110 (2d Cir. 2004) (quoting H.R. Rep. No. 94-1487, at 16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6615); see also Holden v. Canadian Consulate, 92 F.3d 918, 922 (9th Cir. 1996) (holding that Canadian

Consulate's employment of plaintiff, whose "activities were primarily promoting and marketing" products, was a commercial activity under the FSIA); <u>Zveiter v. Brazilian Nat'l Superintendency of Merch. Marine</u>, 833 F.Supp. 1089, 1093 (S.D.N.Y. 1993) (holding that Brazilian agency's employment of plaintiff as a secretary in the clerical staff was a commercial activity under the FSIA). In these cases, the sovereign defendants had hired the plaintiffs and had acted as the plaintiffs' employers. Here, by contrast, Mr. Al-Awadi, not Kuwait, hired plaintiff and acted as her employer. The distinction is critical.

Plaintiff's argument that she was a domestic servant and thus a "laborer," as opposed to being a member of the Kuwait Mission's "civil service personnel," is beside the point. This argument would have force if the relevant question was whether the Individual Defendants engaged in "commercial activity" by employing plaintiff. But that is not the question. For the reasons explained above, the Individual Defendants have no immunity from plaintiff's labor law claims. The question here is whether <u>Kuwait</u> engaged in commercial activity. Plaintiff met the Individual Defendants in Kuwait while working at the home of Ms. Al-Shaitan's parents. (Decl. ¶¶ 5-6; Compl. ¶¶ 11, 14.) The Individual Defendants offered plaintiff a position as a domestic employee in their home in the United States, promised her benefits, and secured the visa necessary for her to work for them. (Decl. ¶¶ 7-8; Compl. ¶¶ 15-22.) These acts were undertaken by the Individual Defendants, not Kuwait.

The only facts connecting Kuwait to the employment of plaintiff are that plaintiff believed based on overheard conversations that the Kuwaiti government "paid for all of the expenses associated with a family moving to and living in New York" (Decl. ¶ 17); that Kuwait owned the home in which the Individual Defendants lived (<u>id.</u> ¶¶ 17-18); and that Kuwait reimbursed Mr. Al-Awadi for certain of plaintiff's medical and travel expenses (<u>id.</u> ¶¶ 17, 19).

These allegations are insufficient to establish that Kuwait engaged in commercial activity.  Cf. Bell Atl. Corp. v. Twombly, 550 U.S. 544, ___, 127 S.Ct. 1955, 1974 (2007).  Rather, they indicate that as part of Kuwait's employment of Mr. Al-Awadi as a diplomatic agent, Kuwait provided Mr. Al-Awadi with certain benefits, including a home in New York and reimbursement of certain expenses.  Providing financial and other compensation to a diplomat is a "power[] peculiar to sovereigns," as distinct from a power that can be "exercised by private citizens." Saudi Arabia, 507 U.S. at 360 (quotations omitted).  Plaintiff has failed to establish that Kuwait's actions "are the type of actions by which a private party engages in trade and traffic or commerce."  Weltover, 504 U.S. at 614 (1992) (emphasis in original) (citations and quotation omitted).  Thus, the commercial activity exception does not apply and Kuwait is immune from plaintiff's labor law claims.


3. ATCA Claims

The FSIA's "torts exception" provides that a foreign state shall not be immune from the jurisdiction of United States courts in any case, not otherwise encompassed in the "commercial activity exception," in which:

> money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

28 U.S.C. § 1605(a)(5).  However, this exception does not apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused."  Id. § 1605(a)(5)(A).  Plaintiff argues that this exception makes Kuwait amenable to suit on plaintiff's ATCA claims because Mr. Al-Awadi's alleged acts were committed "within the scope of his office or employment."

The acts of Mr. Al-Awadi that are alleged to have given rise to plaintiff's ATCA claims were not taken within the scope of his office or employment.  As both parties agree, the question of whether Mr. Al-Awadi was acting within the scope of his employment is governed by New York law.  (See Pl. Rep. Mem. at 15; Def. Opp. at 9); see First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 620-21 (1983); Robinson, 269 F.3d at 142 (determination of applicability of torts exception to FSIA "required [district court] to decide whether [defendant's] acts were tortious under the law of the State of New York").

Under New York law, an employee's tortious acts fall within the scope of his employment if "done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." Riviello v. Waldron, 47 N.Y.2d 297, 302 (1979) (quotation omitted).  However, New York case law establishes that "an employer is not liable for torts committed by the employee for personal motives unrelated to the furtherance of the employer's business." Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995) (citing cases), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).  In particular, "New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." Ross v. Mitsui Fudosan, Inc., 2 F.Supp.2d 522, 531 (S.D.N.Y. 1998); see N.X. v. Cabrini Med. Ctr., 97 N.Y.2d 247, 251 (2002) (sexual assault by hospital employee not within the scope of employment); Judith M. v. Sisters of Charity Hosp., 93 N.Y.2d 932, 933 (1999) (same); Paul J.H. v. Lum, 291 A.D.2d 894, 895 (4th Dep't 2002) (priest's alleged sexual assault of child not within scope of employment); Koran I. v. N.Y.C. Bd. of Educ., 256 A.D.2d 189, 191 (1st Dep't 1998) (teacher's molestation of student not within scope of employment).  Here, there is no basis for holding that Mr. Al-Awadi's alleged

commission of "slavery and slavery-like practices including forced labor, involuntary servitude, and sexual slavery" (Compl. ¶ 113) were in any way related to the furtherance of Kuwait's purposes in the United States.  See N.X., 97 N.Y.2d at 251.  Rather, such acts, by their nature, arise from personal motives.  See id.  Accepting the facts alleged by plaintiff as true, I conclude that, as a matter of law, Mr. Al-Awadi's tortious acts were not committed within the scope of his employment.  Thus, the FSIA's torts exception does not strip Kuwait of its sovereign immunity from plaintiff's ATCA claims.

4. Ratification and Aiding and Abetting Claims

        Plaintiff also claims that Kuwait is liable for ratifying and aiding and abetting Mr. Al-Awadi's allegedly unlawful acts (see Compl. ¶¶ 118-20), and argues that Kuwait is amenable to suit on these claims because the FSIA's torts exception strips Kuwait of immunity.  Plaintiff claims that Kuwait ratified Mr. Al-Awadi's acts by "(1) fail[ing] to repudiate Al-Awadi's conduct and (2) transferr[ing] him to another diplomatic post in France."  (Pl. Mem. at 49.) Plaintiff claims that Kuwait aided and abetted Mr. Al-Awadi's unlawful acts by "creating a protected space in which the Individual Defendants could commit . . . abhorrent human rights violations."  (Id. at 32.)  In particular, plaintiff relies on the fact that two Circular Diplomatic Notes, distributed by the United States Department of State to all foreign missions including Kuwait, emphasized the legal obligations of diplomats to their domestic workers.  (See id. at 44 (citing http://www.state.gov/documents/organization/32298.pdf); see also Decl. ¶ 43.)  Plaintiff also points to the fact that Kuwait allegedly helped secure the visa necessary for plaintiff to work in the United States and reimbursed Mr. Al-Awadi for various expenses associated with her employment.  (See Decl. ¶¶ 8, 10, 17-19.)

These claims do not come within the FSIA's torts exception because that exception expressly excludes "any claim based upon the exercise or performance or the failure to exercise or perform a <u>discretionary function</u> regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A) (emphasis added). Actions are discretionary when they are "grounded in the social, economic, or political policies" of the sovereign. <u>In re Terrorist Attacks on Sept. 11, 2001</u>, 392 F.Supp.2d 539, 554 (S.D.N.Y. 2005), <u>aff'd</u> 538 F.3d 71 (2d Cir. 2008). "Under the FSIA's discretionary function exception, acts which are performed at the planning level of government, as opposed to those at the operational level, are protected by the immunity." <u>Marchisella v. Gov't of Japan</u>, 02 Civ. 10023(DC), 2004 WL 307248, at *2 (S.D.N.Y. Feb.17, 2004) (quotation omitted). Plaintiff's allegations with respect to ratification and aiding and abetting all concern acts taken by Kuwait of a discretionary nature. Kuwait's decision to transfer a diplomat to a new post, and to decline to publicly repudiate the acts of a diplomat are "performed at the planning level of government." <u>Id.</u> at *2 (quotation omitted). And Kuwait's decisions regarding compensation and benefits paid to its diplomats, and its decision whether and to what extent to comply with the State Department's Circular Diplomatic Notes are grounded in Kuwait's "social, economic, or political policies." <u>Terrorist Attacks</u>, 392 F.Supp.2d at 554. These are discretionary acts, and thus, the FSIA's torts exception does not strip Kuwait of its sovereign immunity from plaintiff's ratification and aiding and abetting claims. Accordingly, this Court does not reach the question of whether these allegations state valid claims for relief.

## II. <u>DEFAULT JUDGMENT</u>

Plaintiff seeks a default judgment under Rule 55, Fed. R. Civ. P, against Kuwait and the Individual Defendants. As discussed above, Kuwait has sovereign immunity from this

action and the Court therefore lacks subject matter jurisdiction to grant a default judgment against it.  But no immunity bars this Court from granting a default judgment against the Individual Defendants.  Under Rule 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  A Certificate of Service filed on September 27, 2007 (Doc. #20) certifies that the Individual Defendants were served with copies of the summonses and complaint in accordance with this Court's Order of September 20, 2007.  It appears from the docket report that the Individual Defendants have not answered the complaint or otherwise moved pursuant to Rule 12, Fed. R. Civ. P.  It further appears that the time to answer or move has expired.  Thus, the Clerk is hereby ordered to enter a default as to Mr. Al-Awadi and Ms. Al-Shaitan.

Where the defendants have appeared in person or by a representative, "the party must apply to the court for a default judgment" as plaintiff has done here.[16]  Rule 55(b)(2), Fed. R. Civ. P.  Defendants argue that a default judgment should not be granted because "[i]f the Court entered a default judgment, it would be obligated to vacate it" under Rule 55(c), Fed. R. Civ. P.  (Def. Opp. at 12.)  "The dispositions of motions for entries of defaults and default judgments . . . are left to the sound discretion of a district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties."  Shah v. New York State Dep't of Civil Serv., 168 F.3d 610, 615 (2d Cir. 1999) (quotation omitted).  The Second Circuit has explained that this discretion should be guided by the "[s]trong public policy favor[ing] resolving disputes on the merits."  Pecarsky v. Galaxiworld.com Ltd., 249 F.3d 167, 172 (2d Cir. 2001) (quotation omitted) (first alteration in

---

[16] Counsel for the Individual Defendants and Kuwait entered a Notice of Appearance on August 12, 2008.  (Doc. #35.)

original).  The cases relied on by defendants are inapposite because there, unlike here, the

defaulting defendants sought in good faith to answer the complaint and defend the action.  <u>See</u>

<u>Meehan v. Snow</u>, 652 F.2d 274, 275-77 (2d Cir. 1981) (granting relief from default where

defendants had filed an answer ten days late); <u>Enron Oil Corp. v. Diakuhara</u>, 10 F.3d 90, 94, 97

(2d Cir. 1993) (granting relief from default where <u>pro se</u> defendant claimed to have never been

initially served with the complaint and, after receiving it, wrote to the court that he intended to

answer it "shortly").  Here, the Individual Defendants have not answered the complaint and have

given no indication that they ever plan to defend this action.  Thus, declining to grant a default

judgment would hardly serve the public policy favoring the resolution of disputes on the merits.

      Furthermore, the equitable factors considered under Rule 55(c) weigh strongly in

favor of granting a default judgment.  "When deciding whether to relieve a party from default or

default judgment, we consider [1] the willfulness of the default, [2] the existence of a meritorious

defense, and [3] the level of prejudice that the non-defaulting party may suffer should relief be

granted."  <u>Pecarsky</u>, 249 F.3d at 171.  First, there is no question that the Individual Defendants'

default was willful.  Willfulness in the default judgment context requires "egregious or deliberate

conduct" as distinguished from mere negligence or carelessness.  <u>Am. Alliance Ins. Co. v. Eagle</u>

<u>Ins. Co.</u>, 92 F.3d 57, 61 (2d Cir. 1996).  The Individual Defendants were aware of plaintiff's

grievance as early as 2002, when she filed her first action against them.  That action was

dismissed "without prejudice because plaintiff could plausibly institute a new action against

defendants now that they are no longer associated with the Kuwaiti Mission."  <u>See</u> Summary

Order, <u>Vishranthamma v. Al-Awadi</u>, 02 Civ. 3710(PKL)(MHD) (S.D.N.Y. Jan. 26, 2005).  The

Individual Defendants were aware of the instant action by at least September 27, 2007, when

they were served.  And the Individual Defendants, through their counsel, appeared in this action

to file a memorandum opposing the entry of a default judgment, but not to answer the complaint. Thus, it is clear that their default was deliberate and thus "willful" as that term is used in the default judgment context.

Second, whether the Individual Defendants have meritorious defenses against plaintiff's claims is, at best, uncertain. In their memorandum, defendants argue that they "have at least two defenses . . . . First . . . [defendants] are immune from plaintiff's lawsuit. Second, plaintiff's principal state law claims are barred by the applicable statute of limitations." (Def. Opp. at 16.) However, I have already rejected the Individual Defendants' assertion of diplomatic immunity. Whether plaintiff's "principal state law claims" are time-barred is less clear.[17] Assuming plaintiff's claims under New York law accrued at various times during the period in which she was living and working at the Individual Defendants' home, the six-year statutes of limitations on each claim appear to have expired prior to the date on which plaintiff filed this action. However, given plaintiff's claim that she was held in slavery-like captivity in the Individual Defendants' home (see Decl. ¶ 24), there are appropriate grounds for holding the statutes of limitations tolled under the doctrine of equitable estoppel until the date when she escaped, June 25, 2000. See Zumpano v. Quinn, 6 N.Y.3d 666, 673 (2006) ("The doctrine of equitable estoppel applies where it would be unjust to allow a defendant to assert a statute of limitations defense. [New York] courts have long had the power . . . to bar the assertion of the affirmative defense of the Statute of Limitations where it is the defendant's affirmative wrongdoing . . . which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding.") (quotation omitted); Overall v. Estate of Klotz, 52 F.3d

---

[17] Defendants have not argued that plaintiff's ATCA claims are time-barred. Cf. Manliguez v. Joseph, 226 F.Supp.2d 377, 386 (E.D.N.Y. 2002) ("It is well-established that the ten-year statute of limitations of the Torture Victims Protection Act . . . applies to ATCA claims."); Doe v. Karadzic, 93 Civ. 878(PKL), 2000 WL 763851, at *1 n.3 (S.D.N.Y. June 13, 2000).

398, 404 (2d Cir. 1995) ("In order to invoke equitable estoppel [under New York law], a plaintiff

must show that the defendant 'wrongfully induced the plaintiff to refrain from timely

commencing an action by deception, concealment, threats or other misconduct.'") (quoting <u>Zoe</u>

<u>G. v. Frederick F.G.</u>, 208 A.D.2d 675, 675 (2d Dep't 1994).  Assuming that the Individual

Defendants were equitably estopped from asserting a statute of limitations defense against

plaintiff's claims until June 25, 2000, the question then would be whether plaintiff brought this

action within a reasonable time.  <u>See</u> <u>Overall</u>, 52 F.3d at 404 ("[A] plaintiff invoking estoppel

must show that he brought his action 'within a reasonable time after the facts giving rise to the

estoppel have ceased to be operational.' . . . Equitable estoppel, therefore, looks at the parties'

conduct only to determine their relative blameworthiness in delaying the commencement of

suit.") (quoting <u>Simcuski v. Saeli</u>, 44 N.Y.2d 442, 450 (1978) (citation omitted)).  For one, this

action, filed on June 23, 2006, was brought within six years of the date plaintiff escaped from the

Individual Defendants' home.  Moreover, plaintiff diligently pursued her initial action against the

Individual Defendants, but was frustrated by their diplomatic immunity.  There is no indication

that plaintiff deliberately delayed the commencement of this action.  Thus, because the

Individual Defendants have raised no meritorious defenses to plaintiff's ATCA claims and

appear to have little chance of success on their statute of limitations defenses to plaintiff's labor

law claims, this factor weighs in favor of granting a default judgment.

   Finally, plaintiff would suffer considerable prejudice if a default judgment were

denied.  Plaintiff allegedly suffered harm at the hands of the Individual Defendants between

1996 and 2000.  (Compl. ¶ 23.)  She commenced her first action in 2002 and it was dismissed in

2005.  (<u>Id.</u> ¶ 93.)  She filed this action in June 2006.  It took plaintiff until September 2007 to

serve the Individual Defendants.  To require plaintiff to endure further delays, particularly when

the Individual Defendants have not given any indication that they plan to defend this action, would be unfair and prejudicial to plaintiff.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a default judgment against Mr. Al-Awadi and Ms. Al-Shaitan is granted, subject to an inquest solely on the issue of damages, which will be scheduled by the Court. Plaintiff's motion for a default judgment against the State of Kuwait is denied and all claims against the State of Kuwait are dismissed for lack of subject matter jurisdiction.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 19, 2009

33