IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| VISHRANTHAMMA SWARNA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  06-CV-4880 (PKC) |
| | ) | |
| BADAR AL-AWADI and HALAL | ) | |
| MUHAMMAD AL-SHAITAIN | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN
## SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Neil H. Koslowe (NK 2808)
*Of Counsel*
Thomas B. Wilner*
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 508-8000
Facsimile:  (202) 508-8100

*Attorneys for Defendants*
* Admitted *Pro Hac Vice*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION AND SUMMARY ............................................................................ 1

STATEMENT ................................................................................................................ 3

    A. Litigation History ............................................................................................... 3

        1.  The first action ................................................................................... 3

        2.  The present action ............................................................................. 4

    B. Swarna's Allegations and the Evidence Before the Court ................................. 5

ARGUMENT ................................................................................................................. 7

    I.     Swarna Has Failed To Meet Her Burden Of Showing ATS Jurisdiction ........................ 7

    A. *Sosa v. Alvarez-Machain* ................................................................................ 7

    B. Swarna's Allegations Fail to Establish the Violation of a Specific Norm ....................... 9

        1.  The international agreements Swarna cites in her complaint ............................... 10

        2.  The Restatement ............................................................................... 13

        3.  Practical consequences ..................................................................... 14

        4.  U.S. domestic law ............................................................................ 14

        5.  Case law precedent ........................................................................... 15

        6.  Misconduct in the U.S. ..................................................................... 19

    II.    Swarna's ATS Claim Is Implicitly Pre-Empted By The TVPRA ................................. 19

    III.  Swarna Has Not Adequately Pled An ATS Or TVPRA Claim ................................... 21

    IV.  The Court Should Dismiss Swarna's State Claims ................................................. 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

**Page**

*Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674 (S.D. Tex. 2009) .......................................21

*Alfadda v. Fenn*, 966 F. Supp. 1317, 1335 (S.D.N.Y. 1997).......................................................23

*Brzak v. United Nations*, 597 F.3d 107 (2d Cir. 2010) ...........................................................3, 24

*Doe I v. Nestlé, S.A.*, No. CV 05-513, 2010 WL 3969615 (C.D. Cal. Sept. 8, 2010) ..................18

*Doe v. Unocal Corp.*, 963 F. Supp. 880 (C.D. Cal. 1997)............................................................18

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980).................................................................19

*Flores v. S. Peru Copper Corp.*, 414 F.3d 233 (2d Cir. 2003) ...............................................10, 18

*Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424 (D.N.J. 1999).................................................17

*John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988 (S.D. Ind. 2007) .........................11, 23, 24

*Kadic v. Karadžić*, 70 F.3d 232 (2d Cir. 1995)................................................................ *passim*

*Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010).........................................9, 15

*Licea v. Curaao Drydock Co., Inc.*, 584 F. Supp. 2d 1355 (S.D. Fla. 2008)................................18

*Presbyterian Church of Sudan v. Talisman Energy*, 582 F.3d 244 (2d Cir. 2009) .......................18

*Simcuski v. Saeli*, 44 N.Y.2d 442, 450 (1978) .............................................................................25

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)............................................................... *passim*

*Swarna v. Al-Awadi, et al*, No. 02-cv-03710-PKL-MHD (S.D.N.Y. May 15, 2002)..........3, 4, 6, 7

*Swarna v. Al-Awadi*, 607 F. Supp. 2d 509 (S.D.N.Y. 2009) ........................................................24

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) ............................................15

*United States v. Alzanki*, 54 F.3d 994 (1st Cir. 1995).................................................................22

*United States ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.,* Nos. 06 Civ. 7115, 06 Civ.
11440, 2010 WL 2670829 (S.D.N.Y. July 2, 2010) ........................................................23

*United States v. Habegger*, 370 F.3d 441 (4th Cir. 2004) ..............................................22

*United States v. Ingalls*, 73 F. Supp. 2d 76 (S.D. Cal. 1947) ......................................22

*United States v. Johnson*, 221 F.3d 83 (2d Cir. 2000) ................................................22

*United States v. Kozminski*, 487 U.S. 931 (1988)........................................................22

*United States v. Matta-Ballesteros*, 71 F.3d 754 (9th Cir. 1995) ................................17

*United States v. Shackney*, 333 F.2d 475 (2d Cir. 1964) .........................................22, 23

*United States v. Smith*, 18 U.S. 153 (1820) ................................................................15

*Velez v. Sanchez*, Case No. 04-CV-4797, 2010 WL 4852321 (E.D.N.Y Nov. 30, 2010) ..... *passim*

*Ex parte Wilson*, 114 U.S. 417 (1885)..........................................................................22

*Zumpano v. Quinn*, 6 N.Y.3d 666 (2006) .....................................................................25

## STATUTES

15 U.S.C. §§ 1589, 1590.................................................................................................22

18 U.S.C. §§ 1584, 1589, 1590, 1593, 1595...........................................................2, 15, 20, 21

28 U.S.C. § 1350 (Alien Tort Statute, or "ATS")................................................... *passim*

22 U.S.C. § 7101 *et seq* (Trafficking Victims Protection Act of 2000, or "TVPA") ...................20

Fed. R. Civ. P. 12(b)(1)....................................................................................................1

Fed. R. Civ. P. 12(b)(6)....................................................................................................1

New York CPLR § 205(a) ..............................................................................................24

Pub. L. No. 108-193 *as amended by* Pub. L. No. 110-457 (Trafficking Victims Protection
   Reauthorization Act of 2003, or "TVPRA")............................................... *passim*

## MISCELLANEOUS

Hugo Fischer, *Suppression of Slavery in International Law*, 3 Int'l L. Q. 503 (1950) ................11

Jordan Paust, *The Other Side of Right: Private Duties Under Human Rights Law*, 5
   HARV. HUM. RTS. J. 51 (1992) ...................................................................16

Korowicz, *The Problem of the International Personality of Individuals*, 50 AM. J. INT'L L. 533 (1956) ...................................................................................................15

Lauterpacht, *The Subjects of the Law of Nations*, 63 L. Q. REV. 438 (1947)..............................15

M. Cherif Bassiouni, *Crimes Against Humanity in International Criminal Law* 193 (1992)...................................................................................................................16

The Convention Concerning Forced or Compulsory Labour (ILO No. 29), June 28, 1930, 39 U.N.T.S. 55 (1930) ........................................................................................11

The Convention on the Elimination of All Forms of Discrimination Against Women, Dec. 18, 1979, art. 6, 19 I.L.M. 33, 37, 1249 U.N.T.S. 13 (1979) ...................................12

The Convention to Suppress the Slave Trade and Slavery, Sept. 25, 1926, 46 Stat. 2183, 60 U.N.T.S. 253 (1926) ......................................................................................10

The International Covenant on Civil and Political Rights, art. 8, 999 U.N.T.S. 171, 6( ) I.L.M. 368 (1967)..........................................................................................10, 12

The Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, G.A. Res. 25, annex II, U.N. GAOR, 55th Sess., Supp. No. 49, at 60, U.N. Doc. A/45/49 (2001) ..............................................................12

The Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery, Sept. 7,  1956, 18 U.S.T. 3201, 226 U.N.T.S. 3 (1956) ............................................................................................11

The Universal Declaration of Human Rights, art. 4, G.A. Res. 217(A), U.N. GAOR 3d Sess., U.N. Doc. A/810 (1948) ................................................................................10, 12

## INTRODUCTION AND SUMMARY

The Court should dismiss plaintiff Vishranthamma Swarna's single federal claim of "slavery and slavery-like practices" (Compl. ¶¶ 112-121) against defendants Badar Al-Awadi and Halal Muhammad Al-Shaitain (the "Kuwaiti Diplomats") under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.  Swarna alleges that the Court has jurisdiction over her federal claim under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS").  However, Swarna's allegations do not establish that the Kuwaiti Diplomats violated a specific, universal, and obligatory norm of international law, which is required for ATS claims.  Moreover, because Swarna allegations also do not state a claim upon which relief may be granted under another federal statute over which the Court would have subject matter jurisdiction, Swarna's federal claim should be dismissed under Fed. R. Civ. P. 12(b)(6) as well.

The Supreme Court held in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004) that the ATS is a purely jurisdictional statute which allows federal courts to hear claims "in a very limited category defined by the law of nations and recognized at common law."  Such claims must "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th century paradigms" of "violation of safe conducts, infringement of the rights of ambassadors, and piracy."  *Id*. at 724-725.  Furthermore, the courts must carefully determine "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation *or individual* (emphasis added)."  *Id*. at 732 n. 20.

Although the law of nations has long proscribed state-sponsored slavery and the slave trade, there is no support in acceptable sources of international law for a norm imposing liability on an *individual* for enslaving another *individual*, which is the essence of Swarna's federal claim. In addition, as the court recently held in *Velez v. Sanchez*, Case No. 04-CV-4797, 2010 WL

4852321, at *6 (E.D.N.Y. Nov. 30, 2010), ATS jurisdiction does not extend to misconduct occurring in the United States, which is what Swarna alleges.  Therefore, Swarna has failed to meet her burden of showing that the Court has ATS jurisdiction over her federal claim.

Furthermore, the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"), Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875, 2878, as amended by Pub. L. No. 110-457, § 221(2), 122 Stat. 5067, codified at 18 U.S.C. § 1595, which Swarna has not invoked, pre-empts her putative ATS claim of slavery and slavery-like practices.  The Supreme Court noted in *Sosa* that it has "repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases," and that Congress may "shut the door" to particular ATS claims by enacting "statutes that occupy the field."  542 U.S. at 727, 731.  In 2003, Congress did just that by enacting the TVPRA.  The TVPRA creates a civil remedy for victims of trafficking, slavery, and forced labor, and, as the *Velez* court held (2010 WL 4852321, at *6-7), the TVPRA's remedy implicitly pre-empts any common law claim under the ATS, such as Swarna's, that is based on such conduct.  This is an independent reason why the Court lacks jurisdiction under the ATS over Swarna's federal claim.

At all events, the Court should dismiss Swarna's federal claim because she has not adequately pled a claim of slavery, forced labor, or trafficking sufficient to support ATS jurisdiction or to state a cognizable claim under the TVPRA.  The Second Circuit pointed out in *Kadic v. Karadžić*, 70 F.3d 232, 238 (2d Cir. 1995), that the ATS requires a "searching review" of the merits to establish jurisdiction, and "it is not a sufficient basis for jurisdiction to plead merely a colorable violation of the law of nations."  Slavery and forced labor are unpaid work that is coerced by force or the threat of force such that the victim reasonably believes she or he has no choice but to continue to serve, and trafficking is the commercial transportation of

2

persons for purposes of forced labor.  A "searching review" of Swarna's allegations and the evidence available to the Court reveals that Swarna voluntarily agreed to come to the United States and work for the Kuwaiti Diplomats, she was paid for her labor, she voluntarily returned twice to her job with the Kuwaiti Diplomats after visiting her family in India, and that she continued to serve the Kuwaiti Diplomats primarily because her family needed the money she was earning.  Consequently, Swarna has not adequately pled a claim over which the Court has ATS jurisdiction or which is cognizable under the TVPRA.

Finally, the Court also should dismiss Swarna's five state claims of wage and labor law violations, fraud and fraudulent inducement, unjust enrichment, and breach of contract.  First, because Swarna's federal claim should be dismissed, there is no colorable basis for the Court to exercise supplemental jurisdiction over her state claims.  *Brzak v. United Nations*, 597 F.3d 107, 113-114 (2d Cir. 2010).  Second, Swarna's state claims are time-barred.

## STATEMENT

### A.  Litigation History

#### 1.  The first action

Swarna filed a complaint in this Court against the Kuwaiti Diplomats on May 15, 2002. *Vishranthamma v. Al-Awadi*, et al, No. 02-cv-03710-PKL-MHD (S.D.N.Y. May 15, 2002).  The Kuwaiti Diplomats invoked diplomatic immunity and, through an attorney, advised the Court that they would not be filing any motions or taking any other action in the case (dkt. entry # 21). Nevertheless, the Court granted Swarna's motion for the entry of default against the Kuwaiti Diplomats on December 18, 2003, and it referred the case to a Magistrate Judge to conduct an inquest to hear and determine the amount of Swarna's damages (*Id*. # 20).  The inquest was conducted by the Magistrate Judge on February 25, 2004, at which Swarna was the only witness and gave sworn testimony (*Id*. ## 26 & 27).

On October 29, 2004, in response to a *sua sponte* invitation from the Magistrate Judge, the United States s filed a letter-brief in which it argued that, because Swarna had served the Kuwaiti Diplomats while they were cloaked with full diplomatic immunity, the Court should dismiss her lawsuit without prejudice (dkt. entry #33).  The Magistrate Judge issued a Report and Recommendation on December 27, 2004, recommending that Swarna's lawsuit be dismissed without prejudice on that ground (dkt. entry # 32), and the Court adopted it by Order issued on January 26, 2005 (*Id.* # 34).  The Court noted that "plaintiff could plausibly institute a new action against defendants now that they are no longer associated with the Kuwaiti Mission."  *Id.*

### 2.  The present action

A year and a half later, on June 23, 2006, Swarna filed the present action against the Kuwaiti Diplomats and the State of Kuwait.  Defendants did not respond to Swarna's complaint. Swarna moved for default judgment on August 5, 2008 (*Id.* ## 31-32).  Defendants filed an opposition to that motion on September 17, 2008 (dkt. entries ## 42, 43).

The Court issued a Memorandum and Order on March 19, 2009, granting Swarna's motion for default judgment against the Kuwaiti Diplomats, subject only to an inquest on the issue of damages, but denying Swarna's motion for default judgment against the State of Kuwait and dismissing her claims against Kuwait on grounds of sovereign immunity.  Among other things, the Court held that the Kuwaiti Diplomats were not entitled to "residual immunity."

The parties cross-appealed and, on September 24, 2010, the United States Court of Appeals for the Second Circuit affirmed the Court's dismissal of Swarna's claims against the State of Kuwait and it affirmed the Court's holding that the Kuwaiti Diplomats were not entitled to "residual immunity."  However, the Second Circuit vacated the Court's grant of default judgment against the Kuwaiti Diplomats and remanded that portion of the case to this Court for further proceedings.  The Second Circuit's mandate was issued on December 22, 2010.

B.  **Swarna's Allegations and the Evidence Before the Court**

Swarna alleges the following:

Swarna, a native of India, traveled to Kuwait in 1995 to be a domestic worker for the parents of defendant Halal Muhammad Al-Shaitan. Comp. ¶¶ 10-11.  While she was in Kuwait, the Kuwaiti Diplomats offered Swarna a position as a live-in domestic worker in their home in New York City.  *Id.* ¶ 15.  The Kuwaiti Diplomats told Swarna that they would pay her $2,000 per month, provide her with an annual paid vacation trip to India to visit her family, and give her a day off every Sunday. *Id.* ¶ 17.  Based on these terms, Swarna accepted the Kuwaiti Diplomats' offer and came to New York to work for them in September 1996. *Id.* ¶¶ 18, 23.

During her first year of employment, the Kuwaiti Diplomats paid Swarna $200 per month.  Compl. ¶ 28.  One year later, the Kuwaiti Diplomats increased Swarna's salary to $250 per month, and a year after that, they increased it to $300 per month. *Id.* ¶¶ 30-31.  In addition, the Kuwaiti Diplomats provided for Swarna's personal needs, including food, clothing, shelter, and medical care.  *Id.* ¶ 33.  When Swarna complained that she was entitled to be paid $2,000 per month, the Kuwaiti Diplomats told her that what they were paying her was more than she could earn in India.  *Id.* ¶ 29.

The Kuwaiti Diplomats subjected Swarna to harsh working conditions.  Compl. ¶ 38. They did not give Swarna off on Sundays or permit her to go to church; they required her to work 16 to 17 hours per day; they made her sleep on a mattress in the same room as their children; and they did not allow her to leave their apartment unaccompanied. *Id.* ¶¶ 36, 39, 49, 55.  The Kuwaiti Diplomats also physically and verbally abused Swarna, and Swarna believed she was in imminent danger of being seriously hurt or killed.  *Id.* ¶¶ 72-79.

The Kuwaiti Diplomats permitted Swarna to travel home to India and visit her family twice during the four years she worked for them.  Compl. ¶¶ 35, 69.  The second trip lasted one

month.  *Id*. ¶ 71.  According to sworn testimony Swarna gave in this Court on February 25, 2004, Swarna did not tell family members in India about her alleged mistreatment by the Kuwaiti Diplomats because she needed the job to support them.  In Swarna's words:  "[H]ad I written the truth, my husband and my children would be, would have been very unhappy, asked me to come back.  It was a huge consideration, because if I had left this job then I would have no means to help my family, my five children and my not-very-well husband.  So in four years I never wrote about the condition I was worked under.  I never talked to anybody.  I just endured everything."[1]

Sometime in September 1998, defendant Al-Awadi raped Swarna.  Compl. ¶ 80. According to Swarna's sworn testimony, defendant Al-Awadi warned Swarna not to tell anyone about this attack.[2]  "He said if you ever let my wife know about this, I will send you back to India.  I knew that if I was sent back, then I will not be able to have my children and my husband survive without this kind of a job.  I endured all this.  I did not say a word to anybody about this."[3]  Defendant Al-Awadi raped Swarna on other occasions.  Compl. ¶ 83.  Swarna testified that "there was nobody I could talk to, nobody I could speak about it to, because if I had managed to talk with somebody or anybody, he would have sent me home to India."[4]

The Kuwaiti Diplomats were scheduled to take a family trip to Kuwait with their children on June 20, 2000, and they told Swarna she would be traveling with them to take care of their children.  Compl. ¶ 84.  The morning before the Kuwaiti Diplomats' scheduled departure,

---

[1] Transcript of Proceedings, Feb. 25, 2004, in *Swarna v. Al-Awadi, et al*., Case No. 02-cv-03710-PKL-MHD (S.D.N.Y May 15, 2002) ("Tr."), at 16.  Portions of the transcript are annexed as Exhibit A.

[2] *Id.* at 25.

[3] *Id*.

[4] *Id*.

Swarna and defendant Al-Shaitain got into an argument.  *Id.* ¶ 85.  Defendant Al-Awadi became very angry with Swarna and threatened her.  *Id.* ¶¶ 86-88.  The next day, fearing that, if she went with the Kuwaiti Diplomats to Kuwait she would be harmed, Swarna gathered some personal items and left the apartment while the Kuwaiti Diplomats were away.  *Id.*  ¶ 91.

In her complaint, Swarna asserts one federal claim under the ATS of "slavery and slave-like practices" (Compl. ¶¶ 112-121), and state claims of violation of minimum wage and work hour laws (*id.* ¶¶ 122-131); fraud and fraudulent inducement (*id.* ¶¶ 132-139); unjust enrichment (*id.* ¶¶  140-145); and breach of contract (*id.* ¶¶ 146-150).  Swarna does not assert claims of assault, battery, sexual battery, or infliction of emotional distress.

## ARGUMENT

## I. Swarna Has Failed To Meet Her Burden Of Showing ATS Jurisdiction

The Court should dismiss Swarna's federal claim because her allegations do not establish that the Kuwaiti Diplomats violated a binding norm of international law having the specificity the Supreme Court held in *Sosa* was necessary to support the creation of a federal remedy under the ATS.  It has been the law in this circuit since *Kadic v. Karadžić*, 70 F.3d 232 (2d Cir. 1995) that ATS jurisdiction exists not only over claims against state actors but also over claims against individuals who are liable under international law for violating specific norms.  However, acceptable sources of international law offer no support for a norm imposing liability on individuals, such as the Kuwaiti Diplomats, for enslaving another individual, such as Swarna.  In addition, the ATS does not cover alleged misconduct that occurs entirely in the United States.

### A. *Sosa v. Alvarez-Machain*

Plaintiff in *Sosa*, a Mexican national named Humberto Alvarez-Machain, was abducted by Jose Francisco Sosa and other Mexican nationals who had been hired by the U.S. Drug Enforcement Administration, held overnight in a motel, and flown by plane to El Paso, Texas,

where he was arrested by federal officials.  Alvarez was subsequently indicted for the murder of a DEA agent, tried, and acquitted.  He sued Sosa under the ATS for damages arising from a violation of the law of nations, namely, arbitrary arrest.  The district court awarded summary judgment and $25,000 in damages to Alvarez on his ATS claim, and the Ninth Circuit affirmed that award.  A unanimous Supreme Court reversed, holding that Sosa's actions "violate[ ] no norm of customary international law so well defined as to support the creation of a federal remedy," and that the ATS did not confer jurisdiction over Alvarez's claim.  542 U.S. at 738.

The Supreme Court assumed that, when the ATS was enacted, Congress anticipated that the district courts would recognize private causes of action "for certain torts in violation of the law of nations," in particular "those torts corresponding to . . . three primary offenses:  violation of safe conducts, infringement of the rights of ambassadors, and piracy."  542 U.S. at 724.  Although the Supreme Court further assumed that, since then, Congress had not "categorically precluded" federal courts from recognizing private causes of action for other torts, it admonished that there are "good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind."  *Id*. at 725.  The Supreme Court described in detail five such reasons, which "argue for great caution in adapting the law of nations to private rights."  *Id*. at 725-728.  Thus, "courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized."  *Id*. at 725.

The Supreme Court said that "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts

(footnotes omitted)."  542 U.S. at 732-733.  The courts also must consider "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual."  *Id*. at 732 n. 20.

Ultimately, after evaluating Alvarez's assertion of a "general prohibition of 'arbitrary' detention defined as officially sanctioned action exceeding positive authorization to detain under the domestic law of some government," the Supreme Court concluded that the "broad principle" he advanced "exceeds any binding customary rule having the specificity we require (footnote omitted)."  542 U.S. at 736, 738.  "Creating a private cause of action to further that aspiration would go beyond any residual common law discretion we think it appropriate to exercise (footnote omitted)."  *Id*. at 738.

### B.  <u>Swarna's Allegations Fail to Establish the Violation of a Specific Norm</u>

The Second Circuit, which held in *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010) that the ATS does not confer subject matter jurisdiction over any claim against corporations, ruled that "the responsibility of establishing a norm of customary international law lies with those wishing to invoke it, and in the absence of sources of international law endorsing (or refuting) a norm, the norm simply cannot be applied in a suit grounded on customary international law under the ATS."  *Id*. at 120-121.  For example, to support corporate liability under the ATS "there would need to be not only a few, but so many sources of international law calling for corporate liability that the norm could be regarded as 'universal.'"  *Id*. at 121.

Although Swarna alleges that "numerous international instruments, customary international norms … and international case law establish modern manifestations of slavery such as trafficking, involuntary servitude, enslavement, forced labor, and sexual slavery as violations of the law of nations" (Compl. ¶ 115), *none* of the international declarations, covenants, conventions, and protocols Swarna cites in her complaint (*id*. ¶ 116) establishes as a

9

specific norm of international law that liability may be imposed on individuals, such as the

Kuwaiti Diplomats, for enslaving another individual, such as Swarna.  Moreover, the agreements

upon which Swarna relies in her complaint, several of which the United States has not ratified,

are precisely the kinds of "conventions that set forth broad principles without setting forth . . .

'clear and unambiguous rules'" that the Second Circuit has rejected as acceptable sources of

binding international law.  *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 252 (2d Cir. 2003)

(internal citation omitted).  Thus, Swarna has failed to meet her burden of showing that the

Kuwaiti Diplomats have violated a "'specific, universal, and obligatory'" norm of international

law (*Sosa*, 542 U.S. at 732) (internal citation omitted).

      1.   <u>The international agreements Swarna cites in her complaint</u>.  The Universal

Declaration of Human Rights, art. 4, G.A. Res. 217(A), U.N.GAOR 3d Sess., U.N. Doc. A/810

(1948), states:  "No one shall be held in slavery or servitude; slavery and the slave trade shall be

prohibited in all their forms."[5]  The International Covenant on Civil and Political Rights, Dec.

16, 1966, art. 8, 999 U.N.T.S. 171, 6( ) I.L.M. 368 (1967), states:  "(1) No one shall be held in

slavery; slavery and the slave-trade in all their forms shall be prohibited; (2) No one shall be held

in servitude; (3)(a) No one shall be required to perform forced or compulsory labour."[6]  Neither

creates a norm of individual liability for enslaving another individual.

      The Convention to Suppress the Slave Trade and Slavery, Sept. 25, 1926, 46 Stat. 2183,

60 U.N.T.S. 253, commits the contracting states "[t]o prevent and suppress the slave trade" and

---

[5] The UN General Assembly adopted the Declaration on December 10, 1948, by a vote of 48-0 (including the United States), with eight abstentions.  *See* Yearbook of the United Nations 1948-1949, p. 535 (1950); http://www.un.org/en/documents/udhr/index.shtml.

[6] The United States signed this Covenant on October 5, 1977, but has not ratified it.  *See* http://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-3&chapter=4&lang=en.

"[t]o bring about, progressively and as soon as possible, the complete abolition of slavery in all its forms" (article 2).[7]  The Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery, Sept. 7, 1956, 18 U.S.T. 3201, 226 U.N.T.S. 3, commits the parties to "take all practicable and necessary legislative and other measures to bring about progressively and as soon as possible the complete abolition of the following institutions and practices [of slavery]" (article 1), and to make "[t]he act of enslaving another person" and related acts a "criminal offence under the laws of the States Parties to this Convention" (article 6).[8]  These conventions also do not create a norm imposing liability on an individual for enslaving another individual.

The Convention Concerning Forced or Compulsory Labour (ILO No. 29), June 28, 1930, 39 U.N.T.S. 55, commits the signing members of the International Labour Organization "to suppress and not to make use of any form of forced or compulsory labour" for specified purposes (article 1) and "to take effective measures to secure the immediate and complete abolition of forced or compulsory labour as specified in Article 1 of this Convention" (article 2).[9]  The Convention on the Elimination of All Forms of Discrimination Against Women, Dec. 18, 1979, art. 6, 19 I.L.M. 33, 37, 1249 U.N.T.S. 13, commits the parties to "take all appropriate measures, including legislation, to suppress all forms of traffic in women and exploitation of prostitution of

---

[7] The United States ratified this Convention on March 23, 1929.  46 Stat. 2183.

[8] The Supplementary Convention went into force for the United States on December 6, 1967. *See* http://www.state.gov/documents/organization/143863.pdf.

[9] The United States was not a member of the ILO at the time this Convention was adopted, and it has not ratified this Convention.  *See* Hugo Fischer, *Suppression of Slavery in International Law*, 3 Int'l L.Q. 503, 512 (1950).  Moreover, the Legal Advisor to the ILO and many members have noted that the Declaration "'is recognized by everyone as not being a binding instrument.'"  *See John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1015 (S.D. Ind. 2007).

women" (article 6).[10]  And the Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, G.A. Res. 25, annex II, U.N. GAOR, 55th Sess., Supp. No. 49, at 60, U.N. Doc. A/45/49 (2001), commits the ratifying states to enact *domestic* legislation to combat and punish trafficking in persons and protect the victims. [11]  None of these agreements states a specific, universal, and obligatory norm barring one individual from enslaving another.

Furthermore, the Supreme Court in *Sosa* ruled that such international agreements, "despite their moral authority," have "little utility under the standard set out in this opinion" for determining whether an international norm is sufficiently definite to support a cause of action under the ATS.  *Sosa*, 542 U.S. at 734.  Thus, the Supreme Court found that the Universal Declaration of Human Rights, which Alvarez relied upon because it prohibits arbitrary arrest just as Swarna relies upon it because it also prohibits slavery, "does not of its own force impose obligations as a matter of international law." *Id*.  Similarly, the Supreme Court observed that the International Covenant on Civil and Political Rights, upon which Alvarez and Swarna rely, was ratified by the United States "on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts." *Id*. at 734 n. 22, 735.  Accordingly, just as "Alvarez cannot say that the Declaration and Covenant themselves establish the relevant and applicable rules of international law," *id*. at 735, so, too, Swarna cannot say that

---

[10] The United States has signed but not ratified this Convention.  *See* http://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-8&chapter=4&lang=en.

[11] The United States ratified this Protocol on November 3, 2005.  *See* http://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XVIII-12-a&chapter=18&lang=en.

those documents and the related conventions and agreements she cites themselves establish the relevant and applicable rules of international law.

2.    The Restatement.  It is also significant that the Restatement (Third) of Foreign Relations Law of the United States (1986) does not support a rule that liability may be imposed on an individual for violating the law of nations by enslaving another individual.  The Supreme Court noted in *Sosa* that Alvarez's "failure to marshal support for his proposed rule is underscored by the Restatement (Third) of Foreign Relations Law of the United States (1986), which says in its discussion of customary international human rights law that a 'state violates international law if, as a matter of state policy, it practices, encourages, or condones … prolonged arbitrary detention.'"  *Sosa*, 542 U.S. at 737.  Because Alvarez did not allege such a violation, the Supreme Court concluded that he did not invoke "a principle against arbitrary detention that the civilized world accepts as binding customary international law."  *Id*.

The very same section of the Restatement (§ 702) says that a "state violates international law if, as a matter of state policy, it practices, encourages, or condones … slavery or slave trade." The comment (*id*. at b) to this formulation says that the "violations of human rights cited in this section … are violations of customary international law only if practiced, encouraged, or condoned by the government of a state as official policy."  This Court and the Second Circuit already have held that the Kuwaiti Diplomats were not acting on behalf of the State of Kuwait.

Section 404 of the Restatement says that a "state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism, even where none of the bases of jurisdiction indicated in § 402 is present."  But the comment (*a*) to this section explains that it "recognize[s] that international law

permits any state to apply its laws to punish certain offenses although the state has no links of territory with the offense, or of nationality with the offender (or even the victim)." This section's recognition that a state may adopt its own laws to punish the "slave trade" does not establish that one individual who enslaves another is liable for violating the law of nations. Therefore, Swarna's putative ATS claim against the Kuwaiti Diplomats for enslaving her does not rest on a principal of liability "that the civilized world accepts as binding international law."

3.    Practical consequences.  Moreover, as in *Sosa*, the practical consequences of recognizing Swarna's putative claim under the ATS "would be breathtaking." *Sosa*, 542 U.S. at 736.  In *Sosa*, the Supreme Court was concerned because Alvarez's proposed rule "would support a cause of action in federal court for any arrest, anywhere in the world, unauthorized by the law of the jurisdiction in which it took place, and would create a cause of action for any seizure of an alien in violation of the Fourth Amendment," supplanting existing remedies. *Id*. Here, too, Swarna's proposed rule would support a cause of action in federal court by any alien employee anywhere in the world for underpaid labor and abusive employment conditions that she or he alleges is tantamount to slavery.  There is no authority "that a rule so broad has the status of a binding customary norm today (footnote omitted)."  542 U.S. at 736.

4.    U.S. domestic law.  For purposes of ATS analysis, it is of no consequence that U.S. *domestic* law punishes an individual who holds another individual to involuntary servitude or forced labor or traffics in slavery, involuntary servitude, or forced labor (18 U.S.C. §§ 1584, 1589-1590, 1593A).  In *Kiobel*, the Second Circuit firmly rejected the notion that a norm of liability that exists under domestic law creates a norm of liability under customary international law.  The Second Circuit said:  "By conferring subject matter jurisdiction over a limited number of offenses defined by *international law*, the ATS requires federal courts to look beyond rules of

domestic law – however well-established they may be – to examine the specific and universally accepted rules that the nations of the world treat as binding *in their dealings with one another*. . . Moreover, the fact that a legal norm is found in most or even all 'civilized nations' does not make that norm a part of customary international law (emphasis in the original; footnotes omitted).  621 F.3d at 117-118.

     5.   <u>Case law precedent</u>.  The Kuwaiti Diplomats have found no case holding that, under the law of nations, liability may be imposed on one individual for enslaving another.  At most, several cases have suggested that ATS jurisdiction exists over claims of slave *trading*, which Swarna does not allege, or held that ATS jurisdiction exists over claims of forced labor.

     Thus, in his concurring opinion in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 795 (D.C. Cir. 1984), Judge Edwards observed in *dicta* that ATS jurisdiction might exist over a claim of "slave trading."  He noted that, along with piracy, slave trading was one of a "handful" of acts as to which 19th century law recognized "individual responsibility."  *Id*. at 794.  But although the one case Judge Edwards cited (*id*.) to support this observation, *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 161 (1820), does say that "piracy" is "an offence against the law of nations," the other sources he cites say only that international law authorized individual nations to enact *their own laws* to punish such offenses as slave trading.  Korowicz, in *The Problem of the International Personality of Individuals*, 50 AM. J. INT'L L. 533, 545 (1956), wrote that "international law merely authorizes states to apply sanctions of their municipal law, whatever the nationality of the offender," to those who commit certain criminal activities, including "slave trade," and allow "the state which captures the offenders to proceed according to its own internal law."  H. Lauterpacht wrote in *The Subjects of the Law of Nations* (pt. 1), 63 L. Q. REV. 438, 441-442 (1947), that, although "the law of war constitutes a decisive refutation of the view that

States only, and not individuals, are subject of international duties," rules against other offenses "amount ( ) in effect to no more than a reciprocal concession of jurisdictional rights over an alien for a crime committed abroad." Thus, the sources upon which Judge Edwards relied for his comment about individual responsibility for "slave trading" establish only that international law grants states universal jurisdiction to punish slave traders under their domestic laws. They certainly do not establish that one individual is liable under the law of nations for enslaving another individual.

In *Kadic*, where it held that the ATS confers jurisdiction over a claim that a non-state individual committed acts of genocide, the Second Circuit's premise was that "certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals." 70 F.3d at 239. The Second Circuit said that an early example of this "is the prohibition against piracy." *Id*. "Later examples are prohibitions against the slave trade and certain war crimes." *Id*.

Here, too, the three sources the Second Circuit cited to support the statement that slave trading violates the law of nations refer to the universal jurisdiction of states to punish slave traders under their *domestic* law. 70 F.3d at 239-240. The first source, M. Cherif Bassiouni, *Crimes Against Humanity in International Criminal Law* 193, 196 (1992), states that the European powers made slavery an international crime "by obligating each state to make it a crime and by creating universal jurisdiction over the crime (footnote omitted)." The second source, Jordan Paust, *The Other Side of Right: Private Duties Under Human Rights Law*, 5 HARV. HUM. RTS. J. 51 (1992), asserts (at 56-57) that "[t]here is simply no question whether the 1926 Slavery Convention, the Supplementary Convention on the Abolition of Slavery," and other documents "implicate human rights and attempt to regulate private (if not also public) actor

16

behavior" (footnotes omitted).  But as noted earlier, the Slavery Convention and the Supplemental Convention merely commit the signing states to adopt their *own* laws to punish and suppress slavery and the slave trade.  The third source, section 404 of the Restatement (Third) of the Foreign Relations Law of the United States, identifies "slave trade" as one of the offenses of "universal concern" that is "capable of being committed by non-state actors" and for which "a state has jurisdiction to punish without regard to territoriality or the nationality of the offenders" by the application of its own criminal or civil laws, as noted above.  70 F.3d at 240. None of these says it is a violation of the law of nations for one individual to enslave another.

In *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424 (D.N.J. 1999), the district court dismissed a complaint by plaintiff against Ford Motor Company and its German subsidiary, Ford Werke A.G., alleging that Ford Werke coerced her and thousands of other persons to perform forced labor under inhuman conditions during World War II without compensation.  Although it dismissed the complaint for a variety of reasons, the court held that it had jurisdiction under the ATS over plaintiff's claim that defendants violated the law of nations.  67 F. Supp. 2d at 445-446.  Relying on cases holding that enslavement and deportation of civil populations during wartime are crimes against humanity, as well as upon Judge Edwards' concurring opinion in *Tel-Oren* and *Kadic*, the court said it was "inclined" to find that "private entities using slave labor are liable under the law of nations."  *Id*. at 445.  However, the court concluded that plaintiff "pled sufficient facts to allege that Defendants acted as agents of the state," and it sustained ATS jurisdiction on that ground.  *Id*.[12]

---

[12] In *United States v. Matta-Ballesteros*, 71 F.3d 754, 764 n. 5 (9th Cir. 1995), the Ninth Circuit said in *dicta* that "kidnapping does not rise to the level of other *jus cogens* norms, such as torture, murder, genocide, and slavery."  *Id*.  However, the Ninth Circuit did not say that an individual who enslaves another individual violates a *jus cogens* norm.

There is a line of cases holding that forced labor violates norms of international law and that courts have jurisdiction under the ATS over claims alleging forced labor. *E.g., Doe I v. Nestlé, S.A.*, No. CV 05-5133, 2010 WL 3969615, at *10-11 (C.D. Cal. Sept. 8, 2010) (collecting the cases); *Licea v. Curaçao Drydock Co., Inc.*, 584 F. Supp. 2d 1355, 1358 (S.D. Fla. 2008); *Doe v. Unocal Corp.*, 963 F. Supp. 880, 892 (C.D. Cal. 1997).   Some of these cases were decided before *Sosa* and without knowledge of *Sosa's* stringent jurisdictional requirements or in reliance on international agreements that *Sosa* rejected as insufficient to establish specific and binding norms of international law, and others dealt with slave labor in the context of wartime or systematic attacks on civilian populations.   But even if all the decisions upholding ATS jurisdiction over claims of forced labor were decided correctly, they do not help Swarna because none of them identifies a specific, universal, and obligatory international norm making one individual liable for enslaving another, and none of them holds that ATS jurisdiction exists over a claim that one individual enslaved another.

It would not be anomalous for international law to impose liability on an individual for engaging in the slave trade but not for enslaving another individual.   The Second Circuit pointed out in *Flores* that many offenses are condemned worldwide without being violations of a specific norm of customary international law.   Thus, "'[t]he mere fact that every nation's municipal [*i.e.*, domestic] law may prohibit theft does not incorporate 'the Eighth Commandment,' 'Thou Shalt not steal' … into the law of nations.'"   *Flores*, 414 F.3d at 249 (quoting *IIT v. Vencap, Ltd.*, 519

---

   In *Presbyterian Church of Sudan v. Talisman Energy*, 582 F.3d 244, 257 (2d Cir. 2009), the Second Circuit accepted as "generally serviceable" this Court's definition of "crimes against humanity" as including "enslavement," and it said the parties did not contest that such crimes "are cognizable under the ATS."   However, under this Court's definition, the offenses enumerated were "crimes against humanity" only if they were "'committed as part of a widespread [or] systematic attack directed against a civilian population'" (footnote omitted).   *Id.* Swarna makes no such allegation against the Kuwaiti Diplomats.

F.2d 1015).  Similarly, "murder of one private party by another, universally proscribed by the domestic law of all countries (subject to varying definitions), is not actionable under the AT[S] as a violation of customary international law because the 'nations of the world' have not demonstrated that this wrong is 'of mutual, and not merely several, concern.' . . .  By contrast, other offenses that may be purely intra-national in their execution, such as official torture, extrajudicial killings, and genocide, do violate customary international law because the 'nations of the world' have demonstrated that such wrongs are of 'mutual … concern,' and capable of impairing international peace and security."  *Id.*

In sum, there is no case law precedent to hold the Kuwaiti Diplomats liable for violating the law of nations by allegedly enslaving Swarna.  That alone is fatal to Swarna's ATS claim.

6.    <u>Misconduct in the U.S.</u>  Finally, *Velez v. Sanchez*, Case No. 04-CV-4797, 2010 WL 4852321, at *6 (E.D.N.Y. Nov. 30, 2010) holds as a matter of first impression that the ATS does not confer jurisdiction over claims of misconduct occurring entirely in the United States, such as Swarna's.  As the court noted, "the expanded role for the ATS has always been understood as covering torts committed abroad," and it did not find "a single post-[*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980)] case addressing claims arising out of domestic conduct."  *Id*.  For this additional reason Swarna's ATS claim should be dismissed.

## II.    **Swarna's ATS Claim Is Implicitly Pre-Empted By The TVPRA**

In *Sosa*, the Supreme Court concluded that the ATS was a purely jurisdictional statute that created no new causes of action but was "enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time."  542 U.S. at 724.  However, the Supreme Court noted that "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases."  *Id*. at 727.  Thus, although Congress had not "shut the door" to the

judicial creation of new private rights of action under the ATS, the Supreme Court pointed out that "Congress may do that at any time (explicitly or implicitly by treaties or statutes that occupy the field), just as it may modify or cancel any judicial decision so far as it rests on recognizing an international norm as such (footnote omitted)."  *Id*. at 731.

In *Velez* at \*6-7, the district court held that the TVPRA pre-empted plaintiff's ATS claims.  Plaintiff in *Velez*, an alien, brought ATS claims that she was trafficked from Ecuador and forced to work in defendant's home without pay and subject to physical and verbal abuse. *Velez* at \*1-5.  The TVPRA, at 18 U.S.C. § 1595(a), provides:  "An individual who is a victim of a violation may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees."  The court concluded that plaintiff's ATS claims were pre-empted by the TVPRA because "Congress has, as the Supreme Court contemplated it might in *Sosa*, limited ATS jurisdiction by enacting a statute that occupies the field of civil remedies for human trafficking and forced labor (footnote omitted)."  *Velez* at \*7.

This Court should follow *Velez*.  Congress enacted the TVPRA's civil remedy to enhance the protections provided by the Trafficking Victims Protection Act of 2000, 22 U.S.C. § 7101 *et seq*. ("TVPA").  H.R. REP. NO. 108-264, pt. 1, at 8, 18; pt. 2, at 6, 11 (2003).  The TVPA was enacted to combat international trafficking for purposes of forced labor, slavery, and involuntary servitude."  22 U.S.C. §§ 7101(a); 7101(b)(3), (6), (13).  Congress found that "[e]xisting legislation" was "inadequate to deter trafficking and bring traffickers to justice" and that "[n]o comprehensive law exist[ed]" to accomplish this goal.  *Id*. at § 7101(b)(14).  The TVPA is that

"comprehensive law."  The civil remedy provided by the TVPRA is available to any "individual"

who is a victim of a "violation of this chapter" (chapter 77 of title 18 of the United States Code),

including forced labor, trafficking with respect to peonage, slavery, involuntary servitude, or

forced labor, and benefiting financially from such conduct (18 U.S.C. §§ 1589, 1590, 1593A).

Therefore, as the court in *Velez* correctly held, the civil remedy provided by the TVPRA

"occup[ies] the field" (*Sosa*, 542 U.S. at 731) of private civil remedies for trafficking, slavery

and slavery-like practices, and forced labor, and it implicitly pre-empts a common law cause of

action for such actions under the ATS, such as Swarna's (*see* Compl. ¶¶ 112-121).[13]

### III.   Swarna Has Not Adequately Pled An ATS Or TVPRA Claim

The Court should dismiss Swarna's putative federal claim even if the Court had

jurisdiction under the ATS over a claim that one individual enslaved another, or even if Swarna

had invoked the TVPRA.  Swarna's allegations may well make out state claims of wage and

labor law violations, fraud and fraudulent inducement, unjust enrichment, and breach of contract,

which she has asserted in her complaint, and they also may well make out state claims of assault,

battery, sexual battery, and intentional infliction of emotional distress, which she has not asserted

in her complaint.  But Swarna has not pled slavery, forced labor, or trafficking sufficiently to

allow this Court to exercise ATS jurisdiction or to state a claim under the TVPRA.

Whatever semantic differences there may be among the terms slavery, involuntary

servitude, and forced labor, the essence of these is unpaid work that is coerced by force or the

threat of force such that the victim reasonably believes she or he has no choice but to continue to

---

[13] In an earlier decision, *Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 687-688 (S.D. Tex. 2009), the district court held that the TVPRA does not pre-empt ATS claims of forced labor. However, the court reached that conclusion solely because, in an inter-circuit dispute, it favored opinions suggesting or holding that a *different* statute, the Torture Victim Protections Act, did not pre-empt ATS claims of torture.  *Id.*  The *Adhikari* court did not undertake any analysis of the text or legislative history of the TVPRA, and this Court should not follow *Adhikari*.

serve.  *See* 15 U.S.C. § 1589; *United States v. Kozminski*, 487 U.S. 931, 942-953 (1988);

*Ex parte Wilson*, 114 U.S. 417, 429 (1885); *United States v. Alzanki*, 54 F.3d 994, 1000-1002

(1st Cir. 1995); *United States v. Shackney*, 333 F.2d 475, 486-487 (2d Cir. 1964);  *Iwanowa*, 67

F. Supp. 2d at 440; *United States v. Ingalls*, 73 F. Supp. 76, 78-79 (S.D. Cal. 1947).  Trafficking

in this context is the business of transporting persons for money to place them in slavery,

involuntary servitude, and forced labor.  *See* 15 U.S.C. § 1590; *United States v. Habegger*,

370 F.3d 441, 444-445 (4th Cir. 2004); *United States v. Johnson*, 221 F.3d 83, 98 (2d Cir. 2000).

Swarna has failed adequately to plead slavery, forced labor, or trafficking as defined.

First, Swarna alleges that she voluntarily accepted the Kuwaiti Diplomats' offer of employment

and voluntarily traveled to New York to work for them.  Compl. ¶¶ 17-18, 23.  Swarna does not

allege that the Kuwaiti Diplomats used force or legal coercion to compel her to accept their offer

or to come to New York."[14]  Second, Swarna alleges the Kuwaiti Diplomats paid her every

month.  Compl. ¶¶ 30-33.[15]  Third, Swarna alleges that she traveled to India twice during her

employment, the second time for a month, and she does not allege that the Kuwaiti Diplomats

used force or legal coercion to compel her to return from India.  *Id*. ¶¶ 35, 69, 71.  Based solely

on these allegations in her complaint, Swarna has failed to state a cognizable claim for

trafficking or forced labor upon which relief may be granted under the TVPRA, and her federal

claim should be dismissed under Fed. R. Civ. P. 12(b)(6).

---

[14] To be sure, Swarna alleges that she accepted the Kuwaiti Diplomats' offer and agreed to come
to New York to work for them on the strength of the terms they offered her, and she alleges they
broke their word and did not fulfill those terms.  Compl. ¶¶ 28, 35.  Although that allegation may
well support Swarna's *state* claims of fraudulent inducement, unjust enrichment, and breach of
contract, it does not, by itself, support her ATS claim of slavery, forced labor, and trafficking.

[15] Here, too, Swarna's allegations of low wages and no overtime pay may well support Swarna's
state claims of wage and hour violations, but they do not support her ATS claim.

Fourth, Swarna swore in open Court that the dilemma she faced was either to continue to work for the Kuwaiti Diplomats and endure their alleged abuse or to return to India and deprive her family of the money she was earning.  Swarna continued to work for the Kuwaiti Diplomats "because if I had left this job then I would have no means to help my family, my five children and my not-very-well husband"; "I knew that if I was sent back, then I will not be able to have my children and my husband survive without this kind of a job," so "I just endured everything."[16]  Swarna did *not* testify that the Kuwaiti Diplomats forced her to continue to work. Therefore, Swarna's allegations are insufficient to support her ATS claim of slavery, and it should be dismissed under Fed. R. Civ. P. 12(b)(1).

In a case that is directly on point, *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988 (S.D. Ind. 2007), the district court held that plaintiffs, who alleged low wages and abusive conditions at the world's largest rubber plantation, did not adequately plead "forced labor" in violation of the law of nations under the ATS.  The court cited a report by the International Labour Organization which emphasized the importance of "distinguishing forced labour situations from extremely exploitive, but nonetheless 'freely chosen,' work.'"  *Id*. at 1015. "'Forced labor cannot be equated simply with low wages or poor working conditions.  Nor does it cover situations of pure economic necessity, as when a worker feels unable to leave a job because of the real or perceived absence of employment alternatives.'"  *Id*. at 1013.  *See Shackney*, 333 F.2d at 486 (involuntary servitude does not include the situation where a worker faces "exceedingly bad" consequences if he continues to work rather than leave his employer).

---

[16] Tr. 16, 25.  The Court may consider this testimony because the Kuwaiti Diplomats are moving to dismiss for lack of subject matter jurisdiction. *United States ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.,* Nos. 06 Civ. 7115, 06 Civ. 11440, 2010 WL 2670829, at *3 (S.D.N.Y. July 2, 2010); *Alfadda v. Fenn*, 966 F. Supp. 1317, 1335 (S.D.N.Y. 1997).

Swarna may have worked for the Kuwaiti Diplomats out of "pure economic necessity" and the consequences may have been "exceedingly bad." But she was not a slave.

The court in *John Roe I* observed that exercising ATS jurisdiction over plaintiffs' claims there would have been "contrary to all the cautionary warnings the Supreme Court posted in *Sosa*," and that, "[b]eyond situations presenting clear violations of specific, universal, and obligatory international law norms," such claims should not be left "to the instincts of judges who would love to issue a writ to make the world a better place for some of the poorest and least fortunate members of the human family." *Id*. at 1019. The same is true here.

## IV.   The Court Should Dismiss Swarna's State Claims

If the Court dismisses Swarna's single federal claim, it should dismiss Swarna's state claims as well. As the Second Circuit held in *Brzak v. United Nations*, 597 F.3d 107, 113-114 (2d Cir. 2010), where, as here, a plaintiff's federal claim is dismissed before trial, "there [is] no colorable basis for the district court to exercise supplemental jurisdiction over [plaintiff's] state law claim[s]," and "'the state claims should be dismissed as well.'"

In any event, Swarna's state claims should be dismissed because they are time-barred. First, Swarna filed her initial action against the Kuwaiti Diplomats on May 15, 2002, asserting essentially the same state claims she asserts in the present action. The Court dismissed that action without prejudice on January 26, 2005. Under New York CPLR § 205(a), Swarna was required to "commence a new action upon the same transaction or occurrence … within six months after the termination." Swarna did not commence the present action until June 23, 2006. Therefore, by operation of CPLR § 205(a), Swarna's state claims are barred.

Second, the applicable six-year limitations period for Swarna's state claims expired before she filed the present action. *See Swarna v. Al-Awadi*, 607 F. Supp. 2d 509, 528 (S.D.N.Y. 2009). Although the Court said there were "appropriate grounds" for tolling the limitations

24

period under the doctrine of "equitable estoppel" (*id.* at 529), with all due respect the Court should not apply that doctrine in this case.

Under New York law "equitable estoppel will apply 'where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action'" and plaintiff "demonstrate[s] reasonable reliance on the defendant's misrepresentations." *Zumpano v. Quinn*, 6 N.Y.3d 666, 674 (2006) (internal citation omitted).  Furthermore, plaintiff must establish "that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." *Simcuski v. Saeli*, 44 N.Y.2d 442, 450 (1978).

Swarna has not alleged that she was unable timely to file the present action because of the Kuwaiti Diplomats' "fraud, misrepresentations or deception."  Even if there were other equitable grounds for tolling the limitations period until June 25, 2000, Swarna was able to file her first action against the Kuwaiti Diplomats on May 15, 2002, which was dismissed on January 26, 2005.  Yet, Swarna did not file the present action until June 23, 2006, a year and a half later.

Accordingly, Swarna did not bring the present action "within a reasonable time" after any reasons for estoppel ceased to exist.  Therefore, Swarna's state claims are time-barred.

## CONCLUSION

The Kuwaiti Diplomats respectfully request that the Court grant their motion to dismiss.

Respectfully submitted,

/s/  Neil H. Koslowe
Neil H. Koslowe (NK 2808)
Thomas B. Wilner*
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 508-8000

*Counsel for Defendants*
Dated: February 22, 2011          * Admitted *Pro Hac Vice*